J. Robert Forshey
State Bar No. 07264200
Matthew G. Maben
State Bar No. 24037008
FORSHEY & PROSTOK, L.L.P.
777 Main Street, Suite 1290
Fort Worth, Texas 76102
(817) 877-8855 ● (817) 877-4151 FAX
Email: bforshey@forsheyprostok.com
Email: mmaben@forsheyprostok.com

ATTORNEYS FOR INTEGRA FUNDING SOLUTIONS, LLC

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 16-42146-rfn7 |
| | § | |
| SUPERIOR LUBRICANTS TRANSPORT INC. | § | Chapter 7 |
| | § | |
| | § | |
| Debtor. | § | |
| | § | |

**INTEGRA FUNDING SOLUTIONS, LLC'S MOTION FOR
DISTRIBUTION OF RENTALS COLLECTED BY TRUSTEE**

**NO HEARING WILL BE HELD ON THIS MOTION UNLESS A WRITTEN RESPONSE IS FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT AT 501 W. 10TH STREET, ROOM 147, FORT WORTH, TEXAS 76102 BEFORE CLOSE OF BUSINESS ON SEPTEMBER 12, 2016, WHICH IS AT LEAST 24 DAYS FROM THE DATE OF SERVICE HEREOF.**

**ANY RESPONSE SHALL BE IN WRITING AND FILED WITH THE CLERK, AND A COPY SHALL BE SERVED UPON THE UNDERSIGNED COUNSEL FOR MOVANT PRIOR TO THE DATE AND TIME SET FORTH HEREIN. IF A RESPONSE IS FILED A HEARING MAY BE HELD WITH NOTICE ONLY TO THE OBJECTING PARTY.**

**IF NO HEARING ON THIS MOTION IS TIMELY REQUESTED, THE RELIEF REQUESTED SHALL BE DEEMED TO BE UNOPPOSED, AND THE COURT MAY ENTER AN ORDER GRANTING THE RELIEF SOUGHT.**

**IF A TIMELY OBJECTION IS FILED, THE HEARING ON THE MOTION SHALL BE CONDUCTED BEFORE THE COURT ON SEPTEMBER 13, 2016 at 10:00 A.M. IN THE UNITED STATES COURTHOUSE, 501 WEST TENTH STREET, ROOM 204, FORT WORTH, TEXAS 76102 BEFORE THE HONORABLE RUSSELL F. NELMS.**

TO THE HONORABLE RUSSELL F. NELMS, UNITED STATES BANKRUPTCY JUDGE:

COMES NOW Integra Funding Solutions, LLC ("Movant"), a secured creditor and party in interest in the above-referenced case, and hereby files this *Motion for Distribution of Rentals Collected by Trustee* ("Motion"). In support of the Motion, the Movant would respectfully show the Court as follows:

## JURISDICTION

1.      The Court has jurisdiction pursuant to 28 U.S.C. section 1334.  This bankruptcy case and all related proceedings have been referred to this Court pursuant to 28 U.S.C. section 157.  The Motion constitutes a "core" proceeding pursuant to section 157(b)(2)(A), (M), and (0).

## BACKGROUND FACTS

A.      **Movant's Applicable Loan and Collateral Documents**

2.      On June 2, 2016 (the "Petition Date"), Superior Lubricants Transport Inc. (the "Debtor") filed a voluntary petition for relief under chapter 7 of Title 11 of the United States Code commencing this bankruptcy case.  Marilyn Garner (the "Trustee") is the duly appointed Chapter 7 Trustee for the Debtor's estate.

3.      The Movant holds secured claims against the Debtor.  The Debtor is indebted to the Movant pursuant to that certain Receivables Purchase Agreement (the "Factoring Agreement") between the Movant and the Debtor dated April 2, 2015.  A true and correct copy of the Factoring Agreement is attached hereto as **Exhibit "A"**.  Pursuant to the Factoring Agreement, the Debtor is indebted to Integra as set forth below.

4.      The Debtor defaulted on its obligations to Movant under the Factoring Agreement prior to the petition date.  Based on these defaults, the Movant made demand on the Debtor for payment of $118,918.21 by letter dated March 17, 2016.  The Debtor failed to make any of the past due payments to the Movant. As of the filing of this Motion, the debt owed to the Movant pursuant to the terms of the Factoring Agreement is approximately $121,700 exclusive of Movant's attorneys' fees and collection costs.

5.      In addition to being indebted to the Movant pursuant to the Factoring Agreement, the Debtor is also indebted to the Movant based on a separate prepetition extension of credit made by the Movant to the Debtor.  This loan is evidenced by a Promissory Note ("Note") executed by the Debtor in favor of the Movant dated May 15, 2015 in the original principal amount of $220,000, a true and correct copy of which is attached hereto as **Exhibit "B"**.

6.      To secure repayment of the Note as well as all other indebtedness of the Debtor to the Movant, the Debtor granted the Movant a security interest in and lien on that certain real property (the "Real Estate") located at 3312 Dooling Street, Fort Worth, Texas 76111 and described as:

> Lots 2-R and 3-R, Block 5, Diamond Heights Industrial Addition, an Addition to the City of Fort Worth, Tarrant County, Texas, according to the Plat recorded in Volume 388-42, page 40, Plat Records, Tarrant County, Texas, Lot 5-R, Block 5, Diamond Heights Industrial Addition, an Addition to the City of Fort Worth, Tarrant County, Texas, according to the plat recorded in Volume 388-116, page 40, Plat Records, Tarrant County, Texas and a portion of Lot 7, Block 5, Diamond Heights Industrial Addition, an Addition to the City of Fort Worth, Tarrant County, Texas, according to the plat recorded in Volume 388-Y, page 1, Plat Records, Tarrant County, Texas.

The Movant's lien against the Real Estate is perfected, as evidenced by that certain Deed of Trust Security Agreement – Financing Statement (the "Deed of Trust") recorded on June 15, 2015 in the Deed Records of Tarrant County, Texas as Instrument No. D215126223.  A true and correct copy of the Deed of Trust is attached hereto as **Exhibit "C"**.

7.      The Note is further secured by an Assignment of Leases and Rents ("Assignment") contained in paragraph 13 in the Deed of Trust.  The Assignment assigns to Movant all Leases and Rents (as such terms are respectively defined in the Deed of Trust) relating to the Real Estate.  The Assignment grants to the Debtor a license to collect and use the rentals generated by the Real Estate until the occurrence of a Default, at which time the licenses automatically terminate.

8.      Prior to the Petition Date, the Debtor became delinquent in its obligations to the Movant under the Note.  By letter dated March 4, 2016, the Debtor was given notice of its defaults under the Note at that time and demand was made for payment of $21,777.94 in past due payments.  The Debtor failed to cure its defaults and was then given notice by letter dated April 4, 2016 that the Movant had accelerated the Note.  As of the filing of this Motion, the debt owed to the Movant pursuant to the Note is approximately $178,400 exclusive of Movant's legal fees and collection costs.

9.      Interest and other charges (including Movant's legal fees and collection costs) continue to accrue postpetition on the Debtor's indebtedness pursuant to the terms of the documents attached hereto to the extent allowed by 11 U.S.C. section 506.

**B.      The Wingfoot Lease**

10.      The Debtor, as lessor, and Wingfoot Commercial Tire Systems, LLC ("Wingfoot"), an Ohio limited liability company, as tenant, have entered into a Commercial Lease Agreement ("Lease") for a term of years commencing on October 1, 2015.  The Lease covers the Real Estate subject to the Movant's Deed of Trust.  A copy of the Lease, as received from Wingfoot's counsel, is attached as **Exhibit "D"**.  The Lease provides for monthly Base Rent payments of $7,500 per month.  The Lease also provides that Wingfoot will pay to Debtor, as additional Rent, estimated monthly real estate taxes of $1,247 and estimated monthly insurance premiums of $375 per month.  The Lease, as well as these rental payments, are all subject to the Assignment.

11.      As explained below, the Debtor no longer owns the Real Estate so that neither the Lease nor the rentals pursuant to the Lease constitute property of the bankruptcy estate.  Despite this, out of an abundance of caution, Movant has filed a *Notice of Perfection of Liens Pursuant to 11 U.S.C. § 546(b)* [Docket no. 33] ("Notice of Perfection") in the event that the bankruptcy estate has any interest in either the Lease or rentals.  A copy of the Notice of Perfection is attached as **Exhibit "E"**.

**C.**     <u>The Debtor's Conveyance of the Real Estate</u>

12.     The Debtor does not presently own any interest in the Real Estate and does not purport to.[1] According to the *Debtor's Amended Statement of Financial Affairs* [*see* Docket No. 8], the Debtor transferred the Real Estate in July, 2015 to Jerri Gooden, the Debtor's sole shareholder.  However, in fact, the Real Estate was conveyed by the Debtor to JGooden, LLC ("<u>JGooden</u>") pursuant to a General Warranty Deed dated as of October 20, 2015, and recorded October 27, 2015, in the Deed Records of Tarrant County, Texas, as instrument D215243402.

13.     JGooden is believed to be owned or controlled by Jerri Gooden, the mother of the two (2) officers of the Debtor, Bryan Austin and William Austin, and is reflected in Debtor's Amended Statement of Financial Affairs [Docket no. 16] as owning 100% of the Debtor.  According to the Amended SOFA, the Real Estate was conveyed to Jerri Gooden in satisfaction of alleged debts owed to her by Debtor.  The Trustee's counsel has stated that she is investigating this transaction to determine whether the conveyance to JGooden constitutes an avoidable transfer.  However, to date, no lawsuit has been filed to avoid the transfer of the Real Estate to JGooden.

**D.**     <u>The Trustee's Motion for Authority to Receive and Hold Lease Payments</u>

14.     In discussions with counsel for Wingfoot, such counsel has indicated that Wingfoot wished to continue to make the rental payments as required by the Lease.  However, Wingfoot was concerned that, if it made payments other than pursuant to some order of the Bankruptcy Court, it might not receive credit for the Lease payments.  However, Wingfoot has indicated that it is willing to make the Lease payments to the Trustee pursuant to an order of this Court, with the Trustee being commissioned to receive and hold the rentals payable pursuant to the Lease, subject to Movant's lien claim, until further order of this Court.

---

[1] The Debtor does not list an ownership interest in the Real Estate, or any other real property, in its Bankruptcy Schedules [see Docket No. 7].

15.     To facilitate this, the Trustee has filed a *Motion for Authority to Receive and Hold Lease Payments on behalf of Integra Funding Solutions, LLC* [Docket no. 35] ("Rental Motion"). The Motion was granted pursuant to an *Agreed Order Granting Trustee's Motion for Authority to Receive and Hold Lease Payments Subject to Disputed Claims* [Docket no. 37] ("Rental Order"), a copy of which is attached hereto as **Exhibit "F"**. Pursuant to the Rental Order, Wingfoot is authorized to pay the rents due under the Lease to the Trustee, although subject to Movant's lien claim, to be held by the Trustee until further order of this Court.

## RELIEF REQUESTED BY MOVANT

16.     Movant has a perfected lien against both the Lease and all rentals paid pursuant to the Lease. Pursuant to the Rental Order, these sums are being paid to, and held by, the Trustee pending further order of this Court. However, both the Lease and any rentals pursuant to the Lease remain subject to Movant's lien and rights pursuant to the Assignment which was properly perfected against the Debtor on a pre-petition basis. When the real estate was conveyed by Debtor to JGooden, the conveyance was made subject to the existing and previously recorded Deed of Trust in favor of Movant. While it does not appear that either the Real Estate or the rentals constitute an asset of the bankruptcy estate, Movant has filed the Notice of Perfection out of an abundance of caution to appropriately perfect its lien and rights pursuant to the Assignment as against the bankruptcy estate.

17.     Movant moves the Court to enter its order authorizing and directing the Trustee to pay to Movant, as it is received, all of the $7,500 per month in Base Rent, with the balance of the additional Rent, which constitutes estimated monthly real estate taxes and monthly insurance costs, to continue to be held by the Trustee for the purpose of applying these funds toward the payment of real estate taxes and insurance relating to the Real Estate. The Base Rent paid to Movant will be then applied first against the principal balance of the Note.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, the Movant requests that the Court enter an

Order granting the relief requested herein and granting the Movant such other and further relief

as the Court may deem just and proper.

DATED: August 19, 2016.                  Respectfully Submitted,

                                         By: /s/ J. Robert Forshey
                                         J. Robert Forshey
                                         State Bar No. 07264200
                                         Matthew G. Maben
                                         State Bar No. 24037008
                                         FORSHEY & PROSTOK, L.L.P.
                                         777 Main Street, Suite 1290
                                         Fort Worth, TX 76102
                                         (817) 877-8855 (817) 877-4151 fax
                                         bforshey@forsheyprostok.com
                                         mmaben@forsheyprostok.com

                                         ATTORNEYS FOR INTEGRA FUNDING SOLUTIONS, LLC

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document was
served upon the parties on the attached service list via United States Mail, first class postage
prepaid, or via ECF Electronic Notice, where available, on the 19th day of August, 2016.

                                         /s/ J. Robert Forshey
                                         J. Robert Forshey

L:\BFORSHEY\Integra (CrR - Superior) #5824\Pleadings\Motion for Distribution of Rentals 8.19.16.docx

# **<u>SERVICE LIST</u>**

**Service List**
*Superior Lubricants*
**16-42146-rfn7**
**Integra#5824**

~~Superior Lubricants Transport Inc.~~
~~3311 Crabtree~~
~~Fort Worth, TX 76111~~

Superior Lubricants Transport Inc.
c/o Alice Bower
Law Office of Alice Bower
6421 Camp Bowie Blvd., Suite 300
Fort Worth, TX 76116

United States Trustee
Attn: Erin Schmidt
1100 Commerce Street, Room 976
Dallas, TX 75242

Marilyn Garner
Law Offices of Marilyn D. Garner
2007 E. Lamar Blvd., Suite 200
Arlington, TX 76006

Lyndel Anne Mason/Vargas
Cavazos Hendricks Poirot & Smitham PC
900 Jackson, Suite 570
Dallas, TX 75202-4425

Airedale Haulage, LLC
c/o Mark C. Mackie
2340 Justin Road, Suite 100
Highland Village, TX 75077

American Energy Transport LLC
2415 W Northwest Highway, No. 105
Dallas, TX 75220

Federated Mutual
5501 W. IH 35
Fort Worth, TX 76111

Federated Mutual Insurance Company
Cozen O'Connor
c/o William H. Craven
1717 Main Street, Suite 3400
Dallas, TX 75201-7335

Howard Borg, AUSA
801 Cherry Street, Unit 4
Fort Worth, TX 76102

Integra Funding Solutions
6300 Ridglea, Suite 1101
Fort Worth, TX 76116

Internal Revenue Service
1100 Commerce St., MC 5026 DAL
Dallas, TX 75242-1100

Internal Revenue Service
PO Box 7346
Philadelphia, PA 19101-7346

Jerri Gooden
8811 Royal Harbor
Fort Worth, TX 76179

Paccar Financial
2951 Braswell
Fort Worth, TX 76111

U.S. Attorney General
Main Justice Building, Room 5111
10th & Constitution Ave., NW
Washington, DC 20530-0001

US Department of Justice
717 N. Harwood, Suite 400
Dallas, TX 75201-6598

United States Attorney
1100 Commerce, Room 300
Dallas, TX 75242-0397

Tarrant County
c/o Sherrel K. Knighton, Esq.
Linebarger Goggan Blair & Sampson LLP
2777 N. Stemmons Freeway, Ste. 1000
Dallas, TX 75207

Texas Comptroller of Public Accounts
Attn: John Mark Stern, Asst Attorney General
Bankruptcy & Collections Division
PO Box 12548
Austin, TX 78711-2548

Paccar Financial Corp.
c/o Mark W. Stout; Matthew D. Giadrosich
Padfield & Stout, LLP
421 W. Third Street, Suite 910
Fort Worth, TX 76102

Mel Ottinger
c/o Peter F. Bagley, Esq.
Blumberg & Bagley, LLP
2304 W. Interstate 20, Suite 190
Arlington, TX 76017

# Exhibit "A"

## INTEGRA FUNDING SOLUTIONS, LLC

## RECEIVABLES PURCHASE
## AGREEMENT
## RECOURSE

**THIS RECEIVABLES PURCHASE AGREEMENT** (this "Agreement"), made and executed this $\underline{2nd}$ day of April, 2015, by and between **SUPERIOR LUBRICANTS TRANSPORTS, INC.** (the "Company"); and **INTEGRA FUNDING SOLUTIONS, LLC** ("INTEGRA").

      1.    **Definitions.** Capitalized terms used in this Agreement shall have the meanings assigned to them in **Schedule A** attached hereto. All capitalized terms not herein defined shall have the meaning set forth in the Uniform Commercial Code.

      2.    **Sale and Acceptance of Receivables.**

      2.1    Company agrees during the term of this Agreement to sell to INTEGRA as absolute owner, with full recourse against Company, such of Company's Receivables as are listed from time to time on Schedules of Accounts, or otherwise offered for sale to INTEGRA by the Company. The sale of a Factored Receivable shall include all rights related to such Receivable and the proceeds thereof, including any letter of credit or other assurance or guaranty, all rights and remedies arising in connection therewith, any security interest or lien accessory thereto, all proceeds of insurance and any returned inventory or merchandise in connection with the Factored Receivable.

      2.2    Each Schedule of Accounts shall be accompanied by such documentation supporting and evidencing the Receivables as INTEGRA shall from time to time request. Unless otherwise approved by INTEGRA, the invoice for a Receivable must set forth, as the sole address for payment, the Business Address, or if payment is to be by wire transfer, by ACH transfer to a controlled account at INTEGRA, with notation of the invoice number being paid. In addition, except as otherwise may be agreed in writing by INTEGRA, the payment terms of any Receivable offered for purchase must be "NET 30 DAYS".

      2.3    INTEGRA may, but need not purchase from Company, such Receivables as may be offered for sale to INTEGRA. The election to purchase any Receivable offered for sale shall be in INTEGRA's sole and absolute discretion. INTEGRA shall have no obligation to purchase any Receivable from Company, regardless of any course of conduct or past purchases of Receivables by INTEGRA.

      2.4    The purchase price for each Receivable purchased hereunder shall consist of and be paid by the Initial Payment and any Residual Payment due under Section 3.2 after any deductions for Discounts and other amounts payable with respect to such Factored Receivable or other Obligations as herein provided. The sale of each Factored Receivable shall be deemed perfected and absolute upon the payment by INTEGRA of the Initial Payment therefor. INTEGRA's books and records shall be conclusive evidence of such payment, absent manifest error.

2.5    Subject to the terms and conditions of this Agreement, INTEGRA is authorized to purchase Receivables upon telephonic, facsimile or other instructions received from anyone purporting to be an officer, employee or representative of Company.

### 3.    Payment of Purchase Price.

3.1    The Initial Payment for each Factored Receivable shall be paid to the Company by check, or by electronic transfer or deposit to a Company operating account, or debit to the Reserve Account, at INTEGRA's option. The amount of any Initial Payment may be reduced by set off against any Obligations then due and payable (including charge back items hereunder, such as Repurchase Price payments, Discounts and fee assessments).

3.2    A Residual Payment for a Factored Receivable shall be payable by INTEGRA to Company unless otherwise provided herein, on the third (3rd) Business Day following the date INTEGRA receives and deposits the proceeds of collection of the subject Receivable in a collected amount equal to or greater than the INTEGRA Investment. No Residual Payment shall be payable on Factored Receivables unless and until INTEGRA has collected from the Account Debtor, or from Company if obligated to repurchase, an amount equal to the INTEGRA Investment. INTEGRA may charge back to Company's Reserve Account or other deposit accounts the amount of any Residual Payment for which credit has been given where the check given in payment of the Factored Receivable is not honored in full upon presentment. INTEGRA shall be entitled to withhold payment to the Company of the Residual Payment for a Factored Receivable if an Event of Default exists, if it is determined that it is an Ineligible Receivable or if INTEGRA in its sole and absolute discretion believes that such balance should be held in the Reserve Account to provide adequate available balances for existing or potential charges against the Reserve Account.

3.3    The parties agree that, without the prior written consent of INTEGRA, the INTEGRA Investment in Factored Receivables hereunder (exclusive of discounts, fees, interest and other compensation) shall not exceed the Facility Limit, and any such excess shall be paid by Company to INTEGRA on demand so as to reduce the total INTEGRA Investments (excluding Discounts and fees) to an amount not in excess of the Facility Limit.

### 4.    Reserve Account

4.1    INTEGRA shall establish in the Company's name an internal accounting account, referred to herein as the Reserve Account, and shall furnish the Company with advices of all credits and debits entered in the Reserve Account. The Company's Reserve Account may be charged by INTEGRA from time to time, and at its sole and absolute discretion, without notice, and whether or not an Event of Default exists, for any Obligation directly or indirectly owing by the Company to INTEGRA, including without limitation any Discount, fee, Repurchase Price or indemnity payment or other liability.

4.2    Upon termination of this Agreement INTEGRA may retain the Reserve Account (i) for ninety (90) days thereafter to be applied to payment of any Obligations that were unknown to INTEGRA at the time of termination, and (ii) on a continuing basis thereafter until such time as Company has executed and delivered to INTEGRA a general release in the form of Schedule C hereto.

5.   **Fees and Discounts**

        5.1     Company will pay to INTEGRA an amount equal to the Variable Discount in connection with each purchase of a Factored Receivable. Such amount is non-refundable, fully earned upon the purchase of a Factored Receivable, and is not subject to reimbursement, regardless of any retransfer or repurchase of the Receivable following its original sale to INTEGRA. The Variable Discount shall be payable on the Accrual Termination Date, unless the Factored Receivable is declared by INTEGRA to be an Ineligible Receivable. In such a case, the Variable Discount is payable on the Repurchase Due Date.

        5.2     Each Schedules of Accounts, along with all required supporting documentation, shall be submitted to INTEGRA no later than 1:00 P.M. Central Time. In the event that Company submits a Schedule of Accounts later than 1:00 P.M. Central Time and requests same day processing, the Company shall pay to INTEGRA a late scheduling fee, as determined by INTEGRA in its sole discretion, in an amount no less than $100.00 per late schedule, up to one percent (1%) of the Gross Amount of the Receivables on such schedule. In the event that the processing of the Schedule of Accounts is held until the following business day, either at the request of the Company or at the discretion of INTEGRA, no late scheduling fee shall apply.

        5.3     In the event that Company fails to deliver to INTEGRA any payment or proceeds that it may receive with respect to any Receivable, within the one (1) Business Day delivery deadline provided herein, Company will pay to INTEGRA a Misdirected Payment Fee equal to fifteen (15%) percent of the misdirected payment or proceeds, payable immediately upon its failure to timely deliver such item. Company's agreement to pay such a fee and INTEGRA's acceptance of such a fee shall not be deemed a waiver or acquiescence by INTEGRA of Company's obligation to promptly deliver to Lender's possession all collections on all Receivables no later than the next Business Day.

        5.4     The Company will be assessed a fee (the "Late Repurchase Fee"), in the amount set forth in the definition of Late Repurchase Fee, with respect to any Factored Receivable that either (i) is not repurchased in full by Company on or before the ninetieth day following the Initial Payment Date, or (ii) that has not been paid in cash and in full by the Account Debtor, on or before the ninetieth day following the Initial Payment Date. The Late Repurchase Fee may be assessed, at INTEGRA's election, by charge back to the Reserve Account.

6.   **Repurchase of Receivables; Charge Rights Against Reserve Account.**

        6.1     INTEGRA may require that Company repurchase any of the following Factored Receivables, by payment of a price equal to the amount of the INTEGRA Investment in the related Factored Receivable, less the amount of any collections received by INTEGRA from the Account Debtor with respect to such Receivable (such amount, the "Repurchase Price"), on demand at any time on or after the Repurchase Due Date, in cash, or, at INTEGRA's option, by INTEGRA's charge to the Reserve Account. INTEGRA's election to charge the Reserve Account for such payment shall be deemed to be its election to require such repurchase. Such Factored Receivables include:

6.1.1 Any Factored Receivable, the payment of which has been disputed by the Account Debtor obligated thereon, INTEGRA being under no obligation to determine the bona fides of such dispute;

6.1.2 Any Factored Receivable for which Company has breached its warranty under Section 11 hereunder;

6.1.3 Any Factored Receivable owing from an Account Debtor which, in INTEGRA's reasonable credit judgment, has become insolvent;

6.1.4 All Factored Receivables upon the occurrence of an Event of Default, or upon the termination date of this Agreement; and

6.1.5 Any Factored Receivable for which INTEGRA has not received from the Account Debtor payment in cash equal or greater than the INTEGRA Investment on before the Repurchase Due Date

(all such Factored Receivables described in 6.1.1 through 6.1.5, herein, "Ineligible Receivables"). In addition to the other payment methods provided above, INTEGRA, at its sole option and discretion, may effect payment of any Repurchase Price payment by reducing the amount of any Initial Payment paid for any future purchase price due to the Company in connection with the purchase by INTEGRA of other Factored Receivables.

6.2 INTEGRA shall retain its security interest in any Receivable that has been repurchased by Company. Repurchase shall not be deemed to have occurred until the Repurchase Price has been paid in full, and INTEGRA shall remain the owner of such Receivable until that time.

6.3 Any repurchase of a Receivable under this Agreement shall be without recourse to INTEGRA, and without any warranty or representation, express or implied, and Company waives in connection with any retransfer any and all such warranties, including any warranties of presentment, transfer or otherwise, any warranty concerning the solvency of any Account Debtor, the existence of any right or the absence of any defenses to payment, under the Uniform Commercial Code, the laws of the State of Texas, or otherwise.

7. **Authorizations to INTEGRA.**

7.1 Company hereby irrevocably authorizes INTEGRA at Company's expense, to exercise at any time any of the following powers until all of the Obligations have been paid in full: (a) receive, take, endorse, assign, deliver, accept and deposit, in the name of INTEGRA or Company, any and all cash, checks, commercial paper, drafts, remittances and other instruments and documents relating to any Factored Receivables, other Receivables or the proceeds thereof, (b) take or bring, in the name of INTEGRA or Company, all steps, actions, suits or proceeding deemed by INTEGRA necessary or desirable to effect collection of or other realization upon the Receivables, (c) pay any sums necessary to discharge any lien or encumbrance which is senior to INTEGRA's security interest in the Collateral, which sums shall be included as Obligations hereunder, (d) file in the name of Company or INTEGRA or both, (1) mechanics lien or privileges or related notices or (2) claims under any payment bond, in

connection with goods or services sold by Company, (e) notify any Account Debtor obligated with respect to any Receivable, that the underlying Receivable has been assigned to INTEGRA by Company and that payment thereof is to be made to the order of and directly and solely to INTEGRA, and (f) communicate directly with Company's Account Debtors to verify the amount and validity of any Receivable created or acquired by Company. Company further hereby irrevocably authorizes INTEGRA at Company's expense at any time following an Event of Default to exercise any of the following powers until all of the Obligations have been paid in full: (f) change the address for delivery of mail to Company and to receive and open mail addressed to Company, and (g) extend the time of payment of, compromise or settle for cash, credit, other obligor (including filing of any public record releasing any lien granted to Company by such Account Debtor), without affecting any of the Obligations.

7.2     The Company authorizes INTEGRA at any time and from time to time to file any initial financing statements and amendments thereto that (a) describes the Collateral; (b) contain any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment; (c) contain a notification that the Company has granted a negative pledge to INTEGRA, and agreed not to assign or encumber its Collateral, and that any subsequent lienor or claimant may be tortuously interfering with INTEGRA's rights; and (d) advises third parties that any notification of Company's Account Debtors will interfere with INTEGRA's collection rights.

7.3     Company authorizes INTEGRA to accept, indorse and deposit on behalf of Company any checks tendered by an account debtor "in full payment" of its obligation to Company. Company shall not assert against INTEGRA any claim arising therefrom, irrespective of whether such action by INTEGRA effects an accord and satisfaction of Company's claims, under §3-311 of the Uniform Commercial Code, or otherwise.

7.4     In order to satisfy any Obligations, INTEGRA is hereby authorized by Company to initiate electronic debit or credit entries through the ACH system to any deposit account maintained by Company wherever located.

8.     **Security Interest.**

8.1     As collateral securing the Obligations, company grants to INTEGRA a continuing first priority security interest in and to the Collateral.

8.2     Notwithstanding the creation of the above security interest, the relationship of the parties with respect to the Factored Receivables (until the completion of any repurchase thereof by Company and the payment of the Repurchase Price therefor) shall be that of purchaser and seller of the Factored Receivables, and not that of lender or borrower.

9.     **Financial Statements.**

9.1     At all times during the term of this Agreement, Company will, unless INTEGRA shall otherwise consent in writing, furnish to INTEGRA:

9.1.1     <u>Financial Statements.</u>  Within ninety (90) days after the last day of each fiscal year of Company an internally prepared statement of income and a statement of cash flows of

Company for such fiscal year, and a balance sheet of Company as of the last day of such fiscal year. Within forty five (45) days after the last day of each fiscal month of Company, an internally prepared statement of income and statement of cash flows of Company for such fiscal month, and an internally prepared balance sheet of Company as of the last day of such fiscal month. Company represents and warrants that each such statement will fairly present, in all material respects, the results of operations and the financial condition of Company as of the date set forth therein, all in accordance with generally accepted accounting principles.

        9.1.2    If requested by INTEGRA, an accounts receivable report; specifying the names, addresses, face value, dates of invoices and due dates for each Account Debtor obligated on a Receivable.

        9.1.3    Copies of Company's and each Guarantor's state and federal income tax returns within thirty days of filing, including copies of its Form 941 returns and evidence of payment of all amounts due thereunder.

        9.1.4    If applicable, updated financial statements on each Guarantor of Company on an annual basis so that no financial statement for any Guarantor is more than thirteen months old.

        9.1.5    The Company shall also execute promptly upon INTEGRA's request an Internal Revenue Service form 8821 or its equivalent in order to authorize INTEGRA to obtain information directly from, and communicate with, the Internal Revenue Service about the Company and the status of its taxes owing to the Internal Revenue Service.

## 10.    **Covenants By Company.**

        10.1    Company shall not, without the prior written consent of INTEGRA in each instance, (a) grant any extension of time for payment of any of the Factored Receivables, (b) compromise or settle any of the Factored Receivables for less than the full amount thereof, (c) release in whole or in part any Account Debtor under a factored Receivable, or (d) grant any credits, discounts, allowances, deductions, return authorizations or the like with respect to any of the Factored Receivables.

        10.2    From time to time as requested by INTEGRA, at the sole expense of Company, INTEGRA or its designee shall have access, during reasonable business hours if prior to an Event of Default and at any time if on or after an Event of Default, to all premises where Collateral is located for the purposes of inspecting (and removing, if after the occurrence of an Event of Default) any of the Collateral, including Company's books and records, and Company shall permit INTEGRA or its designee to make copies of such books and records or extracts therefrom as INTEGRA may request. Without expense to INTEGRA, INTEGRA may use any of Company's personnel, equipment, including computer equipment programs, printed output and computer readable media, supplies and premises for the collection of accounts and realization on other Collateral as INTEGRA, in its sole discretion, deems appropriate. Company hereby irrevocably authorizes all accountants and third parties to disclose and deliver to INTEGRA at Company's expense all financial information, books and records, work papers, management reports and other information in their possession relating to Company.

10.3    Before sending any invoice to an Account Debtor, Company shall mark same with a notice of assignment as may be required by INTEGRA.

10.4    Company shall pay when due all payroll and other taxes.

10.5    Company shall not create, incur, assume or permit to exist any lien upon or with respect to any Collateral now owned or hereafter acquired by Company other than in favor of INTEGRA.

10.6    Company shall indemnify INTEGRA from any loss arising out of the assertion of any Avoidance Claim and shall pay to INTEGRA on demand the amount thereof. Company shall notify INTEGRA within two Business Days of its becoming aware of the assertion of an Avoidance Claim. This provision shall survive termination of this Agreement.

10.7    The invoices related to all of the Receivables (whether or not Factored Receivables) shall set forth the Business Address as its sole address for payment. Company shall request in writing or otherwise take reasonable steps to ensure that all payments be sent directly to such Business Address. Company agrees that it will deposit or cause to be deposited promptly, and in any event no later than the first Business day after the date of receipt thereof, all cash, checks, drafts or other similar items of payment relating to or constituting payments made in respect of any and all Collateral (whether or not otherwise delivered to Business Address) to the Business Address, or in the case of ACH wire transfers that it may receive, to immediately transfer such funds by wire transfer to a controlled account designated by INTEGRA. With respect to collections on Receivables that are not Factored Receivables (including repurchased Receivables) and for which no amounts are owing to INTEGRA, INTEGRA is irrevocably authorized and empowered to apply any and all proceeds of collection of such Receivables received by INTEGRA (at INTEGRA's option, without obligation to do so) to the outstanding principal amount of, interest on, and other amounts owing in connection with the Obligations (in any order selected by INTEGRA). Company acknowledges and agrees (a) that all proceeds of collection of such Receivables by INTEGRA will not be segregated by INTEGRA and may be commingled with INTEGRA's other funds, and (b) that INTEGRA shall have no duty (fiduciary or otherwise) with respect to the proceeds of collection of such Receivables except as specifically provided for in this Agreement. If INTEGRA either elects not to apply the proceeds of collection of such collections to the Company's Obligations, INTEGRA may retain possession of such collections as additional Collateral; provided, however, that if no Event of Default has occurred, INTEGRA shall release such collections to Company at the written request of Company within (3) Business Days following the clearance of such payment item and its receipt of Company's request.

10.8    Company shall not, without the prior written consent of INTEGRA in each instance, (a) change its legal name, or (b) merge or consolidate with any other entity.

**11.1    Representations and Warranties.**

11.1    Company expresses warrants, represents and covenants as follows:

11.1.1  the Company shall immediately notify INTEGRA in writing (i) upon it acquiring knowledge of any facts that would cause a Factored Receivable to become an Ineligible

Receivable, (ii) of any material adverse change in Company's financial condition or its businesses, and (iii) of any litigation or claims against Company which could materially affect the Company or its business operations, financial condition or prospects;

        11.1.2  the Company has good and indefeasible clear title to the Collateral, will convey clear title to all Factored Receivables to INTEGRA, and has the right, power and authority, subject to all applicable governmental regulations, to sell Factored Receivables hereunder, and to grant a security interest in the Collateral to INTEGRA;

        11.1.3  the Collateral is not subject to, and is free and clear of, any lien, claim, pledge, security interest or encumbrance of any kind, other than those granted to INTEGRA hereunder;

        11.1.4  the Company is properly licensed and authorized to operate its business under all applicable state and federal laws in the name designated for Company on the signature page of this Agreement;

        11.1.5  the Company will not assign, pledge, subordinate, give a security interest in or otherwise transfer any Collateral to any entity other than INTEGRA or its assigns;

        11.1.6  this Agreement is binding upon Company as well as upon Company's successors, representatives and assigns, and is legally enforceable in accordance with its terms;

        11.1.7  The Company has conducted business under no name other than its name indicated herein, and uses no trade name or assumed name, except as follows:  Superior Enterprises, Inc., dba Superior Energy Services;

        11.1.8  Company has not filed any petition under the Bankruptcy Code of the United States nor has any petition in bankruptcy been filed against Company; no application for appointment of a receiver or trustee for all or a substantial part of Company's property is pending; and Company has made no assignment for the benefit of creditors; and

        11.1.9  Company shall not (a) be or become subject at any time to any law, regulation, or list of any government agency (including, without limitation, the U.S. Office of Foreign Asset Control list) that prohibits or limits INTEGRA from making any advance or extension of credit to Company or from otherwise conducting business with Company, or (b) fail to provide documentary and other evidence of Company's identity as may be requested by INTEGRA at any time to enable INTEGRA to verify Company's identity or to comply with any applicable law or regulation, including, without limitation, Section 326 of the USA Patriot Act of 2001, 31 U.S.C. Section 5318.

        11.2     The foregoing representations, covenants and warranties will run to the benefit of INTEGRA's successors and assigns and will be continuing in nature and will remain in full force and effect until all obligations and sums owing to INTEGRA by Company have been fully performed, paid and satisfied, whether or not this Agreement is canceled or terminated.  Company does hereby bind itself, its successors and assigns, to indemnify and hold INTEGRA (and its successors and

assigns) harmless from any and all cost incurred by INTEGRA and its successors and assigns, including attorney's fees and court costs, for breach of any warranty expressed in this Section.

**12.** **Representations Concerning Factored Receivables.**

12.1 Company represents and warrants that the Factored Receivables are and will remain:

12.1.1 bona fide existing obligations created by the sale and delivery of goods or the rendition of services in the ordinary course of Company's business;

12.1.2 unconditionally owed and will be paid to INTEGRA without defenses, disputes, offsets, counterclaims, or rights of return or cancellation;

12.1.3 Not sales to an entity which is affiliated with Company or in any way not an "arms length" transaction.

12.2 Company also represents and warrants that Company has not received notice of actual or imminent bankruptcy, insolvency, or material impairment of the financial condition of any applicable Account Debtor regarding Factored Receivables.

**13.** **Default.**

13.1 Company will be in default of this Agreement upon the happening of any Event of Default.

13.2 **Waiver of Notice. COMPANY WAIVES ANY REQUIREMENT THAT INTEGRA INFORM COMPANY BY AFFIRMATIVE ACT OR OTHERWISE OF ANY ACCLERATION OF COMPANY'S OBLIGATIONS HEREUNDER. FURTHER, INTEGRA'S FAILURE TO CHARGE OR ACCRUE INTEREST OR FEES AT ANY "DEFAULT" OR "PAST DUE" RATE SHALL NOT BE DEEMED A WAIVER BY INTEGRA OF ITS CLAIMS THERETO.**

13.3 **Effect of Default**

13.3.1 Upon the occurrence of any Event of Default, in addition to any right INTEGRA has under this Agreement or applicable law, INTEGRA may immediately terminate this Agreement, at which time all Obligations shall immediately become due and payable without notice and all Factored Receivables shall become Ineligible Receivables which Company is obligated to repurchase. Company hereby waives demand for payment of any Obligations, notice of nonpayment of any Obligations, notice that INTEGRA is making all Obligations immediately due, as well as all other notices, demands or presentations for payment.

13.3.2 INTEGRA may commence and effect collection of any and all Collateral by whatever means INTEGRA deems reasonable and necessary, subject to applicable law, without recourse to judicial proceedings against Company.

14.   **Survival.**  All representations, warranties and agreements herein contained on the part of Company shall be effective so long as Obligations remain outstanding.

15.   **Severability of Provisions.**  In the event any one or more of the provisions contained in this Agreement is held to be invalid, illegal or unenforceable in any respect, then such provision shall be ineffective only to the extent of such prohibition or invalidity, and the validity, legality, and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

16.   **Conflict.**  Unless otherwise expressly stated in any other agreement between INTEGRA and Company, if a conflict exists between the provisions of this Agreement and the provisions of such other agreement, the provisions of this Agreement shall control.

17.   **Amendment.**  Neither this Agreement nor any provisions hereof may be changed, waived, discharged or terminated, nor may any consent to the departure from the terms hereof be given, orally (even if supported by new consideration), but only by an instrument in writing signed by all parties to this Agreement. Any waiver or consent so given shall be effective only in the specific instance and for the specific instance for which given.

18.   **No Waiver.**  No failure to exercise and no delay in exercising any right, power, or remedy hereunder shall impair any right, power, or remedy which INTEGRA may have, nor shall any such delay be construed to be a waiver of any such rights, powers, or remedies, or any acquiescence in any breach or default hereunder, nor shall any waiver of any breach or default of Company hereunder be deemed a waiver of any default or breach subsequently occurring. All rights and remedies granted to INTEGRA hereunder shall remain in full force and effect notwithstanding any single or partial exercise of, or any discontinuance of action begun to enforce, any such right or remedy. The rights and remedies specified herein are cumulative and not exclusive of each other or of any rights or remedies which INTEGRA would otherwise have. Any waiver by INTEGRA of any breach or default hereunder must be in writing and shall be effective only to the extent set forth in such writing and only as to that specific instance.

19.   **Headings.**  Section headings and numbers have been set forth for convenience only.

20.   **Waiver of Trial By Jury.**  IN RECOGNITION OF THE HIGHER COSTS AND DELAY THAT MAY RESULT FROM A JURY TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING HEREUNDER, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIEVER OF THEIR RIGHT TO TRIAL BY JURY.

21.   **Costs and Expenses; Interest.**

21.1 Company agrees to reimburse INTEGRA for all costs and expenses, including attorney's fees, which INTEGRA has incurred or may incur in negotiating, preparing, administering or enforcing this Agreement and any documents prepared in connection herewith; in protecting, monitoring, preserving or enforcing any lien, security interest or other right granted by Company to INTEGRA (including travel expenses of INTEGRA's employees and agents), or arising under applicable law, whether or not suit is brought; in connection with any federal or state insolvency proceeding commenced by or against Company, including those (i) arising out the automatic stay, (ii) seeking dismissal or conversation of the bankruptcy proceeding or (iii) opposing confirmation of Company's plan thereunder; and in connection with Company's sale of the Factored Receivables and the grant of a security interest in and to the Collateral (and other Receivables) to INTEGRA, filing fees, public records searches, and other expenses directly related to the sale of the Factored Receivables and the perfection of the security interest of INTEGRA.

21.2 Company acknowledges that the occurrence of an Event of Default will cause INTEGRA to expend substantial employee time in monitoring such default, and supervising any remedial action that may be taken by INTEGRA in connection therewith. Company agrees to reimburse INTEGRA for its internal costs in connection with an Event of Default, as determined and assessed by INTEGRA in its sole discretion.

21.3 All of the aforementioned costs and expenses which have been incurred on or prior to the execution hereof shall be paid contemporaneously with the execution hereof. Any such costs and expenses incurred subsequent to the execution hereof shall become part of the Obligations incurred, and payable on demand, and if not paid when due, shall accrue interest for each day outstanding at the rate equal to the lesser of the Prime Rate plus six percent or the highest nonusurious rate allowed by applicable law.

## 22. Term; Effective Date

22.1 This Agreement shall take effect on the Effective Date set forth on the signature page hereto and shall remain in full force for a period of twelve (12) months (the "Initial Term"). The Agreement shall be automatically extended and renewed for successive on (1) year periods following the Initial Term unless terminated by INTEGRA or the Company as hereinafter provided (each such one (1) year period, a "Renewal Term"). This Agreement may be terminated; (a) by Company at any time upon the giving of not less than ninety (90) days prior written notice of termination to INTEGRA, or (b) by INTEGRA at any time upon thirty (30) days prior written notice of termination to Company, or, without notice by INTEGRA to Company if an Event of Default shall occur.

22.2 Upon the effective date of termination, Company shall be obligated to repurchase all factored Receivables for a repurchase price equal to the aggregate INTEGRA Investment on the date of repurchase, and all Obligations of Company to INTEGRA shall become immediately due and payable without further notice or demand irrespective of any maturity dates established prior thereto. No termination of this Agreement will in any way affect or impair any right of INTEGRA arising prior thereto or by reason thereof, nor will any such termination relieve Company of any duty to INTEGRA under, nor deny INTEGRA any benefit from, this Agreement or otherwise until all of Obligations have been fully discharged and all Factored Receivables have been repurchased or paid in the full amount of

the INTEGRA Investment therein. In recognition of INTEGRA's right to have its attorney's fees and other expenses incurred in connection with this Agreement secured by the Collateral, as well as all indemnities of Company with respect to dishonored payment items and Avoidance Claims, notwithstanding payment in full of all Obligations by Company, INTEGRA shall not be required to record any terminations or satisfactions of any of INTEGRA's liens on the Collateral unless and until Company has executed and delivered to INTEGRA a general release in the form of Schedule C hereto. **Company understands that this provision constitutes a waiver of its rights under §9-513 of the UCC.**

## 23. Indemnification and Release.

23.1 The Company shall indemnify, defend and hold INTEGRA and its successors and assigns harmless from and against all loss, claims and damages arising from (i) any breach of any warranty or representation hereunder; (ii) any action or inaction or liability of the Company with respect to any Receivable, including any collection action, usury claim, violation of consumer credit, truth in lending, equal credit opportunity or unfair trade practice laws; or (iii) the manufacture, sale, possession or use of, or otherwise relating to, goods, or the performance of services, associated with or relating to any Receivable, including any liability to deliver goods, render services, or to answer for any deficiencies with respect thereto, and Company shall remain fully liable therefor.

23.2 Company hereby releases and exculpates INTEGRA, its officers, employees and designees, from any liability arising from any acts under this Agreement or in furtherance thereof whether of omission or commission, and whether based upon any error of judgment or mistake of law or fact, except for willful misconduct. In no event will INTEGRA have any liability to Company for lost profits or other special or consequential damages. Without limiting the generality of the foregoing, Company releases INTEGRA from any claims which Company may now or hereafter have arising out of INTEGRA's endorsement and deposit of checks issued by Company's customers stating that they were in full payment of an account, but issued for less than the full amount which may have been owed on the account.

The provisions of this Section 23 shall survive the termination of this Agreement and the payment in full of the Obligations.

## 24. State law; Jurisdiction. 
This Agreement is accepted, made and will be governed by the laws of the State of Texas without regard to conflict of laws principles. Unless otherwise elected by INTEGRA, venue and jurisdiction will be exclusively in the state or federal district courts in Tarrant County, Texas.

## 25. Miscellaneous. 
This Agreement sets forth the entire agreement and understanding between the parties relating to the subject matter herein and merges all prior discussion between them. Company may not assign any of its rights and remedies. INTEGRA may assign its rights and remedies including assignments for financing and/or collateralization purposes and may grant participation interests to assignees, without further notice to or consent by Company, all rights to receive such notice being hereby waived. Company consents to INTEGRA or its assignees conducting a comprehensive due diligence review and financial history investigation relating to Company. Notwithstanding anything to the contrary contained herein, the payment of a purchase price or any other advance by INTEGRA to the

Company shall constitute INTEGRA's affirmative consent and agreement to the terms and conditions set forth in this Agreement, without the requirement that INTEGRA execute this Agreement.

**26.** **Notice.**

26.1 All notices required to be given to any party other than INTEGRA shall be deemed given upon the first to occur of (i) deposit thereof in a receptacle under the control of the United States Postal Service, (ii) transmittal by electronic means to a receiver under the control of such party; or (iii) actual receipt by such party or an employee or agent of such party. All notices to INTEGRA hereunder shall be deemed given upon actual receipt by a responsible officer of INTEGRA.

26.2 For the purposes hereof, notices hereunder shall be sent to the following addresses, or to such other addresses as each such party may in writing hereafter indicate:

| | | |
|---|---|---|
| (a) | If to INTEGRA | Integra Funding Solutions, LLC |
| | | 6300 Ridglea Place, Suite 1101 |
| | | Fort Worth, TX 76116 |
| | | Phone No. 866-552-8536 |
| | | Facsimile No. 877-739-4054 |
| | | |
| (b) | If to the Company: | Superior Lubricants Transport, INC. |
| | | 3312 Dooling Street |
| | | Fort Worth, TX 76111 |
| | | Phone No. 817-831-0684 |

**27.** **Determination of Initial Payment and Residual Payment.** The Purchase Price of the Factored Receivables has been approved and verified by the Company and represents the fair market value of an "account purchase transaction" as that term is defined in the Texas Finance Code. The parties acknowledge that the purchase of Factored Receivables by INTEGRA constitutes an outright conveyance and sale by Company to INTEGRA. Nothing herein, or any course of dealing in the future, with respect to any transactions consummated pursuant to this Agreement shall be construed to be anything other than an outright purchase and sale of the applicable Factored Receivables. All right, title and interest of Company in any Factored Receivables will be conveyed to INTEGRA immediately upon the payment of the Initial Payment therefor, and the payment of the Initial Payment therefor will constitute consideration for the sale of the applicable factored receivables and under no circumstances shall such transaction be construed as a loan and no consideration herein set forth is for the use, forbearance or detention of money.

**28.** **Provision Regarding Usury.** Nothing herein shall be construed as to require the payment of interest except as specifically provided in Section 21.3; however, should a court of competent jurisdiction rule that any consideration paid hereunder is in fact or in law to be treated as interest, in no event shall Company be obligated to pay that interest at a rate in excess of the maximum amount permitted by law, and all agreements, conditions, or stipulation contained herein, if any, which may in any event or contingency whatsoever operate to bind, obligate, or compel Company to pay a rate of interest exceeding the maximum rate of interest permitted by law shall be without binding force or effect at law or in equity to the extent only of the excess of interest over such maximum rate of interest permitted by law. Also in such event, INTEGRA may "spread" all charges characterized as interest over

the entire term of all transactions with Company and will refund to Company the excess of any payments made over the highest lawful rate. It is the intention of the parties hereto that in the construction and interpretation of this Agreement, the foregoing sentence shall be given precedence over any other agreement, condition, or stipulation herein contained which is in conflict with same.

**29. Counterparts.** This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if all signatures were upon the same instrument. Delivery of an executed counterpart of the signature page to this Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Agreement, and any party delivering such an executed counterpart of the signature page to this Agreement by facsimile to any other party shall thereafter also promptly deliver a manually executed counterpart of this Agreement to such other party, provided that the failure to deliver such manually executed counterpart shall not affect the validity, enforceability, or binding effect of this Agreement.

**IN WITNESS WHEREOF,** the respective authorized officers of the parties have executed this Agreement effective as of the Effective Date set forth below.

**INTEGRA:**
**Integra Funding Solutions, LLC**

By: Randy Woods
Title: president

**COMPANY:**
**Superior Lubricants Transport, INC.**

By: Bryan Austin
Title: President

Effective Date: "April [2nd], 2015"

Attachments:
Schedule A- Definitions
Schedule B- Form of Schedule of Accounts
Schedule C- Form of Release

**SCHEDULE A – DEFINITIONS**

"**Account Debtor**" – the obligor on a Receivable.

"**Agreement**" – This Receivables Purchase Agreement as modified or amended from time to time, and any exhibits or attachments to this Agreement.

"**Accrual Termination Date**" – with respect to a Receivable, three(3) Business Days following the date on which INTEGRA has collected, in cash, from the Account Debtor, or been paid by the Company (by Reserve Account adjustment, Company reimbursement or otherwise) an amount equal to the INTEGRA Investment.

"**Avoidance claim**" – any loss, damage or expense (including attorney's fees) incurred by INTEGRA as a result of a claim made at any time against INTEGRA for the repayment or recovery of any amount received by INTEGRA in payment of any Receivable by the payor or legal representative thereof (including a trustee in bankruptcy or assignee for the benefit of creditors) on the grounds of preference under the provisions of the Bankruptcy Code or any other federal or state insolvency law.

"**Business Address**" – the following address:    6300 Ridglea Place, Suite 1101
Fort Worth, TX 76116

"**Business Day**" – any day that INTEGRA is open for business at its offices in Arlington, Texas.

"**Collateral**" – all now owned and hereafter acquired (i) accounts, chattel paper, other Receivables, instruments (including promissory notes), investment property, documents, and general intangibles; including without limitation all reserve accounts, Residual Payments, credits and reserves, and letter-of credit rights, (ii) all deposit; (iii) all equipment and inventory, and (iv) all proceeds from any of the foregoing.

"**Company**" – see Preamble.

"**Discounts**" – all Fixed Discounts with respect to a Factored Receivable.

"**Event of Default**" – (a) Company defaults in the payment of any Obligations or in the performance of any provision hereof or of any other agreement now or hereafter entered into with INTEGRA, or any warranty or representation contained herein proves to be false in any way, howsoever minor, (b) Company or any guarantor of the Obligations becomes subject to any debtor-relief proceedings, (c) any such guarantor fails to perform or observe any of such Guarantor's obligations to INTEGRA or shall notify INTEGRA of its intention to rescind, modify, terminate or revoke any guaranty of the Obligations, or any such guaranty shall cease to be in full force and effect for any reason whatever, (d) INTEGRA for any reason, in good faith, deems itself insecure with respect to the prospect of repayment or performance of the Obligations.

"**Facility Limit**" – $300,000

**"Factored Receivable"** – a Receivable which has been purchased by INTEGRA from Company hereunder.

**"Fixed Discount"** – for each Factored Receivable, the Gross Amount of the Factored Receivable time the applicable Fixed Discount Percentage.

**"Variable Discount Percentage"**- for each Receivable, a percentage, based on the number of days in the period starting with the Initial Payment date ending with the Accrual Termination Date. Such period shall be ongoing until the Accrual Termination Date occurs. The percentage will be calculated as follows: (i) if the Accrual Termination date occurs in the first thirty (35) days of the period, 2.00%, (ii) if the Accrual Termination Date occurs following such initial thirty (35) day period, 2.00% PLUS an additional 0.25% for each successive ten (10) day period that commences following such initial thirty (35) day period, until the Accrual Termination Date occurs.

**"INTEGRA"** – see preamble.

**"INTEGRA Investment"** – with respect to a Factored Receivable, the sum of (i) the Initial Payment, plus (ii) all Fixed Discounts, fees and charges owed by Company to INTEGRA relating to the Factored Receivable.

**"Gross Amount"** – the gross amount of a Factored Receivable, based on the shortest payment terms, prior to any credits, discounts or allowances to which the Account Debtor is entitled.

**"Guarantor"** – any present or future guarantor of the Obligations, in whole or in part, including Bryan Austin.

**"Ineligible Receivables"** – see Section 6.1.

**"Initial Payment"** – for each Factored Receivable, the Net Face Amount less the Reserve Amount relating to that Factored Receivable.

**"Initial Payment Date"** – with respect to any Factored Receivable, the date on which the initial Payment for such Receivable is paid.

**"Late Repurchase Fee"** – a fee equal to zero percent (0%) of the Gross Amount of the applicable factored Receivable. The fee shall be in addition to any other fees or discounts due INTEGRA.

**"Misdirected Payment Fee"** – fifteen percent (15%) of the amount of any payment on account of a Receivable where said payment has been received by Company and not immediately delivered in kind by Company to INTEGRA by the next Business Day as required hereunder.

**"Net Face Amount"** – the Gross Amount of a Factored Receivable, less all credits, discounts, and allowances to which the Account Debtor is entitled.

**"Obligations"**- all Discounts, fees, repurchase payments, and other amounts due hereunder, together with any and all other present and future obligations owing by Company to INTEGRA, whether or not for the payment of money, whether or not evidenced by any note or other instrument, whether direct or indirect, absolute or contingent, due or to become due, joint or several, primary or secondary, liquidated or unliquidated, secured or unsecured, original or renewed or extended, whether arising before, during or after the commencement of any bankruptcy case in which Company is a debtor, and all principal, interest, fees, charges, expenses, attorney's fees and accountants' fees chargeable to Company or incurred by INTEGRA in connection with this Agreement and/or the transaction(s) related thereto.

**"Person"**- means an individual, partnership, corporation, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority, or other entity of whatever nature.

**"Prime Rate"**- means, for each applicable date of calculation, the rate of interest announced in the Wall Street Journal on such date (or the immediately preceding Business Day, if such date is not a Business Day) as the "prime" rate of Interest. In the even such rate is not published or available INTEGRA may select a substitute interest rate index of comparable nature, as basis. The Prime Rate is not necessarily the lowest rate charged by INTEGRA on loans or for variable discounts payable in connection with purchased receivables. If the above Prime Rate becomes unavailable during the term of this Agreement, INTEGRA may designate a substitute index after notifying Company.

**"Receivables"**- means any accounts, contract rights, chattel paper (electronic or written), notes, drafts, rental receivables, conditional sale contracts, general intangibles, payment intangibles, security agreements, installment sales, revolving charge accounts, and other obligations for the payment of money, including inter-company accounts and notes receivable, and all documents, contracts, invoices and instruments evidencing or constituting the same and all security instruments and security agreements relating thereto, which are created, generated, acquired or otherwise owned by the Company, all property the sale or lease of which gives rise or purports to give rise to Receivables, all related letter of credit rights, all accessory rights, and all cash and non-cash proceeds thereof, including any merchandise returned or rejected by, or repossessed from, Account Debtors.

**"Repurchase Due Date"**- means the ninetieth (90th) day following the invoice date of a Factored Receivable, for each Factored Receivable for which the Account Debtor has not made payment, in cash, to INTEGRA, in an amount greater than the INTEGRA Investment by the ninetieth (90th) day following the invoice date of the Factored Receivable. Any such Factored Receivable shall become an Ineligible Receivable on such date (unless it becomes an Ineligible Receivable prior to such date). Provided, if prior to that date a Factored Receivable becomes an Ineligible Receivable, the Repurchase Due Date shall be the date on which a Factored Receivable becomes an Ineligible Receivable, for any reason other than the failure of the Account Debtor to the INTEGRA Investment amount within ninety (90) days of invoice date. In the event that a Receivable is purchased, but constitutes an Ineligible Receivable, and such failure has not been expressly and knowingly waived by INTEGRA at the time of purchase, the Repurchase Due Date shall be deemed to be the date of INTEGRA's purchase of the Receivable.

**"Repurchase Price"**- see Section 6.1

"**Required Termination Period**"- is the ninety day period commencing on the date that INTEGRA receives notice of the Company's intent to terminate. Requests for a payout statement in connection with a termination, subordination or assignment of INTEGRA's interests in the Collateral shall be deemed to be a request to terminate this Agreement. Termination of this Agreement shall be deemed to have occurred upon the happening of: (i) the receipt by INTEGRA of the payment of all Obligations then outstanding, and (ii) the request by the Company for a subordination, termination, assignment or partial release of INTEGRA's interests in the Collateral, or the actual filing of a termination, assignment or partial release of INTEGRA's interests in the Collateral.

"**Reserve Account**"- an account established in the records of INTEGRA (and not a segregated or separate account), pursuant to the provisions of Section 4 of this Agreement, to which INTEGRA shall credit the Net Face Amount of all Factored Receivables purchase by INTEGRA from the Company (calculated based on any and all credits, discounts available to the Company's Account Debtors, and anticipations earned by the Company's Account Debtors) and which INTEGRA shall debit with all purchase price payments or advances under this Agreement made to the Company or on its behalf; and against which INTEGRA may charge any Discounts and any other Obligations chargeable to the Company.

"**Reserve Amount**"- means the Net Face Amount of any Factored Receivable, times the Reserve Percentage for such Factored Receivable.

"**Reserve Percentage**"- initially <u>fifteen percent (15.00%).</u> This percentage may be increased or decreased by INTEGRA in its sole discretion at any time with respect to any Receivables that may be offered for sale hereunder, by written or verbal notice to Company prior to purchase.

"**Residual Payment**"- with respect to any Factored Receivable, as of each date of calculation, means the aggregate amount collected by INTEGRA from the Account Debtor with respect to the Receivable, less the sum on such date of (i) the Initial Payment with respect to such Receivable, and (ii) all Discounts, fees and charges payable hereunder with respect thereto, including any attorney's fees and other costs of collection with respect thereto, to the extent unpaid by Company on the date of payment of the Residual Payment.

"**Security interest**"- shall have the meaning provided in the Uniform Commercial Code, and shall include without limitation a purchase interest in Factored Receivables.

"**Schedule of Accounts**"- A schedule substantially in the form of Schedule "B" annexed hereto sent by Company to INTEGRA evidencing Company's offer to sell receivables.

"**Uniform Commercial Code**"- the Uniform Commercial Code in effect in the State of Texas, as amended from time to time.

# Exhibit "B"

# PROMISSORY NOTE

**$220,000.00**                     **Fort Worth, Texas**                     **May 15, 2015**

FOR VALUE RECEIVED, the undersigned, Superior Lubricants Transport, LLC, a Texas limited liability company ("Maker"), hereby unconditionally promises to pay to the order of Integra Funding Solutions, LLC, a Texas limited liability company ("Payee"), at 6300 Ridglea Place, Suite 1101, Fort Worth, Texas 76116 or such other address given to Maker by Payee, the principal sum of two hundred twenty thousand dollars ($220,000.00), or so much thereof as may be advanced prior to maturity, in lawful money of the United States of America, together with interest (calculated on the basis of a 365-day year) on the unpaid principal balance at the rate of twelve percent (12.0%) per annum.

Section 1.     Definitions.

As used herein, the term "Event of Default" shall have the meaning ascribed to it in Section 4.

As used herein, the term "Maximum Rate" shall mean the highest nonusurious rate of interest (if any) permitted from day to day by applicable law. Maker hereby notifies and discloses to Payee that, for purposes of *Texas Finance Code* § 303.001, as it may from time to time be amended, the "*applicable rate ceiling*" shall be the "*weekly*" ceiling from time to time in effect as limited by *Texas Finance Code* § 303.009; *provided, however*, that to the extent permitted by applicable law, Maker reserves the right to change the "*applicable rate ceiling*" from time to time by further notice and disclosure to Payee.

Section 2.     Payments.     The principal of and interest upon this Note shall be due and payable as follows:

(a)     Principal and interest shall be due and payable in monthly installments of ten thousand three hundred fifty-six and 16/100 dollars ($10,356.16) each on the fifteenth (15th) day of each month beginning June 15, 2015, interest being calculated on the unpaid principal to the date of each installment paid and the payment credited first to the discharge of interest accrued and the balance to the reduction of principal; and

(b)     The entire unpaid balance of this Note shall be due and payable on May 15, 2017.

Should the principal of, or any installment of the principal of or interest upon, this Note become due and payable on any day other than a business day, the maturity thereof shall be extended to the next succeeding business day, and interest shall be payable with respect to such extension.

All past due principal of and, to the extent permitted by applicable law, interest upon this Note shall bear interest at the Maximum Rate.

Section 3.   **Waiver.**   Maker and each surety, endorser, guarantor and other party ever liable for payment of any sums of money payable upon this Note, jointly and severally waive presentment, protest, notice of protest and non-payment, or other notice of default, notice of acceleration and intention to accelerate, and agree that their liability under this Note shall not be affected by any renewal or extension in the time of payment hereof, or in any indulgences, or by any release or change in any security for the payment of this Note, and hereby consent to any and all renewals, extensions, indulgences, releases or changes, regardless of the number of such renewals, extensions, indulgences, releases or changes.

No waiver by Payee of any of its rights or remedies hereunder or under any other document evidencing or securing this Note or otherwise shall be considered a waiver of any other subsequent right or remedy of Payee; no delay or omission in the exercise or enforcement by Payee of any rights or remedies shall ever be construed as a waiver of any right or remedy of Payee; and no exercise or enforcement of any such rights or remedies shall ever be held to exhaust any right or remedy of Payee.

Section 4.   **Events of Default and Remedies.**   An "Event of Default" shall exist hereunder if any one or more of the following events shall occur and be continuing:  (a) the failure of Maker to pay any fee to Payee or to make any payment of principal or interest on this Note when due (whether at stated maturity, by acceleration or otherwise); (b) any representation or warranty made by Maker to Payee herein or in any of the documents executed or delivered to Payee in connection herewith shall prove to be untrue or inaccurate in any material respect; (c) default shall occur in the performance of any of the covenants or agreements of Maker contained herein or in any document executed or delivered to Payee in connection herewith and such default shall continue for a period of at least ten (10) days after the date Payee notifies Maker of such default; provided, however, if Maker is delinquently attempting to cure or correct such default and if such default cannot be cured within ten (10) days, such cure period shall be extended until thirty (30) days after the date the Payee notifies Maker of such default; (d) Maker or any guarantor shall (1) apply for or consent to the appointment of a receiver, trustee, intervenor, custodian or liquidator of itself or of all or a substantial part of their respective assets, (2) be adjudicated a bankrupt or insolvent or file a voluntary petition for bankruptcy or admit in writing that it is unable to pay its debts as they become due, (3) make a general assignment for the benefit of creditors, (4) file a petition or answer seeking reorganization or an arrangement with creditors or to take advantage of any bankruptcy or insolvency laws, or (5) file an answer admitting the material allegations of, or consent to, or default in answering, a petition filed against it in any bankruptcy, reorganization or insolvency proceeding, or take action for the purpose of effecting any of the foregoing; (e) an order, judgment or decree shall be entered by any court of competent jurisdiction or other competent authority approving a petition seeking reorganization of Maker or appointing a receiver, trustee, intervenor or liquidator of any such person, or of all or substantially all of its assets, and such order, judgment or decree shall continue unstayed and in effect for a period of ninety (90) days; (f) Maker shall fail to have discharged within a period of ten (10) days after the commencement thereof any attachment, sequestration or similar proceeding against any material portion of the assets of Maker or surety; or

(g) the entry of any judgment against Maker or the issuance or entry of any attachment or other lien against any property of Maker for an amount in excess of $100,000.

Upon the failure of Maker to pay when due any principal of or interest on this Note or the occurrence of any Event of Default, then in any such event the holder hereof may, at its option, (a) declare the entire unpaid balance of principal of and accrued interest upon this Note to be immediately due and payable, (b) foreclose all liens and security interests securing payment thereof or any part thereof, and/or (c) exercise any of the other rights and remedies which may be available to Payee.

Section 5.     Notice.   Whenever this Note requires or permits any notice, approval, request or demand from one party to another, the notice, approval, request or demand must be in writing and shall be deemed to have been given when personally served or when deposited in the United States mails, registered or certified, return receipt requested, addressed to the party to be notified at the following address (or at such other address as may have been designated by written notice):

|          |                                     |
|----------|-------------------------------------|
| Maker:   | Superior Lubricants Transport, Inc. |
|          | 3312 Dooling Street                 |
|          | Fort Worth, Texas 76111             |
|          |                                     |
| Payee:   | Integra Funding Solutions, LLC      |
|          | 6300 Ridglea Place, Suite 1101      |
|          | Fort Worth, Texas 76116             |

In the event that the holder hereof shall fail to give notice of default to Maker as provided herein, the sole and exclusive remedy of Maker for such failure shall be to seek appropriate equitable relief to enforce this agreement to give such notice and to have any acceleration of the maturity hereof postponed or revoked and foreclosure proceedings in connection therewith delayed or terminated pending or upon the curing of such default in the manner and during the period of time hereinbefore set out, and Maker shall have no right to damages or any other type of relief not herein specifically set out against the holder hereof, all of which damages or other relief are expressly waived by Maker. The foregoing is not intended and shall not be deemed under any circumstances to require the holder hereof to give notice of any type or nature to Maker not expressly required by other provisions of this Note.

Section 6.     Prepayment.   Maker reserves the right to prepay the outstanding principal balance of this Note, in whole or in part, at any time and from time to time, without premium or penalty. Any such prepayment shall be made together with payment of interest accrued on the amount of principal being prepaid through the date of such prepayment. Notwithstanding the foregoing, in the event Maker prepays the outstanding principal balance of this Note in full, Payee's obligation to make subsequent advances hereunder shall terminate as of the date of such prepayment.

Section 7.     Usury Laws.   Any provision herein, or in any document securing this Note, or any other document executed or delivered in connection herewith, or in any other agreement or

commitment, whether written or oral, expressed or implied, to the contrary notwithstanding, neither Payee nor any holder hereof shall in any event be entitled to receive or collect, nor shall or may amounts received hereunder be credited, so that Payee or any holder hereof shall be paid, as interest, a sum greater than the maximum amount permitted by applicable law to be charged to the person, partnership, firm or corporation primarily obligated to pay this Note at the time in question. If any construction of this Note or any document securing this Note, or any and all other papers, agreements or commitments, indicate a different right given to Payee or any holder hereof to ask for, demand or receive any larger sum as interest, such is a mistake in calculation or wording which this clause shall override and control, it being the intention of the parties that this Note, and all other instruments securing the payment of this Note or executed or delivered in connection herewith shall in all things comply with applicable law and proper adjustments shall automatically be made accordingly. In the event that Payee or any holder hereof ever receives, collects or applies as interest, any sum in excess of the Maximum Rate, if any, such excess amount shall be applied to the reduction of the unpaid principal balance of this Note, and if this Note is paid in full, any remaining excess shall be paid to Maker. In determining whether or not the interest paid or payable, under any specific contingency, exceeds the Maximum Rate, if any, Maker and Payee or any holder hereof shall, to the maximum extent permitted under applicable law, (a) characterize any nonprincipal payment as an expense or fee rather than as interest, (b) exclude voluntary prepayments and the effects thereof, (c) "spread" the total amount of interest throughout the entire term of this Note so that the interest rate is uniform throughout the entire term of this Note; provided, that if this Note is paid and performed in full prior to the end of the full contemplated term hereof, and if the interest received for the actual period of existence thereof exceeds the maximum lawful rate, if any, Payee or any holder hereof shall refund to Maker the amount of such excess, or credit the amount of such excess against the aggregate unpaid principal balance of all advances made by the Payee or any holder hereof under this Note at the time in question.

Section 8.    Costs.   The loan evidenced by this Note shall be closed without expense to Payee, it being understood and agreed that all expenses necessary and usual to a transaction of this kind shall be paid by Maker, such expenses to include but not to be limited to: (i) recording fees; and (ii) reasonable attorneys' fees arising in connection with the negotiation and preparation of this Note and all documents to be executed in connection with this Note. If this Note is placed in the hands of an attorney for collection, or if it is collected through any legal proceeding at law or in equity, or in bankruptcy, receivership or other court proceedings, Maker agrees to pay all costs of collection, including, but not limited to, court costs and reasonable attorneys' fees, including all costs of appeal.

Section 9.    Applicable Law.  This Note is being executed and delivered, and is intended to be performed in the State of Texas. Except to the extent that the laws of the United States may apply to the terms hereof, the substantive laws of the State of Texas shall govern the validity, construction, enforcement and interpretation of this Note. In the event of a dispute involving this Note or any other instruments executed in connection herewith, the undersigned irrevocably agrees that venue for such dispute shall lie in any court of competent jurisdiction in Tarrant County, Texas.

Maker and Payee expressly agree that the provisions of Chapter 346 of the Texas Finance Code, as amended (regulating certain revolving credit loans and revolving tri-party accounts), shall not apply to this Note or any loan evidenced by this Note.

Section 10. <u>Renewal Note</u>. This Note is executed in renewal and increase of that one certain promissory note dated March 30, 2015 in the amount of one hundred fifty thousand dollars ($150,000) executed by Maker and payable to Payee.

Section 11. <u>Final Agreement</u>. THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER HEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

SUPERIOR LUBRICANTS TRANSPORT, INC., a Texas corporation

By: _____

Bryan Austin, President

# Exhibit "C"



When Recorded, Return To:

**INTEGRA FUNDING SOLUTIONS, LLC**
6300 Ridglea Place, Suite 1101
Fort Worth, Texas 76116
Attention: Randy Woods

### DEED OF TRUST
### SECURITY AGREEMENT - FINANCING STATEMENT

THE STATE OF TEXAS   §
                           §
COUNTY OF TARRANT   §

      That as of the 14th day of May, 2015, Superior Lubricants Transport, Inc., a Texas corporation (hereinafter, whether one or more, jointly and severally called "Grantor"), whose mailing address is 3312 Dooling Street, Fort Worth, Texas 76111, in consideration of the debt and trust hereinafter mentioned, does hereby GRANT, BARGAIN, SELL, TRANSFER, ASSIGN and CONVEY unto Randy Woods, Trustee, the real property described on Exhibit "A" (all of which is sometimes referred to collectively herein as the "Property") and all improvements now or hereafter situated thereon inclusive of all goods which are or are to become fixtures.

      TO HAVE AND TO HOLD the Property, together with the rights, privileges, and appurtenances thereto, unto the said Trustee, and to his substitutes or successors forever. And Grantor does hereby bind itself, and Grantor's successors and assigns to warrant and forever defend the Property unto the said Trustee, his substitutes or successors and assigns forever, against the claim or claims of all persons claiming or to claim the Property or any part thereof.

      This conveyance, however, is made in TRUST to secure payment of (a) the indebtedness evidenced by that one certain promissory note (the "Note") of even date herewith, incorporated herein by this reference, executed by Grantor and payable to the order of Integra Funding Solutions, LLC, whose mailing address is 6300 Ridglea Place, Suite 1101, Fort Worth, Texas 76116 (hereinafter called "Beneficiary", which definition shall include any holder of the indebtedness) in the City of Fort Worth, Texas in the principal amount of two hundred twenty thousand dollars ($220,000.00) and all renewals, extensions and increases thereof, (b) all other indebtedness of Grantor to Beneficiary, whether now existing or hereafter arising, and (c) all indebtedness, obligations and liabilities of Grantor to Beneficiary under this Deed of Trust or any security agreement which secures the payment of the Note.

      If Grantor performs all of the covenants and agreements herein contained, and if Grantor makes prompt payment of all indebtedness secured hereby as the same shall become due and payable, then this conveyance shall become null and void and of no further force and effect, and this Deed of Trust shall be released, at the expense of Grantor, by the Beneficiary.

Grantor covenants and agrees as follows:

1.     *Title*. That it is lawfully seized of the Property, and has the right to convey the same, and that the Property is free from all liens and encumbrances, except as herein provided.

2.     *Taxes, Assessments*. To protect the title and possession of the Property, and to pay when due all taxes and assessments now existing or hereafter levied or assessed upon the Property or levied or assessed on the interest therein created by this Deed of Trust, and to deliver to Beneficiary on or before thirty (30) days prior to the date such taxes become delinquent, validated receipts evidencing payment of all such taxes, and to preserve and maintain the lien hereby created as a first and prior lien, except as hereinafter provided, on the Property, including any improvements hereafter made a part of the realty.

3.     *Maintenance*. To keep the improvements on the Property in good repair and condition, and not to permit or commit any waste thereof, and to keep all buildings and other improvements occupied so as not to impair the insurance carried thereon.

4.     *Minerals*. To not, without the prior written consent of Beneficiary, permit any drilling or exploration for or extraction, removal or production of any mineral, natural element, compound or substance from the surface or subsurface of the Property regardless of the depth thereof or the method of mining or extraction thereof and agree to defend, indemnify, save and hold Beneficiary, its officers, agents, servants, employees, successors and assigns harmless from any and all claims, liabilities, losses or expenses which may be incurred by Beneficiary, and any and all other expenses or losses, either direct or consequential, which are attributable, or alleged in any way to be attributable, to the development and exploitation of mineral rights in, on or around the Property by Grantor or any other party.

5.     *Insurance*. To insure and keep insured all improvements now or hereafter created upon the Property against loss or damage by fire and windstorm and any other hazard or hazards, as may be reasonably required from time to time by Beneficiary during the term of the indebtedness hereby secured, to the extent of the original amount of the indebtedness hereby secured or to the extent of the full insurable value of said improvements, whichever is the lesser, in such form and with such insurance company or companies as may be approved by Beneficiary; and to deliver to Beneficiary the policies of such insurance, having attached to said policies such mortgage indemnity clause as Beneficiary shall direct; and to deliver renewals of such policies to Beneficiary at least five (5) days before any such insurance policies shall expire. If a Default has occurred and is continuing, any proceeds which Beneficiary may receive under any such policy, or policies, may be applied by Beneficiary to reduce the indebtedness hereby secured, whether then matured or to mature in the future, and in such manner as Beneficiary may elect. If no Default has occurred and is continuing, Beneficiary shall permit Grantor to use said proceeds to repair or replace all improvements damaged or destroyed and covered by said policy.

6.     *Performance by Beneficiary*. That, in the event Grantor shall fail to keep the improvements on the Property hereby conveyed in good repair and condition, or to pay promptly

when due all taxes and assessments as aforesaid, or to preserve the prior lien of this Deed of Trust on the Property, or to keep the buildings and improvements insured as aforesaid, or to deliver the policy or policies of insurance, or the renewal or renewals thereof, to Beneficiary as aforesaid, or to perform any other covenants of this Deed of Trust concerning the Property, then Beneficiary may, at its option, but without being required to do so, make such repairs, pay such taxes and assessments, purchase any tax title thereon, remove any prior liens, and prosecute or defend any suits in relation to the preservation of the prior lien of this Deed of Trust on the Property, or insure and keep insured the improvements thereon in an amount not to exceed that above stipulated; and any sums which may be so paid out by Beneficiary, and all sums paid for insurance premiums as aforesaid, including the costs, expenses and attorney's fees paid in any suit affecting the Property, shall bear interest from the dates of such payments at the rate stated in the Note, and shall be paid by Grantor to Beneficiary upon demand, at the same place at which the Note is payable, and shall be deemed a part of the debt hereby secured and recoverable as such in all respects.

       7.     *Default, Foreclosure.*  Upon the occurrence of any one or more of the following events (individually a "Default" and collectively, "Defaults"):

          (a)    the failure of Grantor to pay any sum of money in accordance with the terms of the Note as it becomes due and payable, whether at the scheduled due date thereof or when accelerated pursuant to any power to accelerate, or otherwise; or

          (b)    the failure of Grantor to punctually and properly perform, observe or comply with any covenant, agreement, undertaking or condition contained herein, or in the Note, or any renewal, modification, rearrangement, amendment or extension thereof, or in any documents evidencing, securing or executed in connection with the Note (the "Loan Documents") (other than covenants to pay any sum of money in accordance with the Note or any other promissory note executed by Grantor and payable to the order of Beneficiary); or

          (c)    a default under and pursuant to any other mortgage or security agreement which covers or affects any part of the Property; or

          (d)    the execution by Grantor of an assignment for the benefit of creditors or the admission in writing by Grantor of Grantor's inability to pay, or Grantor's failure to pay, debts generally as the debts become due; or

          (e)    the levy against the Property or any part thereof, of any execution, attachment, sequestration or other writ which is not vacated within sixty (60) days after the levy; or

          (f)    the appointment of a receiver, trustee or custodian of Grantor, or of the Property or any part thereof, which receiver, trustee or custodian is not discharged within sixty (60) days after the appointment; or

(g) the filing by Grantor as a debtor of a petition, case, proceeding or other action pursuant to, or the voluntary seeking of the benefit or benefits of, Title 11 of the United States Code, as now or hereafter in effect, or any other law, domestic or foreign, as now or hereafter in effect relating to bankruptcy, insolvency, liquidation, receivership, reorganization, arrangement, or composition or extension or adjustment of debts, or similar laws affecting the rights of creditors (Title 11 of the United States Code and such other laws being herein referred to as "Debtor Relief Laws"), or the taking of any action in furtherance thereof; or

(h) the filing by Grantor of either a petition, complaint, answer or other instrument which seeks to effect a suspension of, or which has the effect of suspending any of the rights or powers of Beneficiary or Trustee granted in the Note, herein or in any Loan Document; or

(i) the filing of a petition, case, proceeding or other action against Grantor as a debtor under any Debtor Relief Law or seeking appointment of a receiver, trustee, custodian or liquidator of Grantor or of the Property, or any part thereof, or of any significant portion of Grantor's other property, and (i) Grantor admits, acquiesces in or fails to contest diligently the material allegations thereof, or (ii) the petition, case, proceeding or other action results in the entry of an order for relief or order granting the relief sought against Grantor, or (iii) the petition, case, proceeding or other action is not permanently dismissed or discharged on or before the earlier of trial thereon or thirty (30) days next following the date of filing; or

(j) the discovery by Beneficiary of information establishing that any representation or warranty made by Grantor herein or in any loan document is false, misleading, erroneous or breached in any material respect; or

(k) abandonment by Grantor of all or any portion of the Property; or

(l) dissolution or liquidation of the Grantor or termination or forfeiture of Grantor's right to do business, or, if Grantor is an individual, the death of Grantor; or

(m) the failure of Grantor to immediately pay any final money judgment against Grantor; or

(n) the occurrence of any event referred to in Subsections (d), (f), (g), (h), (i), (l) and (m) above with respect to any guarantor or other person or entity obligated in any manner to pay or perform the Note or any part thereof (as if such guarantor or other person or entity were "Grantor" in such Subsections); or

(o) the failure of this Deed of Trust to constitute a first lien upon the Property; or

(p)   the occurrence of a default or event of default under any promissory note executed by Grantor or by The Flatiron Building Partners, Ltd. and payable to Beneficiary.

Beneficiary may elect, after the giving of any required notice and expiration of any applicable cure period set forth in the Note, Grantor hereby expressly waiving any notice of intent to accelerate maturity of the indebtedness, protest and notice of protest, presentment and demand for payment, to declare the entire principal indebtedness hereby secured, with all interest accrued thereon and all other sums hereby secured, immediately due and payable; and in the event of default in the payment of said indebtedness when due or declared due, it shall thereupon, or at any time thereafter, be the duty of the Trustee, or his successor or substitute as hereinafter provided, at the request of Beneficiary (which request is hereby conclusively presumed), to enforce this trust; and after advertising the time, place and terms of the sale of the above the Property then subject to the lien hereof, and after mailing and filing notices as required by Section 51.002, Texas Property Code, as then amended, and after otherwise complying with that statute, the Trustee shall sell the Property then subject to the lien hereof, at public auction in accordance with such notices, on the first Tuesday in any month between the hours of ten o'clock A.M. and four o'clock P.M., to the highest bidder for cash; selling all of the Property as an entirety or in such parcels as the Trustee acting may elect; and make due conveyance to the purchaser or purchasers, with general warranty binding Grantor, and Grantor's successors and assigns; and out of the money arising from such sale, the Trustee acting shall first pay all the expenses of advertising the sale and making the conveyance, including a reasonable commission to the Trustee, which commission shall be due and owing in addition to the attorneys' fees provided for in the Note, and then pay to Beneficiary the full amount of principal, interest, attorney's fees and other charges due and unpaid on the Note and all other indebtedness secured hereby, and then rendering the balance of the sales price, if any, to Grantor, and Grantor's successors or assigns; and the recitals in the conveyance to the Purchaser or Purchasers shall be full and conclusive evidence of the truth of the matters therein stated, and all prerequisites to said sale shall be presumed to have been performed and such sale and conveyance shall be conclusive against Grantor, and Grantor's successors and assigns.

8.   *Abandonment, Dismissal*.  It is agreed that, in the event a foreclosure hereunder is commenced by the Trustee, or his substitute or successor, Beneficiary may, at any time before the sale of the Property direct the said Trustee to abandon the sale, and may then institute suit, for the collection of the Note and for the judicial foreclosure of this Deed of Trust lien. It is further agreed that, if Beneficiary institutes a suit for the collection thereof and for a judicial foreclosure of this Deed of Trust lien, Beneficiary may at any time before the entry of a final judgment in said suit dismiss the same and require the Trustee, his substitute or successor, to sell the Property in accordance with the provisions of this Deed of Trust.

9.   *Right to Purchase*.  Beneficiary, if it is the highest bidder, shall have the right to purchase at any sale of the Property, and to have the amount for which such Property is sold credited on the debt then owing.

10.  *Substitute Trustee*.  Beneficiary in any event is hereby authorized to appoint a substitute trustee, or a successor trustee, to act instead of the Trustee named herein, without other

formality than the designation in writing of a substitute or successor trustee; and the authority hereby conferred shall extend to the appointment of other successor and substitute trustees successively until the indebtedness hereby secured has been paid in full, or until the Property is sold hereunder; and each substitute and successor trustee shall succeed to all of the rights and powers of the original trustee named herein.

11. _Possession._ In the event any sale is made of the Property, or any portion thereof, under the terms of this Deed of Trust, Grantor, and Grantor's successors and assigns, shall forthwith upon the making of such sale surrender and deliver possession of the Property so sold to the Purchaser at such sale, and, in the event of their failure to do so, they shall thereupon from and after the making of such sale be and continue as tenants at will of such Purchaser; and in the event of their failure to surrender possession of the Property upon demand, the Purchaser, and Purchaser's successors or assigns, shall be entitled to institute and maintain an action for forcible detainer of the Property in the Justice of the Peace Court in the Justice Precinct in which such Property, or any part thereof, is situated.

12. _Prior Liens._ It is agreed that the lien hereby created is a second lien; in the event the proceeds of the indebtedness secured hereby as set forth herein are used to pay off and satisfy any liens heretofore existing on the Property, then Beneficiary is, and shall be, subrogated to all of the rights, liens and remedies of the holders of the indebtedness so paid.

13. _Assignment of Leases and Rents._

(a) Grantor hereby assigns to Beneficiary all existing and future leases, including, without limitation, all subleases thereof, and any and all extensions, renewals, modifications and replacements thereof, upon any part of the Property (collectively, the "Leases"). Grantor hereby further assigns to Beneficiary all guaranties of tenants' performance under the Leases. Prior to a Default, Grantor shall have the right, without joinder of Beneficiary, to enforce the Leases, unless Beneficiary directs otherwise.

(b) Grantor does hereby absolutely and unconditionally assign, transfer and set over to Beneficiary all rents, income, receipts, revenues, issues, profits and proceeds to be derived from the Property, including, without limitation, the immediate and continuing right to collect and receive all of the rents, income, receipts, revenues, issues, profits and other sums of money that may now or at any time hereafter become due and payable to Grantor under the terms of any leases now or hereafter covering the Property, or any part thereof, including, but not limited to, minimum rents, additional rents, percentage rents, deficiency rents and liquidated damages following a Default, all proceeds payable under any policy of insurance covering the loss of rents resulting from untenantability caused by destruction or damage to the Property, and all of Grantor's rights to recover monetary amounts from any tenant in bankruptcy, including, without limitation, rights of recovery for use and occupancy and damage claims arising out of lease defaults, including rejections, under the United States Bankruptcy Code or any other present or future federal or state insolvency, bankruptcy or similar law, together with any sums of money that may now or at any time hereafter become due and payable to Grantor by virtue of any and all royalties, overriding royalties, bonuses, delay rentals and any other amount of any kind or

character arising under any and all present and future oil, gas and mining leases covering the Property or any part thereof (collectively, the "Rents"); and all proceeds and other amounts paid or owing to Grantor under or pursuant to any and all contracts and bonds relating to the construction, erection or renovation of the Property; subject however to a license hereby granted by Beneficiary to Grantor to collect and receive all of the foregoing (such license evidenced by Beneficiary's acceptance of this Deed of Trust), subject to the terms and conditions hereof. Notwithstanding anything contained herein or in any of the other Loan Documents to the contrary, the assignment in this Paragraph is an absolute, unconditional and presently effective assignment and not merely a security interest; provided, however, upon the occurrence of a Default hereunder or upon the occurrence of any event or circumstance which with the lapse of time or the giving of notice or both would constitute a Default hereunder, such license shall automatically and immediately terminate and Grantor shall hold all Rents paid to Grantor thereafter in trust for the use and benefit of Beneficiary and Beneficiary shall have the right, power and authority, whether or not it takes possession of the Property, to seek enforcement of any such lease, contract or bond and to demand, collect, receive, sue for and recover in its own name any and all of the above described amounts assigned hereby and to apply the sum(s) collected, first to the payment of expenses incident to the collection of the same, and the balance to the payment of the Note; provided further, however, that Beneficiary shall not be deemed to have taken possession of the Property except on the exercise of its option to do so, evidenced by its demand and overt act for such purpose. It shall not be necessary for Beneficiary to institute any type of legal proceedings or take any other action whatsoever to enforce the assignment provisions in this Section 13.

14.    *Possible Extensions.* It is agreed that an extension or extensions may be made of the time of payment of all, or any part, of the indebtedness secured hereby, and that any part of the Property may be released from this lien without altering or affecting the priority of the lien created by this Deed of Trust in favor of any junior encumbrancer, mortgagee or purchaser, or any person acquiring an interest in the Property, or any part thereof; it being the intention of the parties hereto to preserve this lien on the Property, and all improvements thereon and that may be hereafter constructed thereon, as first and superior to any liens that may be placed thereon, or that may be fixed, given or imposed by law thereon, after the execution of this instrument, notwithstanding any such extension of the time of payment or the release of a portion of the Property from this lien.

15.    *Application of Payments.* In the event any portion of the indebtedness hereinabove described cannot be lawfully secured by this Deed of Trust lien on the Property, it is agreed that the first payments made on said indebtedness shall be applied to the discharge of that portion of said indebtedness.

16.    *Condemnation.* If a Default has occurred and is continuing, Beneficiary shall be entitled to receive any and all sums which may become payable to Grantor for the condemnation of the Property, or any part thereof, for public or quasi-public use, or by virtue of private sale in lieu thereof, and any sums which may be awarded or become payable to Grantor for damages caused by public works or construction on or near the Property. All such sums are hereby assigned to Beneficiary, who shall, after deducting therefrom all expenses actually incurred, including attorney's fees, release same to Grantor, if no Default has occurred and is continuing. If a Default

has occurred and is continuing, Beneficiary may apply any and all sums which may become payable to Grantor for the condemnation of the Property, or any part thereof, for public or quasi-public use, or by virtue of private sale in lieu thereof, and any sums which may be awarded or become payable to Grantor for damages caused by public works or construction on or near the Property to the reduction of the indebtedness hereby secured, whether then matured or to mature in the future, or to the reduction of any money obligation hereunder, as and in such manner as Beneficiary may elect. Beneficiary shall not be, in any event or circumstance, liable or responsible for failure to collect, or exercise diligence in the collection of, any such sums. Grantor shall control the prosecution of any proceeding relating to the condemnation of the Property.

17. *Controlling Agreement.* Nothing herein, or in the Note, contained shall ever entitle Beneficiary, upon the arising of any contingency whatsoever, to receive or collect interest in excess of the highest rate allowed by the laws of the State of Texas and/or the United States on the principal indebtedness hereby secured or on any money obligation hereunder, and in no event shall Grantor be obligated to pay interest thereon in excess of such rate.

18. *Fixtures and Security Agreement.* It is understood and agreed that by this instrument Grantor, in addition to fixing and creating a Deed of Trust lien upon and against the Property, inclusive of all goods which are or are to become fixtures thereon, have also created and granted to the Beneficiary pursuant to the Uniform Commercial Code of Texas a security interest in said goods.

19. *Sale or Transfer.* Upon sale or transfer of all or any part of the Property, or any interest therein, or of any beneficial interest in any Grantor (if said Grantor is not a natural person or persons but is a corporation, partnership, trust or other legal entity), Beneficiary may, at its option, declare all of the sums secured by this instrument to be immediately due and payable, and Beneficiary may invoke any remedies provided in this instrument. Notwithstanding the foregoing, said option shall not apply in case of: (a) sales or transfers when the transferee's creditworthiness and management ability are satisfactory to Beneficiary, and the transferee has executed, prior to the sale or transfer, a written assumption agreement containing such terms as Beneficiary may require, including, if required by Beneficiary, an increase in the rate of interest payable under the Note; or (b) sales or transfers of items of Grantor's personal property which have become obsolete or worn beyond practical use and which have been replaced by adequate substitutes having a value equal to or greater than the replaced items when new.

20. *Subordinate Financing.* If Grantor, without the prior written consent of Beneficiary, executes or delivers any pledge, security agreement, mortgage or deed of trust covering all or any portion of the Property (hereinafter called "Subordinate Mortgage"), Beneficiary may, at Beneficiary's option, which option may be exercised at any time following the execution or delivery of such pledge, security agreement, mortgage or deed of trust, without demand, presentment, protest, notice of protest, notice of intent to accelerate, notice of acceleration or other notice, or any other action, all of which are hereby waived by Grantor and all other parties obligated in any manner on the indebtedness hereby secured, declare the indebtedness hereby secured to be immediately due and payable. In the event of consent by Beneficiary to the granting of a Subordinate Mortgage, or in the event the above-described right of Beneficiary to declare the

indebtedness hereby secured to be immediately due and payable upon the granting of a Subordinate Mortgage without the prior written consent of Beneficiary is determined by a court of competent jurisdiction to be unenforceable under the provisions of any applicable law, Grantor will not execute or deliver any Subordinate Mortgage unless there shall have been delivered to Beneficiary not less than ten (10) days prior to the date thereof a copy thereof which shall contain express covenants to the effect: (a) that the Subordinate Mortgage is in all respects unconditionally subject and subordinate to the lien and security interest evidenced by this Deed of Trust and each term and provision hereof; and (b) that if any action or proceeding shall be brought to foreclose the Subordinate Mortgage (regardless of whether the same is a judicial proceeding or pursuant to a power of sale contained therein), written notice of the commencement thereof will be given to Beneficiary contemporaneously with the commencement of such action or proceeding.

21.    *Limitation on Interest*. The parties hereto intend to conform strictly to the applicable usury laws. All agreements between Grantor (and any other party liable for any part of the Note) and Beneficiary, whether now existing or hereafter arising and whether written or oral, are expressly limited so that in no event whatsoever, whether by reason of acceleration of the maturity of the Note or otherwise, shall the interest contracted for, charged or received by Beneficiary hereunder or otherwise exceed the maximum amount permissible under applicable law. If from any circumstances whatsoever interest would otherwise be payable to Beneficiary in excess of the maximum lawful amount, the interest payable to Beneficiary shall be reduced automatically to the maximum amount permitted under applicable law. If Beneficiary shall ever receive anything of value deemed interest under applicable law which would apart from this provision be in excess of the maximum lawful amount, the amount which would have been excessive interest shall be applied to the reduction of the principal amount owing on the Note in inverse order of maturity and not to the payment of interest, or if such amount which would have been excessive interest exceeds the unpaid principal balance of the Note, such excess shall be refunded to Grantor, or to the maker of the Note or other evidence of indebtedness if other than Grantor. All interest paid or agreed to be paid to Beneficiary shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full stated term, including any renewal or extension, of such indebtedness so that the amount of interest on account of such indebtedness does not exceed the maximum permitted by applicable law. The terms and provisions of this section shall control and supersede every other provision of all existing and future agreements between Grantor, the maker of the Note or other evidence of indebtedness if other than Grantor, and Beneficiary

22.    *Binding Effect*. The covenants herein contained shall bind, and the benefits and advantages shall inure to, the respective heirs, executors, administrators, personal representatives, successors, and assigns of the parties hereto and shall be covenants running with the Property. The term "Grantor" shall include in their individual capacities and jointly all parties hereinabove named a Grantor. The duties, covenants, conditions, obligations, and warranties of Grantor in this Deed of Trust shall be joint and several obligations of Grantor and, if more than one, of each party named a Grantor hereinabove, and each such party's heirs, personal representatives, successors and assigns. Each party who executes this Deed of Trust and each subsequent owner of the Property or any part thereof (other than Beneficiary), covenants and agrees that it will perform, or cause to be performed, each term, provision, covenant and condition of this Deed of Trust. Words of any gender used in

this Deed of Trust shall be held and construed to include any other gender and words in the singular number shall be held to include the plural, and vice versa, unless the context requires otherwise.

23. *Escrows*. Upon Grantor's failure to perform the covenants of this Deed of Trust concerning the delivery to Beneficiary of evidence of the payment of taxes and insurance premiums on the Property and upon written request by Beneficiary, Grantor covenants and agrees to make an initial deposit and monthly deposits thereafter with Beneficiary for the purpose of creating a fund for the payment of taxes and insurance premiums on the Property. Monthly deposits shall be made on the dates specified by Beneficiary in such request, and each payment shall be one-twelfth of the estimated annual taxes and insurance premiums on the Property, such estimates to be made by Beneficiary. Said deposits shall be in addition to the payments called for in the Note, and Beneficiary shall hold said deposits in trust, without bond and without the accrual of interest thereon, to pay such taxes and premiums as they become due. Should such deposits at any time be insufficient to pay the taxes and insurance premiums when due, Grantor agrees to deposit the deficiency with Beneficiary immediately upon demand, and if an excess should accumulate in such fund, such excess shall be credited to the next maturing monthly deposit to such fund, or, at Beneficiary's option, be refunded to Grantor, or Grantor's successors or assigns. If Grantor shall make full payment of the indebtedness hereby secured, Beneficiary will, before accepting such full payment, apply to the reduction of principal any and all amounts then accumulated in such fund. Grantor covenants and agrees that any default in the making of said deposits as herein provided shall, at the option of Beneficiary, mature at once the entire amount remaining unpaid on the Note.

24. *Environmental Matters; Compliance with Laws*. Grantor warrants and represents to Beneficiary that (a) the occupancy, operation, and use of the Property shall not violate any applicable law, statute, ordinance, rule, regulation, order, or determination of any governmental authority or any board of fire underwriters (or other body exercising similar functions), or any restrictive covenant or deed restriction (of record or otherwise) affecting the Property, including, without limitation, applicable zoning ordinances and building codes, the Americans with Disabilities Act of 1990, flood disaster laws and health and environmental laws and regulations (hereinafter sometimes collectively called the "Applicable Regulations"); (b) neither Grantor nor any lessee of space from Grantor in the Property shall obtain or be required to obtain any permits, licenses, or similar authorizations to occupy, operate, or use any buildings, improvements, fixtures, and equipment forming a part of the Property as intended by Grantor to be used and operated by reason of any Applicable Regulations pertaining to health or the environment (hereinafter sometimes collectively called "Applicable Environmental Laws"), including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA") and the Resource Conservation and Recovery Act of 1976 ("RCRA"), as each is amended from time to time; and (c) the use that Grantor intends to make, or intends to allow, of the Property will not result in the disposal of or release of any hazardous substance or solid waste onto or into the Property, or any part thereof. The terms (as used in this Deed of Trust) "hazardous substance" and "release" have the meanings specified in CERCLA, and the terms "solid waste" and "disposal" (or "disposed") have the meanings specified in RCRA. If either CERCLA or RCRA is amended to broaden the meaning of any term defined thereby, the broader meaning shall apply to this provision after the effective date of the amendment. Moreover, to the extent that Texas law establishes a

meaning for "hazardous substance", "release", "solid waste", or "disposal" that is broader than that specified in either CERCLA or RCRA, the broader meaning shall apply.

Beneficiary (through its officers, employees and agents) at any reasonable time and from time to time, either prior to or after default in this Deed of Trust or under the Note, may employ persons (the "Site Reviewers") to conduct environmental site assessments ("Site Assessments") on the Property to determine whether or not there exists on the Property any environmental condition which might result in any liability, cost or expense to the owner, occupier or operator of the Property arising under the Applicable Environmental Laws. The Site Assessments may be performed at any time or times, upon reasonable notice, and under reasonable conditions established by Beneficiary (so as not to unreasonably interfere with the operation of the Property). The Site Reviewers are authorized at their own risk to enter upon the Property and to perform above and below-the-ground testing (including, without limitation, taking of core samples) to determine environmental damage or presence of any hazardous substance or solid waste in, on or under the Property and such other tests as may be necessary or desirable, in the opinion of the Site Reviewers, to conduct Site Assessments. Grantor will supply to the Site Reviewers such historical and operational information available to Grantor regarding the Property as may be requested by the Site Reviewers to facilitate the Site Assessments and will make available for meetings with the Site Reviewers appropriate personnel having knowledge of such matters.

Grantor shall indemnify, defend (with counsel selected by Beneficiary) and hold Beneficiary harmless from and against, and reimburse Beneficiary with respect to, any and all claims, demands, causes of action, loss, damage, liabilities, costs, and expenses (including attorney's fees and court costs) of every kind or character, known or unknown, fixed or contingent, asserted against or incurred by Beneficiary at any time and from time to time by reason of or arising out of any violation of an Applicable Environmental Law and all matters arising out of acts, omissions, events, or circumstances relating to the Property (including, without limitation, the presence on the Property or release from or to the Property of hazardous substances or solid wastes disposed of or otherwise released and Grantor's breach of any of its covenants, representations or indemnities under this provision), regardless of whether the act, omission, event, or circumstance constituted a violation of any Applicable Environmental Law at the time of the existence or occurrence.

25.    *Appraisals.*  Upon written request of Beneficiary, Grantor agrees to reimburse Beneficiary for the full cost of narrative appraisals of the Property, such appraisals being required from time-to-time in Beneficiary's sole discretion to re-evaluate the current value of the Property due to (a) a deterioration of Grantor's revenue from the Property, (b) an increase in Grantor's operating expenses for the Property, or (c) other events which would suggest a deterioration in the value of the Property. Each appraisal shall be ordered directly by Beneficiary from an appraiser satisfactory to Beneficiary and shall be in form and substance necessary to comply with all laws and regulations affecting Beneficiary. Grantor shall reimburse Beneficiary for any requested appraisal expense within thirty (30) days from the date of the written request by Beneficiary. Appraisals may be ordered by Beneficiary at any time in its sole discretion, but Grantor is required to reimburse Beneficiary for only one appraisal in any calendar year. Failure of Grantor to reimburse Beneficiary for any requested appraisal (not to exceed one appraisal in any twelve month period) shall constitute a Default under this Deed of Trust.

26. *Final Agreement*. THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

EXECUTED as of the date first above written.

SUPERIOR LUBRICANTS TRANSPORT, INC.,
a Texas corporation

By: _____
Bryan Austin, President

STATE OF TEXAS      §
                        §
COUNTY OF TARRANT  §

This instrument was acknowledged before me on the _26___ day of May, 2015, by Bryan Austin, president of Superior Lubricants Transport, Inc., a Texas corporation, on behalf of said corporation and in the capacity therein stated.

_____
Notary Public in and for the State of Texas

CONNIE BRYANT
Notary Public, State of Texas
My Commission Expires
February 07, 2017

## EXHIBIT A

### LEGAL DESCRIPTION

Being Lots 2-R and 3-R, Block 5, Diamond Heights Industrial Addition, an Addition to the City of Fort Worth, Tarrant County, Texas, according to the Plat recorded in Volume 388-42, page 40, Plat Records, Tarrant County, Texas, Lot 5-R, Block 5, Diamond Heights Industrial Addition, an Addition to the City of Fort Worth, Tarrant County, Texas, according to the plat recorded in Volume 388-116, page 40, Plat Records, Tarrant County, Texas and a portion of Lot 7, Block 5, Diamond Heights Industrial Addition, an Addition to the City of Fort Worth, Tarrant County, Texas, according to the plat recorded in Volume 388-Y, page 1, Plat Records, Tarrant County, Texas, being more particularly described by metes and bounds as follows:

Beginning at a 5/8" iron found at the Southwest corner of said Lot 5-R and the Northwest corner of said Lot 7, said iron being in the East line of Dooley Street (60 foot R.O.W.) and the beginning of a curve to the left whose radius is 352.38 feet and whose long chord bears North 23 degrees 55 minutes 29 seconds West, 153.82 feet.

Thence along the East line of said Dooling Street as follows:

Along said curve in a Northerly direction thru a central angle of 25 degrees 12 minutes 52 seconds, a distance of 155.07 feet to a 5/8" iron found at the end of said curve;

North 36 degrees 35 minutes 14 seconds West, 79.32 feet to a 5/8" iron found at the beginning of a curve to the right whose radius is 420.00 feet and whose long chord bears North 21 degrees 48 minutes 08 seconds West, 217.75 feet;

Along said curve in a Northerly direction, thru a central angle 30 degrees 02 minutes 52 seconds, a distance of 220.26 feet to a P.K. nail found at the end of said curve;

North 06 degrees 47 minutes 37 seconds West, 85,07 feet to a 1/2" iron set with Fulton Surveying cap at the beginning of a curve to the right whose radius is 40.00 feet and whose long chord bears North 48 degrees 37 minutes 26 seconds East, 65.76 feet;

Along said curve in a Easterly direction thru a central angle of 10 degrees 34 minutes 16 seconds, a distance of 77.19 feet to a 1/2" iron set with Fulton Surveying cap at the end of said curve and the intersection of the East line of said Dooling Street and the South line of 33rd Street (60' R.O.W.);

Thence South 76 degrees 03 minutes 00 second East along the South line of said 33rd Street, 24.14 feet to a 5/8" iron found at the Northeast corner of said Lot 2-R in the West line of the F.T.W. and D. RR. Co. R.O.W. (R.O.W. varies);

Thence South 36 degrees 42 minutes 00 seconds East, along the common line of said Lot 2-R and said RR. R.O.W., passing the Southeast corner of said Lot 2-R continuing in all a distance of 541.19 feet to a 5/8" iron found at the Southeast corner of said Lot 5-R and the Northeast corner of said Lot 7;

Thence South 53 degrees 56 minutes 58 seconds West, along the common line of Lots 5-R and 7, a distance of 86.38 feet to an "X" in concrete found;

Thence South 11 degrees 55 minutes 07 seconds East, 5.54 feet to a P.K Nail found;

Thence South 77 degrees 09 minutes 04 seconds West, 12.84 feet to P.K. Nail found in the common line of said Lots 5-R and 7;

Thence along the common line of said Lots 5-R and 7 as follows:

South 53 degrees 56 minutes 58 seconds West 19.77 feet to a 5/8" iron found;

South 76 degrees 20 minutes 12 seconds West, 101.27 feet to the point of beginning and containing 2.110 acres of land.

**MARY LOUISE GARCIA**

**COUNTY CLERK**



100 West Weatherford   Fort Worth, TX 76196-0401

PHONE (817) 884-1195

HAYNES AND BOONE LLP
301 COMMERCE ST STE 2600
FT WORTH, TX 76102

Submitter:   HAYNES AND BOONE

## *DO NOT DESTROY*
## *WARNING - THIS IS PART OF THE OFFICIAL RECORD.*

Filed For Registration:   6/15/2015 9:38 AM
Instrument #:   D215126223

DT          16          PGS          $72.00

By: _Mary Louue Garcia_

D215126223

ANY PROVISION WHICH RESTRICTS THE SALE, RENTAL OR USE OF THE DESCRIBED REAL PROPERTY
BECAUSE OF COLOR OR RACE IS INVALID AND UNENFORCEABLE UNDER FEDERAL LAW.

# Exhibit "D"



Transwestern

## NORTH TEXAS COMMERCIAL ASSOCIATION OF REALTORS®

## COMMERCIAL LEASE AGREEMENT

### between

**Superior Lubricants Transport**
(Landlord)

### and

**Wingfoot Commercial Tire Systems, LLC, an Ohio Limited**
(Tenant)     Liability Company

## TABLE OF CONTENTS

Article
1. Defined Terms
2. Lease and Term
3. Rent and Security Deposit
4. Taxes
5. Insurance and Indemnity
6. Use of Premises
7. Property Condition, Maintenance, Repairs and Alterations
8. Damage or Destruction
9. Condemnation
10. Assignment and Subletting
11. Default and Remedies
12. Landlord's Contractual Lien
13. Protection of Lenders
14. Environmental Representations and Indemnity
15. Professional Service Fees
16. Miscellaneous and Additional Provisions

# COMMERCIAL LEASE AGREEMENT

*[Throughout this Lease, complete all blanks and check all boxes that apply. Blanks not completed and boxes not checked do not apply.]*

For good and valuable consideration, the parties to this Commercial Lease Agreement (the **"Lease"**) agree as follows:

## ARTICLE ONE

### DEFINED TERMS

As used in this Lease, the terms set forth in this Article One have the following meanings:

**1.01 Effective Date:** The last date beneath the signatures of Landlord and Tenant on this Lease.

**1.02 Landlord:** Superior Lubricants Transport
Address: PO Box 161279
Fort Worth, Texas 76161
Telephone: (817) 980-3012; (817) 996-2699 Fax:
Email: austin214@gmail.com; bryan114@gmail.com

**1.03 Tenant:** Wingfoot Commercial Tire Systems, LLC
Address: c/o CBRE, Inc. 5100 Poplar Avenue, #1000
Memphis, TN 38137
Telephone: (479) 788-6221          Fax: (901) 620-3211
Email: pas goodyeardocs@cbre.com

**1.04 Premises** *[include Suite or Unit No., if applicable]:* 3300-3316 Dooling

**A. Building Name:** _____

**B. Street address:** 3300-3316 Dooling
          Fort Worth, TX  76111
_____ in          Tarrant          County, Texas.

**C. Legal description:** The property on which the Premises are situated is described as: _____
DIAMOND HEIGHTS INDUSTRIAL ADN Block: 5 Lot: 7B, Lot: 7A, Lot: 5R and
Lot: 3R

and may be more particularly described on the attached **Exhibit "A", Survey or Legal Description** (the **"Property"**). The term "Property" includes the land described on Exhibit "A", and any improvements on the land (including the Premises).

**D. Floor Plan or Site Plan:** Being a floor area of approximately ____8,600____ square feet, or a land area of approximately ____NA____ square feet or approximately ___1.9309___ acres, and being more particularly shown in outline form on the attached **Exhibit "B", Floor Plan or Site Plan.**

E. **Tenant's Pro Rata Share:** _____ 100.000 _____ %.

1.05 **Term:** _____ 5 _____ years and _____ 1 _____ months beginning on _____ October 1 _____ , 2015 (the "**Commencement Date**") and ending on _____ October 31 _____ , 2020 (the "**Expiration Date**"). Unless the context requires otherwise, references in this Lease to the "**Term**" include any renewal or extension of this Lease. [See Addendum "A", Renewal Options, if applicable].

1.06 **Base Rent:** Base Rent is due and payable in monthly installments during the Term of this Lease as set forth in this Section. Base Rent and all other sums due or payable by Tenant to Landlord under this Lease are collectively referred to in this Lease as the "**Rent.**"

### Base Rent Payment Schedule

On or before the first day of each month during the Term of this Lease, Tenant shall pay monthly installments of Base Rent as follows:

| Dates | | | Monthly Base Rent |
|---|---|---|---|
| From October 1, 2015 | to | October 31, 2015 | $ _____ ; |
| From November 1, 2015 | to | October 31, 2020 | $ 7,500.00 ; |
| From _____ | to _____ | | $ _____ ; |
| From _____ | to _____ | | $ _____ ; |
| From _____ | to _____ | | $ _____ ; |
| From _____ | to _____ | | $ _____ . |

*[Rent for any Renewal Term is determined pursuant to a separate Addendum, if applicable, and should not be set forth here.]*

1.07 **Percentage Rental Rate:** _____ NA _____ %. [See Addendum "D", Percentage Rental and Gross Sales Reports, if applicable]

1.08 **Security Deposit:** $ 7,500.00 _____ (within thirty (30) days of Lease execution) ~~(due upon execution of this Lease)~~. [See Section 3.04]

1.09 **Expense Reimbursements:**

A. Tenant shall pay Landlord as additional Rent (or pay the charges directly to the service provider, if applicable) the following expenses (or a portion of the expenses, if applicable) (each an "**Expense Reimbursement**" and collectively the "**Expense Reimbursements**") that are incurred by or assessed against the Premises (as each of these terms is defined in this Lease) *[check all boxes that apply]:*

☒ Real Estate Taxes; estimated monthly Real Estate Taxes of $1,247.00
☒ Insurance Premiums; estimated monthly Insurance of $375.00
☐ Common Area Maintenance (CAM) Expenses;
☐ Operating Expenses;
☐ Roof and Structural Maintenance Expenses;
☐ Electricity;
☐ Cable;
☐ Gas;
☐ Internet Access;

☐ Water;
☐ Sewer;
☐ Telephone;
☐ Trash Removal; and
☐ All other Utilities.

**B. Expense Definitions.**

1. **Real Estate Taxes.** "Real Estate Taxes" means all general real estate taxes, ad valorem taxes, general and special assessments, parking surcharges, rent taxes, and other similar governmental charges levied against or applicable to the Property for each calendar year.

2. **Insurance Premiums.** "Insurance Premiums" means all Landlord's insurance premiums attributable to the Property, including but not limited to insurance for fire, casualty, general liability, property damage, medical expenses, extended coverage, and loss of rents coverage for up to 12 months' Rent.

3. ~~Common Area Maintenance Expenses. "Common Area Maintenance Expenses" or "CAM Expenses" means all costs of maintenance, inspection and repairs of the Common Areas of the Property, including, but not limited to, those costs for inspection, lighting, painting, cleaning, decorations and fixtures, Utilities, ice and snow removal, trash disposal, project signs, roof repairs, pest control, project promotional expenses, property owners' association dues, wages and salary costs of maintenance personnel, and other expenses benefiting all the Property that may be incurred by Landlord, in its discretion, including sales taxes and a reasonable service charge for the administration thereof. The term "Common Areas" is defined as that part of the Property intended for the collective use of all tenants including, but not limited to, the parking areas, driveways, loading areas, landscaping, gutters and downspouts, plumbing, electrical systems, HVAC systems, roof, exterior walls, sidewalks, malls, promenades (enclosed or otherwise), meeting rooms, doors, windows, corridors and public rest rooms. CAM Expenses do not include the cost of capital improvements, the cost of management office equipment and furnishings, depreciation on Landlord's original investment, the cost of tenant improvements, real estate brokers' fees, advertising of space for lease, or interest or depreciation on capital investments.~~

4. ~~Operating Expenses. "Operating Expenses" means all costs of ownership, building management, maintenance, repairs and operation of the Property, including but not limited to roof and structural maintenance, Real Estate Taxes, Insurance Premiums, CAM Expenses, reasonable management fees, wages and salary costs of building management personnel, overhead and operational costs of a management office, janitorial, Utilities, and professional services such as accounting and legal fees. Operating Expenses do not include the cost of capital improvements, the cost of management office equipment and furnishings, depreciation on Landlord's original investment, the cost of tenant improvements, real estate brokers' fees, advertising of space for lease, or interest or depreciation on capital investments.~~

5. ~~Roof and Structural Maintenance Expenses. "Roof and Structural Maintenance Expenses" means all costs of maintenance, repair and replacement of the roof, roof deck, flashings, skylights, foundation, floor slabs, structural components and the structural soundness of the building in general.~~

6. **Utilities.** "Utilities" means charges for electricity, cable, gas, Internet access, water, sewer, telephone, trash removal, and any other services that are commonly understood to be utilities, including connection charges.

7. **Other Terms.** Other terms that are not expressly defined are intended to have the meanings given those terms in common usage.

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com

**C. Expense Reimbursement Limitations.** The amount of Tenant's Expense Reimbursement will be determined by one of the following methods as described and defined below *[check only one]:*

☐ Base Year Adjustment;
☐ Expense Stop Adjustment;
☐ Pro Rata Adjustment;
☐ Fixed Amounts; or
☒ Net Lease.

**D. Expense Reimbursement Limitation Definitions.**

1. **Base Year Adjustment.** If "Base Year Adjustment" has been checked above, Tenant shall pay to Landlord as additional Rent Tenant's Pro Rata Share of increases in the applicable expenses (those checked in Section 1.09.A. above) for the Property for any calendar year during the Term or during any Extension of this Lease, over such amounts paid by Landlord for the **Base Year** _____ (the **"Base Year"**).

2. **Expense Stop Adjustment.** If "Expense Stop Adjustment" has been checked above, Tenant shall pay to Landlord as additional Rent Tenant's Pro Rata Share of increases in the applicable expenses (those checked in Section 1.09.A. above), for the Property for any calendar year during the Term or during any Extension of this Lease, over $_____ per square foot of floor area (as set forth in Section 1.04D) per year.

3. **Pro Rata Adjustment.** If "Pro Rata Adjustment" has been checked above, Tenant shall pay to Landlord as additional Rent Tenant's Pro Rata Share of the total amount of the applicable expenses (those checked in Section 1.09.A. above) for every calendar year during the Term and during any extension of this Lease.

4. **Fixed Amounts.** If "Fixed Amounts" has been checked above, Tenant shall pay to Landlord as additional Rent the following monthly amounts (regardless of whether they have been checked in Section 1.09.A. above) as Tenant's Expense Reimbursements to Landlord for the following expenses that are incurred by or assessed against the Property:

| | | |
|---|---|---|
| Real Estate Taxes | $_____ | per month. |
| Insurance Premiums | $_____ | per month. |
| CAM Expenses | $_____ | per month, |
| Operating Expenses | $_____ | per month, |
| Roof & Structural Maintenance Expenses | $_____ | per month. |
| Electricity | $_____ | per month. |
| Cable | $_____ | per month. |
| Gas | $_____ | per month. |
| Internet Access | $_____ | per month. |
| Water | $_____ | per month. |
| Sewer | $_____ | per month. |
| Telephone | $_____ | per month. |
| Trash Removal | $_____ | per month. |
| All Other Utilities | $_____ | per month. |

5. **Net Lease.** If "Net Lease" has been checked above, then notwithstanding anything contained in this Lease to the contrary in Section 6.02, Article Seven or otherwise, Tenant shall be responsible for paying Tenant's Pro Rata Share of all costs of compliance with laws, ownership, maintenance, repairs, replacements, operation of the Premises, and operation of the Property, including but not limited to all costs of Real Estate Taxes, Insurance Premiums, ~~Common Area Maintenance Expenses, Operating Expenses, Roof and Structural Maintenance Expenses~~, and all Utilities (regardless of whether they have been checked in Section 1.09.A. above).

**E. First Payment.** The sum of the Monthly Base Rent for the first month of the Term for which Base Rent is due (which may be later than the first month of the Term, if there is a free rent period), and the initial estimated monthly Expense Reimbursement payments (before adjustments) is set forth below. ~~Upon the execution of this Lease,~~ in addition to the Security Deposit, Tenant shall pay the first monthly payment in the sum of the amounts set forth below.

| | |
|---|---|
| Initial Monthly Base Rent | $ 7,500.00 |
| Real Estate Taxes | $ 1,247.00 |
| Insurance Premiums | $ 375.00 |
| CAM Expenses | $ |
| Operating Expenses | $ |
| Roof & Structural Maintenance Expenses | $ |
| Electricity | $ |
| Cable | $ |
| Gas | $ |
| Internet Access | $ |
| Water | $ |
| Sewer | $ |
| Telephone | $ |
| Trash Removal | $ |
| All Other Utilities | $ |
| **Total** | $ 9,122.00 |

*[Complete the amount of the first Base Rent payment to be due, as well as estimated amounts of any other monthly payments that start at the beginning of the Term of this Lease. Put N/A or strike through the rest. Any estimated amounts are subject to adjustment pursuant to other provisions of this Lease. If any expense payments are not due at the beginning of the Term, they may begin later in the Term pursuant to other provisions of this Lease.]*

**F. Expense Reimbursement Payments.** Tenant agrees to pay any end-of-year lump sum Expense Reimbursement within 30 days after receiving an invoice from Landlord. Any time during the Term, Landlord may direct Tenant to pay monthly an estimated portion of the projected future Expense Reimbursement amount. Any such payment directed by Landlord will be due and payable monthly on the same day that the Base Rent is due. Landlord may, at Landlord's option and to the extent allowed by applicable law, impose a Late Charge on any Expense Reimbursement payments that are not actually received by Landlord on or before the due date, in the amount and manner set forth in Section 3.03 of this Lease. Any Expense Reimbursements relating to partial calendar years will be prorated accordingly. If Tenant's Pro Rata Share is not expressed in Section 1.04.E of this Lease, then Tenant's Pro Rata Share of such Expense Reimbursements will be based on the square footage of useable area contained in the Premises in proportion to the square footage of useable building area of the Property. Tenant may audit or examine those items of expense in Landlord's records that relate to Tenant's obligations under this Lease. Landlord shall promptly refund to Tenant any overpayment that is established by an audit or examination. If the audit or examination reveals an error of more than 5% over the figures billed to Tenant, Landlord shall pay the reasonable cost of the audit or examination.

**G. ☐ Gross-Up Provisions.** *[Check this only if applicable.]* If the Property is a multi-tenant building and is not fully occupied during the Base Year or any portion of the Term, an adjustment will be made in computing the variable costs for the Base Year and each applicable calendar year of the Term. Variable costs will include only those items of expense that vary directly proportionally to the occupancy of the Property. Variable costs that are included in the CAM Expenses, Operating Expenses and Utilities will be increased proportionately to the amounts that, in Landlord's reasonable judgment, would have been incurred had 95% of the useable area of the Property been occupied during those years.

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com

TH-Dooling-Lease

1.10 **Permitted Use:** Commercial Tire Sales and Service

[See Section 6.01]

1.11 **Party to whom Tenant is to deliver payments under this Lease** is the Landlord, unless one of the following boxes is checked, in which case Tenant shall deliver payments to: ☐ Principal Broker, or ☐ Other [Set forth name and address, if other than Landlord or Principal Broker]:

_____

_____

1.12 **Principal Broker:** _____ Transwestern Commercial Services Fort Worth _____ , is acting as the agent for Landlord exclusively, unless one of the following boxes is checked, in which case Principal Broker is acting as: ☐ the agent for Tenant exclusively, or ☐ an intermediary.

Principal Broker's Address: 777 Main Street, Suite 1100

Fort Worth, Texas 76102

Telephone: (817) 877-4433 _____ Fax: (817) 870-2826

Email: todd.hawpe@transwestern.com

1.13 **Cooperating Broker:** _____ CBRE _____ ,
is acting as the agent for Tenant exclusively, unless one of the following boxes is checked, in which case Cooperating Broker is acting as: ☐ the agent for Landlord exclusively, or ☐ an intermediary.

Cooperating Broker's Address: 2100 McKinney Avenue, Suite 700

Dallas, Texas 75201

Telephone: (214) 979-6356 _____ Fax: (214) 979-6390

Email: Timothy.Vogds@cbre.com

1.14 **The Professional Service Fee** (the "Fee"):

    **A.** The percentages applicable in Section 15.01 and Section 15.02 to leases will be 2.250 % of the Base Rent to Principal Broker and 4.500 % of the Base Rent to Cooperating Broker. If the Fee is based on an amount per square foot, that amount is $ _____ per square foot to Principal Broker and $ _____ per square foot to Cooperating Broker. The Fee will be paid in the manner described in Subsection 15.01A (half on execution and half on the Commencement Date), unless this box ☐ is checked, in which case the Fee will be paid in the manner described in Subsection 15.01B (monthly).

    **B.** The percentages applicable in Section 15.03 in the event of a sale will be 3.000 % to Principal Broker and 3.000 % to Cooperating Broker.

1.15 **Disclosure of Dual Capacity as Broker and Principal.** *[Complete if applicable]*

    **A.** _____ is a licensed Texas real estate broker and is acting in a dual capacity as broker for Landlord and as a principal in this transaction, as he or she may be Landlord (or one of the owners of Landlord).

    **B.** _____ is a licensed Texas real estate broker and is acting in a dual capacity as broker for Tenant and as a principal in this transaction, as he or she may be Tenant (or one of the owners of Tenant).

1.16 **Exhibits and Addenda.** Any exhibit or addendum attached to this Lease (as indicated by the boxes checked below) is incorporated as a part of this Lease. Any term not specifically defined in an Addendum will have the same meaning given to it in the body of this Lease.

    ☒ Exhibit "A"    Survey and/or Legal Description of the Property
    ☒ Exhibit "B"    Floor Plan and/or Site Plan
    ☐ Exhibit "C"    Information About Brokerage Services
    ☐ Exhibit "D"    Other _____

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com

TH-Dooling-Lease

| | | |
|---|---|---|
| ☒ | Addendum "A" | Renewal Options |
| ☐ | Addendum "B" | Construction of Improvements by Landlord |
| ☐ | Addendum "C" | Construction of Improvements by Tenant |
| ☐ | Addendum "D" | Percentage Rental and Gross Sales Reports |
| ☐ | Addendum "E" | Right of First Refusal for Additional Space |
| ☐ | Addendum "F" | Guaranty |
| ☐ | Addendum "G" | Rules and Regulations |
| ☐ | Addendum "H" | Rooftop Lease |
| ☐ | Addendum "I" | Parking |
| ☒ | Addendum "J" | Additional Provisions Addendum |
| ☐ | Addendum "K" | Other _____ |

## ARTICLE TWO

### LEASE AND TERM

**2.01 Lease of Premises for Term.** Landlord leases the Premises to Tenant and Tenant leases the Premises from Landlord for the Term stated in Section 1.05. The Commencement Date is the date specified in Section 1.05, unless advanced or delayed under any provision of this Lease.

**2.02 Delays in Commencement.** Landlord will not be liable to Tenant if Landlord does not deliver possession of the Premises to Tenant on the Commencement Date specified in Section 1.05 above. Landlord's non-delivery of possession of the Premises to Tenant on the Commencement Date will not affect this Lease or the obligations of Tenant under this Lease. However, the Commencement Date will be delayed until possession of the Premises is delivered to Tenant. The Term will be extended for a period equal to the delay in delivery of possession of the Premises to Tenant, plus the number of days necessary for the Term to expire on the last day of a month. If Landlord does not deliver possession of the Premises to Tenant within 60 days after the Commencement Date specified in Section 1.05, Tenant may cancel this Lease by giving a written notice to Landlord at any time after the 60-day period ends, but before Landlord actually delivers possession of the Premises to Tenant. If Tenant gives such notice, this Lease will be canceled effective as of the date of its execution, any prepaid amounts will be reimbursed to Tenant, and no party will have any rights or obligations under this Lease. If Tenant does not give such notice within the time specified, Tenant will have no right to cancel this Lease, and the Term will commence upon the delivery of possession of the Premises to Tenant. If delivery of possession of the Premises to Tenant is delayed, Landlord and Tenant shall, upon such delivery, execute an amendment to this Lease setting forth the revised Commencement Date and Expiration Date of the Term.

**2.03 Early Occupancy.** If Tenant occupies the Premises before the Commencement Date, Tenant's occupancy of the Premises will be subject to all of the provisions of this Lease. Early occupancy of the Premises will not advance the Expiration Date. Unless otherwise provided in this Lease, Tenant shall pay Base Rent and all other charges specified in this Lease for the period of occupancy.

**2.04 Holding Over.** Tenant shall vacate the Premises immediately upon the expiration of the Term or earlier termination of this Lease. Tenant shall reimburse Landlord for and indemnify Landlord against all damages incurred by Landlord as a result of any delay by Tenant in vacating the Premises. If Tenant does not vacate the Premises upon the expiration of the Term or earlier termination of this Lease, Tenant's occupancy of the Premises will be a day-to-day tenancy, subject to all of the terms of this Lease, except that the Base Rent during the holdover period will be increased to an amount that is ~~one and one-half (1½)~~ times the Base Rent in effect on the expiration or termination of this Lease, computed on a daily basis for each day of the holdover period, plus all additional sums due under this Lease. This Section will not be construed as Landlord's consent for Tenant to hold over or to extend this Lease.

110%

## ARTICLE THREE

## RENT AND SECURITY DEPOSIT

**3.01 Manner of Payment.** Tenant shall pay the Rent to Landlord at the address set forth in Section 1.02, unless another person is designated in Section 1.11, or to any other party or address Landlord may designate in any written notice delivered to Tenant. Landlord may designate, in a written notice delivered to Tenant, the party authorized to receive Rent and act on behalf of Landlord to enforce this Lease. Any such authorization will remain in effect until it is revoked by Landlord in a subsequent written notice delivered to Tenant. Any payments made to a third party designated by Landlord will be deemed made to Landlord when received by the designated third party. All sums payable by Tenant under this Lease, whether or not expressly denominated as Rent, will constitute rent for the purposes of Section 502(b)(6) of the Bankruptcy Code and for all other purposes.

**3.02 Time of Payment.** ~~Upon execution of this Lease,~~ Within thirty (30) days of Lease execution Tenant shall pay the installment of Base Rent for the first month of the Term for which Base Rent is due (which may be later than the first month of the Term, if there is a free rent period). On or before the **first day** of the next month and each month thereafter, the installment of Base Rent and other sums due under this Lease will be due and payable, in advance, without off-set, deduction or prior demand. Tenant shall cause payments to be properly mailed or otherwise delivered so as to be actually received (and not merely deposited in the mail) by Landlord (or the party identified in Section 1.11, or any other third party designated by Landlord) on or before the due date. If the Term commences or ends on a day other than the first or last day of a calendar month, the rent for any partial calendar month following the Commencement Date or preceding the end of the Term will be prorated. Tenant shall pay any such prorated portion for a partial calendar month at the beginning of the Term on the Commencement Date. Tenant shall pay any such prorated portion for a partial calendar month at the end of the Term on the first day of that calendar month.

⊡ 5%

**3.03 Late Charges.** Tenant's failure to promptly pay sums due under this Lease may cause Landlord to incur unanticipated costs. The exact amount of those costs is impractical or extremely difficult to ascertain. The costs may include, but are not limited to, processing and accounting charges and late charges that may be imposed on Landlord by any ground lease or deed of trust encumbering the Premises. Payments due to Landlord under this Lease are not an extension of credit. Therefore, if any payment under this Lease is not actually received on or before the due date (and not merely deposited in the mail), Landlord may, at Landlord's option and to the extent allowed by applicable law, impose a Late Charge on any late payments in an amount equal to ~~10%~~ 5% of the amount of the past due payment (the **"Late Charge"**) after the payment is more than five days past due. A Late Charge may be imposed only once on each past due payment. Any Late Charge will be in addition to Landlord's other remedies for nonpayment of Rent. If any check tendered by Tenant under this Lease is dishonored for any reason, Tenant shall pay to Landlord a dishonored check fee of $30.00, plus (at Landlord's option) a Late Charge as provided above ~~until Good Funds (defined below) are received by Landlord~~. The parties agree that any Late Charge and dishonored check fee represent a fair and reasonable estimate of the costs Landlord will incur by reason of the late payment or dishonored check. If there are any Late Charges, dishonored check fees, installments of Base Rent, and any other unpaid charges or reimbursements due to Landlord, then Landlord may apply any payments received from Tenant to any amounts due in any order Landlord may choose. Notwithstanding the foregoing, Landlord will not impose a Late Charge as to the first late payment in any calendar year, unless Tenant fails to pay the late payment to Landlord within three business days after the delivery of a written notice from Landlord to Tenant demanding the late payment be paid. However, Landlord may impose a Late Charge without advance notice to Tenant on any subsequent late payment in the same calendar year.

Within thirty (30) days of

**3.04 Security Deposit.** ~~Upon execution of this Lease,~~ in addition to the installment of Base Rent due under Section 3.02, and in addition to any other amounts that are due from Tenant ~~upon~~ the execution of this Lease, Tenant shall deliver to Landlord a Security Deposit in the amount stated in Section 1.08. Landlord may apply all or part of the Security Deposit to any unpaid Rent, and damages and charges for which Tenant is legally liable under this Lease, and damages and charges that result from a breach of this Lease, including but not limited to, the cost to cure Tenant's failure to comply with Section 7.05 and any other provision that requires Tenant to leave the Premises in a certain condition upon the expiration or termination of this Lease. If Landlord uses any part of the Security Deposit, Tenant shall

within thirty (30) days of

restore the Security Deposit to its full amount within 10 days after Landlord's written demand. Tenant's failure to restore the full amount of the Security Deposit within the time specified will be a default under this Lease. No interest will be paid on the Security Deposit. Landlord will not be required to keep the Security Deposit separate from its other accounts, and no trust relationship is created with respect to the Security Deposit. After the expiration of this Lease, Landlord shall refund the unused portion of the Security Deposit, if any, to Tenant within ~~60~~ days after the date Tenant surrenders possession of the Premises and provides a written notice to Landlord of Tenant's forwarding address for the purpose of refunding the Security Deposit. The provisions of this Section will survive the expiration or termination of this Lease.

30

~~3.05 Good-Funds-Payments. If any two or more payments by check from Tenant to Landlord for Rent are dishonored and returned unpaid, thereafter Landlord may, at Landlord's option, by the delivery of a written notice to Tenant, require that all future payments of Rent for the remaining Term of this Lease must be made by cash, certified check, cashier's check, official bank check, money order, wire transfer or automatic electronic funds transfer ("Good Funds"), and that the delivery of Tenant's personal or corporate check will no longer constitute payment of Rent under this Lease. Any acceptance by Landlord of a payment for Rent by Tenant's personal or corporate check thereafter will not be construed as a waiver of Landlord's right to insist upon payment by Good Funds as set forth in this Section.~~

## ARTICLE FOUR

### TAXES

**4.01 Payment by Landlord.** Landlord shall pay the real estate taxes on the Premises during the Term, subject to reimbursement by Tenant pursuant to any other provision in this Lease.

**4.02 Improvements by Tenant.** If the real estate taxes levied against the Premises for the year in which the Term commences are increased as a result of any additions or improvements made by Tenant, or by Landlord at Tenant's request, Tenant shall pay to Landlord upon demand the amount of the increase and continue to pay the increase during the Term. Landlord shall use reasonable efforts to obtain from the tax assessor a written statement of the amount of the increase due to such additions or improvements.

**4.03 Joint Assessment.** If the real estate taxes are assessed against the Premises jointly with other property that is not part of the Premises, the real estate taxes applicable to the Premises will be equal to the amount bearing the same proportion to the aggregate assessment that the total square feet of building area in the Premises bears to the total square feet of building area included in the joint assessment. If there are no improvements on the Property or the other property, then land area will be used instead of building area for the calculation of the proportional assessment. If there are improvements on one of the jointly assessed properties but not on the other property, then the calculation of the proportional assessment must be done in a reasonable manner.

**4.04 Personal Property Taxes.** Tenant shall pay all taxes assessed against trade fixtures, furnishings, equipment, inventory, products, or any other personal property belonging to Tenant. Tenant shall use reasonable efforts to have Tenant's property taxed separately from the Premises. If any of Tenant's property is taxed with the Premises, Tenant shall pay the taxes for Tenant's property to Landlord within 15 days after Tenant receives a written statement from Landlord for the property taxes.

and Tenant

**4.05 Waiver of Right to Protest Taxes.** Unless otherwise provided in this Lease: (i) Landlord retains the right to protest the tax assessment of the Property, ~~and Tenant waives the right to protest; and (ii) Tenant waives Landlord's obligation to provide Tenant with a notice of the tax valuation of the Property.~~

## ARTICLE FIVE

### INSURANCE AND INDEMNITY

**5.01 Property Insurance.** During the Term, Landlord shall maintain insurance policies covering damage to the Premises in an amount or percentage of replacement value as Landlord deems reasonable in relation to the age, location, type of construction and physical condition of the Premises

and the availability of insurance at reasonable rates. The policies will provide protection against risks and causes of loss that Landlord reasonably deems necessary. Landlord may, at Landlord's option, obtain insurance coverage for Tenant's fixtures, equipment and improvements in or on the Premises. Promptly after the receipt of a written request from Tenant, Landlord shall provide a certificate of insurance showing the insurance coverage then in effect. Tenant shall, at Tenant's expense, obtain and maintain insurance on Tenant's fixtures, equipment and improvements in or on the Premises as Tenant reasonably deems necessary to protect Tenant's interest. Any property insurance carried by Landlord or Tenant will be for the sole benefit of the party carrying the insurance and under its sole control. and/or self-insure

**5.02 Increases in Premiums.** Tenant shall not conduct or permit any operation or activity, or store or use any materials, in or around the Premises that would cause suspension or cancellation of any insurance policy carried by Landlord. If Tenant's use or occupancy of the Premises causes Landlord's insurance premiums to increase, then Tenant shall pay to Landlord, as additional Rent, the amount of the increase within 10 days after Landlord delivers written evidence of the increase to Tenant.

**5.03 Liability Insurance.** During the Term, Tenant shall self-insure and maintain a commercial general liability insurance policy, at Tenant's expense, insuring Tenant against liability arising out of the use or occupancy of the Premises, and naming Landlord as an additional insured. The initial amounts of the insurance must be at least $1,000,000 or, if the following blank is completed $_____ for Each Occurrence, $2,000,000 or, if the following blank is completed $_____ General Aggregate per policy year, and $10,000 for Medical Expense. If Tenant's liability insurance coverage is less than $5,000,000, and if this box ☐ is checked, then Tenant must also maintain a commercial liability umbrella policy in amount to provide a combination of liability insurance coverage to equal a $5,000,000 total limit. ~~The coverage amounts will be subject to periodic increases as Landlord may reasonably determine from time to time.~~ The amounts of the insurance will not limit Tenant's liability or relieve Tenant of any obligation under this Lease. The policies must contain cross-liability endorsements and must insure Tenant's performance of the indemnity provisions of Section 5.04. The policies must contain a provision that prohibits cancellation or modification of the policy except upon 30 days' prior written notice to Landlord. Tenant shall deliver a copy ~~of the policy or~~ certificate of insurance to Landlord before the Commencement Date and before the expiration of the policy during the Term. If Tenant fails to maintain the policy, Landlord may elect to maintain the insurance at Tenant's expense.

**5.04 Indemnity.** Landlord will not be liable to Tenant or to Tenant's employees, agents, invitees or visitors, or to any other person, for any injury to persons or damage to property on or about the Premises or any adjacent area owned by Landlord caused by the negligence or misconduct of Tenant, Tenant's employees, subtenants, agents, licensees or concessionaires or any other person entering the Premises under express or implied invitation of Tenant, or arising out of the use of the Premises by Tenant and the conduct of Tenant's business, or arising out of any breach or default by Tenant in the performance of Tenant's obligations under this Lease. Tenant hereby agrees to defend, indemnify and hold Landlord harmless from any loss, expense or claims arising out of such damage or injury. Tenant will not be liable for any injury or damage caused by the negligence or misconduct of Landlord, or Landlord's employees or agents, and Landlord agrees to indemnify and hold Tenant harmless from any loss, expense or damage arising out of such damage or injury.

**5.05 Waiver of Subrogation.** Each party to this Lease waives any and every claim that arises or may arise in its favor against the other party during the Term of this Lease for any and all loss of, or damage to, any of its property located within or upon, or constituting a part of, the Premises, to the extent the loss or damage is covered by and recoverable under valid and collectible insurance policies. These mutual waivers are in addition to, and not in limitation or derogation of, any other waiver or release contained in this Lease with respect to any loss of, or damage to, property of the parties. Inasmuch as these mutual waivers will preclude the assignment of any such claim by way of subrogation to an insurance company (or any other person), each party agrees to immediately give to each insurance company that has issued an insurance policy to such party written notice of the terms of such mutual waivers, and to cause the policies to be endorsed to prevent the invalidation of the insurance coverage by reason of these waivers.

## ARTICLE SIX

### USE OF PREMISES

**6.01 Permitted Use.** Tenant may use the Premises only for the Permitted Use stated in Section 1.10. Tenant acknowledges that: (i) the current use of the Premises or the improvements located on the Premises, or both, may not conform to city ordinances or restrictive covenants with respect to the permitted use, zoning, height limitations, setback requirements, minimum parking requirements, coverage ratio of improvements to land area, and other matters that may have a significant impact upon the Tenant's intended use of the Premises; (ii) Tenant has independently investigated and verified to Tenant's satisfaction the extent of any limitations or non-conforming uses of the Premises; and (iii) Tenant is not relying upon any representations of Landlord or the Brokers with respect to any such matters.

**6.02 Compliance with Laws.** Tenant shall comply with all governmental laws, ordinances and regulations applicable to the use of the Premises, and will promptly comply with all governmental orders and directives for the correction, prevention and abatement of nuisances and other activities in or upon, or connected with the Premises, all at Tenant's sole expense, including any expense or cost resulting from the construction or installation of fixtures and improvements or other accommodations for handicapped or disabled persons required for compliance with governmental laws and regulations, including but not limited to the Texas Architectural Barriers Act (the **"TABA"**) and the Americans with Disabilities Act (the **"ADA"**). To the extent any alterations to the Premises are required by the TABA, the ADA or other applicable laws or regulations, Tenant shall bear the expense of the alterations. To the extent any alterations to areas of the Property outside the Premises are required by the TABA, the ADA or other applicable laws or regulations (for "path of travel" requirements or otherwise), Landlord shall bear the expense of the alterations. Notwithstanding the above, at Lease commencement, Landlord warrants that the Premises complies with all governmental laws, ordinances and regulations including "ADA" and "TABA" to the extent such legal requirements relate to the Premises in general (and not to Tenant's specific use of the Premises).

**6.03 Certificate of Occupancy.** If required, Tenant shall apply for Certificate of Occupancy from the municipality in which the Property is located before the Commencement Date, and obtain a Certificate of Occupancy before Tenant occupies the Premises. If Tenant is unable to obtain a Certificate of Occupancy after making an application and diligently pursuing it, then Tenant may terminate this Lease by delivering a written notice to Landlord, unless either Landlord or Tenant is willing and able to cure the defects that prevented the issuance of the Certificate of Occupancy. Either Landlord or Tenant may cure any such defects, at their own expense, including any repairs, replacements, or installations of any items that are not presently existing on the Premises, but neither of them have any obligation to do so (unless another provision of this Lease states otherwise). If Tenant delivers a written termination notice to Landlord under this Section, and then any defects are cured and a Certificate of Occupancy is issued within 15 days after Tenant delivered the notice, then this Lease will remain in force. If this Lease is terminated because Landlord and Tenant cannot get a Certificate of Occupancy, then Landlord will return to Tenant any prepaid rent and any Security Deposit, and the parties will have no further obligations under this Lease. References in this Lease to a **"Certificate of Occupancy"** mean a Certificate of Occupancy sufficient to allow the Tenant to occupy the Premises for the Permitted Use.

**6.04 Signs.** Without the prior written consent of Landlord, Tenant may not place any signs, ornaments or other objects on the Premises or the Property, including but not limited to the roof or exterior of the building or other improvements on the Property, or paint or otherwise decorate or deface the exterior of the building or other improvements on the Property. Any signs installed by Tenant must conform to applicable laws, deed restrictions, and other applicable requirements. Tenant must remove all signs, decorations and ornaments at the expiration or termination of this Lease, and must repair any damage and close any holes caused by installation or removal.

**6.05 Utility Services.** Unless otherwise provided in this Lease, Tenant shall pay the cost of all Utilities used for the Premises, and the cost of replacing light bulbs and tubes. Unless otherwise required by law, Landlord is the party entitled to designate utility and telecommunication service providers to the Property and the Premises. Landlord may, at Landlord's option, allow Tenant to select the provider. If Tenant selects the provider, any access or alterations to the Property or the Premises necessary for the Utilities may be made only with Landlord's prior consent, which Landlord will not unreasonably withhold or delay. If Landlord incurs any utility or connection charges that

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

Tenant is responsible to pay and Landlord pays the charges, Tenant shall reimburse Landlord immediately upon receipt of a written notice from Landlord stating the amount of the charges.

**6.06 Landlord's Access.** Landlord and Landlord's agents will have the right to, upon reasonable advance notice, and without unreasonably interfering with Tenant's business, enter the Premises: (a) to inspect the general condition and state of repair of the Premises, (b) to make repairs required or permitted under this Lease, (c) to show the Premises or the Property to any prospective tenant or purchaser, and (d) for any other reasonable purpose. If Tenant changes the locks on the Premises, Tenant must provide Landlord with a copy of each separate key upon Landlord's request. During the last 150 days of the Term, Landlord and Landlord's agents may erect signs on or about the Premises advertising the Premises for lease or for sale.

**6.07 Possession.** If Tenant pays the Rent, properly maintains the Premises, and complies with all other terms of this Lease, Tenant may occupy and enjoy the Premises for the full Term, subject to the provisions of this Lease.

**6.08 Exemptions from Liability.** Landlord will not be liable for any damage to the business (including any loss of income), goods, inventory, furnishings, fixtures, equipment, merchandise or other property of Tenant, Tenant's employees, invitees or customers, or for any injury to Tenant or Tenant's employees, invitees, customers or any other person in or about the Premises, whether the damage or injury is caused by or results from: (a) fire, steam, electricity, water, gas or wind; (b) the breakage, leakage, obstruction or other defects of pipes, sprinklers, wires, appliances, plumbing, air conditioning or lighting fixtures or any other cause; (c) conditions arising on or about the Premises or other portions of the Property, or from other sources or places; or (d) any act or omission of any other occupant of the Property. The provisions of this Section will not, however, exempt Landlord from liability for Landlord's gross negligence or willful misconduct.

### ARTICLE SEVEN

### PROPERTY CONDITION, MAINTENANCE, REPAIRS AND ALTERATIONS

**7.01 Property Condition.** Except as disclosed in writing by Landlord to Tenant before the execution of this Lease, to the best of Landlord's actual knowledge: (i) the Premises have no known latent structural or construction defects of a material nature; and (ii) none of the improvements to the Premises have been constructed with materials known to be a potential health hazard to occupants of the Premises. Unless otherwise expressly set forth in this Lease, Landlord represents that on the Commencement Date (and for a period of 30 days thereafter): (a) the fixtures and equipment serving the Premises are in good operating condition, including the plumbing, electrical and lighting systems, any fire protection sprinkler system, the HVAC (defined below) systems and equipment, the roof, skylights, doors, overhead doors, windows, dock levelers and elevators; and (b) the interior of the Premises is in good condition. Tenant will have a period of 30 days after the Commencement Date to inspect the Premises and notify Landlord in writing of any defects and maintenance, repairs or replacements required to the above named fixtures, equipment and interior. Within a reasonable period of time after the timely receipt of any such written notice from Tenant, Landlord shall, at Landlord's expense, correct the defects and perform the maintenance, repairs and replacements.

**7.02 Acceptance of Premises.** Tenant has inspected, or has had an opportunity to inspect, the Premises, before the execution of this Lease. Tenant has determined that the Premises may be used for the Permitted Use. Subject to the provisions in Section 7.01, and any other express obligations of Landlord in this Lease to construct any improvements, make repairs, or correct defects, Tenant agrees to accept the Premises in "AS IS" condition and with all faults (other than latent defects). To the extent permitted by applicable law, Tenant waives any implied warranties of Landlord as to the quality or condition of the Premises or the Property, or as to the fitness or suitability of the Premises or the Property for any particular use.

**7.03 Maintenance and Repairs.** Landlord will not be required to perform any maintenance or repairs, or management services, in the Premises, except as otherwise provided in this Lease. Tenant will be fully responsible, at Tenant's expense, for all maintenance and repairs, and management services, other than those that are expressly set forth in this Lease as Landlord's responsibility.

**A. Landlord's Obligations.**

(1) Subject to the provisions of <u>Article Eight</u> (Damage or Destruction) and <u>Article Nine</u> (Condemnation) and except for damage caused by any act or omission of Tenant, Landlord shall keep the roof, skylights, foundation, structural components and the structural portions of exterior walls of the Premises in good order, condition and repair. Landlord will not be obligated to maintain or repair windows, doors, overhead doors, plate glass or the surfaces of walls. In addition, Landlord will not be obligated to make any repairs under this Section until a reasonable time after receipt of written notice from Tenant of the need for repairs. If any repairs are required to be made by Landlord, Tenant shall, at Tenant's sole cost and expense, promptly remove Tenant's furnishings, fixtures, inventory, equipment and other property, to the extent required to enable Landlord to make repairs. Landlord's liability under this Section will be limited to the cost of those repairs or corrections. Tenant waives the benefit of any present or future law that might give Tenant the right to repair the Premises at Landlord's expense or to terminate this Lease because of the condition.

(2) All repairs, maintenance, management and other services to be performed by Landlord or Landlord's agents involve the exercise of professional judgment by service providers, and Tenant expressly waives any claims against Landlord for breach of warranty arising from the performance of those services.

**B. Tenant's Obligations.** Subject to the provisions of <u>Section 7.01</u>, <u>Section 7.03A</u>, <u>Article Eight</u> (Damage or Destruction) and <u>Article Nine</u> (Condemnation), Tenant shall, at all times, keep all other portions of the Premises in good order, condition and repair (except for normal wear and tear), including, but not limited to, maintenance, repairs and all necessary replacements of the windows, plate glass, doors, overhead doors, HVAC equipment, electrical and lighting systems, fire protection sprinkler system, dock levelers, elevators, interior and exterior plumbing, the interior and exterior of the Premises in general, pest control and extermination, down spouts, gutters, paving, railroad siding, care of landscaping and regular mowing of grass. In addition, Tenant shall, at Tenant's expense, repair any damage to any portion of the Property, including the roof, skylights, foundation, or structural components and exterior walls of the Premises, caused by Tenant's acts or omissions. If Tenant fails to maintain and repair the Property as required by this Section, Landlord may, on 10 days' prior written notice, enter the Premises and perform the maintenance or repair on behalf of Tenant, except that no notice is required in case of emergency, and Tenant shall reimburse Landlord immediately upon demand for all costs incurred in performing the maintenance or repair, plus a reasonable service charge.

**C. HVAC Service.** This Section pertains to the heating, ventilation and air-conditioning ("HVAC") systems and equipment that service the Premises. *[Check one box only.]*

☐ (1) Landlord is obligated to provide the HVAC services to the Premises only during the operating hours of the Property (as described below).

☐ (2) Landlord will provide the HVAC services to the Premises during the operating hours of the Property (as described below) for no additional charge and will, at Tenant's request, provide HVAC services to the Premises during other hours for an additional charge of $_____ per hour. Tenant will pay Landlord the charges under this paragraph promptly after receipt of Landlord's invoice. Hourly charges are charged on a half-hour basis. Any partial hour will be rounded up to the next half hour. Tenant will comply with Landlord's procedures to make a request to provide the additional HVAC services in advance.

☒ (3) Tenant will pay for the HVAC services under this Lease. For any HVAC system that services only the Premises, Tenant shall, at Tenant's own cost and expense, enter into a regularly scheduled preventative maintenance and service contract for all such HVAC systems and equipment during the Term. If Tenant fails to enter into such a service contract acceptable to Landlord, Landlord may do so on Tenant's behalf and Tenant agrees to pay Landlord the cost and expense thereof, plus a reasonable service charge, periodically upon demand.

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com

TH-Dooling-Lease

D. **Operating Hours of the Property.** The operating hours of the Property are the times reasonably determined by Landlord unless they are specified here. *[specify the operating hours of the Property including the days of the week, and whether Saturdays, Sundays and holidays are included]:* 24 hours a day, seven days a week, holidays included.

E. **Cleaning.** Tenant must keep the Premises clean and sanitary and promptly dispose of all trash in appropriate receptacles. Tenant will provide, at Tenant's expense, janitorial services to the Premises, unless this box ☐ is checked, in which case Landlord will provide janitorial services to the Premises that are customary for the property type. Tenant will maintain, at Tenant's expense, any grease trap on the Property that Tenant uses, including but not limited to periodic emptying and cleaning, as well as making any modification to the grease trap that may be necessary to comply with any applicable law.

**7.04 Alterations, Additions and Improvements.** Tenant may not create any openings in the roof or exterior walls without the prior written consent of Landlord. Tenant may not make any alterations, additions or improvements to the Premises (**"Alterations"**) without the prior written consent of Landlord. However, Tenant is not required to obtain the Landlord's prior written consent for non-structural Alterations that do not cost more than $5,000 and that do not modify or affect the roof, plumbing, HVAC systems or electrical systems. Consent for non-structural Alterations in excess of $5,000 or that modify or affect plumbing, HVAC systems or electrical systems will not be unreasonably withheld, conditioned or delayed by Landlord. Tenant may erect or install trade fixtures, shelves, bins, machinery, HVAC systems, and refrigeration equipment, provided that Tenant complies with all applicable governmental laws, ordinances, codes, and regulations. At the expiration or termination of this Lease, Tenant may, subject to the restrictions of Section 7.05, remove items installed by Tenant, provided Tenant is not in default at the time of the removal and Tenant repairs, in a good and workmanlike manner, any damage caused by the installation or removal. Tenant shall pay for all costs incurred or arising out of Alterations and will not permit any mechanic's or materialman's lien to be filed against the Premises or the Property. Upon request by Landlord, Tenant shall deliver to Landlord proof of payment, reasonably satisfactory to Landlord, of all costs incurred in connection with any Alterations.

**7.05 Condition upon Termination.** Upon the expiration or termination of this Lease, Tenant shall surrender the Premises to Landlord broom clean and in the same condition as received, except for normal wear and tear and any damage caused by a casualty that Tenant is not otherwise obligated to repair under any provision of this Lease. Tenant will not be obligated to repair any damage that Landlord is required to repair under Article Seven (Property Condition) or Article Eight (Damage or Destruction). In addition, Landlord may require Tenant to remove any Alterations before the expiration or termination of this Lease and to restore the Premises to their prior condition, all at Tenant's expense. However, Tenant will not be required to remove any Alterations that were made with Landlord's consent or that were otherwise permitted under the terms of this Lease. All Alterations that Tenant does not remove will become Landlord's property upon the expiration or termination of this Lease. In no event may Tenant remove any of the following items without Landlord's prior written consent: (i) electrical wiring or power panels; (ii) lighting or lighting fixtures; (iii) wall coverings, drapes, blinds or other window coverings; (iv) carpets or other floor coverings; (v) HVAC equipment; (vi) plumbing equipment; (vii) fencing or gates; or (viii) any fixtures, equipment or other items that, if removed, would affect the operation or the appearance of the Property. However, Tenant may remove Tenant's trade fixtures, equipment used in Tenant's business, and personal property. The provisions of this Section will survive the expiration or termination of this Lease.

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com

TH-Dooling-Lease

## ARTICLE EIGHT

### DAMAGE OR DESTRUCTION

**8.01 Notice.** If any buildings or other improvements situated on the Property are damaged or destroyed by fire, flood, windstorm, tornado or other casualty, Tenant shall immediately give written notice of the damage or destruction to Landlord.

**8.02 Partial Damage.** If the Premises are damaged by fire, tornado or other casualty, and rebuilding and repairs can be completed within 120 days after the date Landlord receives written notification from Tenant of the occurrence of the damage, then this Lease will not terminate, but Landlord shall proceed with reasonable diligence to rebuild and repair the Premises (other than leasehold improvements made by Tenant or any assignee, subtenant or other occupant of the Premises) to substantially the condition they were in before the damage. To the extent the Premises cannot be occupied (in whole or in part) after the casualty, the Rent payable under this Lease during the period the Premises cannot be fully occupied will be adjusted equitably.

If the casualty occurs during the last 18 months of the Term, Landlord will not be required to rebuild or repair the damage unless Tenant exercises Tenant's renewal option (if any) within 15 days after the date Landlord receives written notification of the occurrence of the damage. If the casualty occurs during the last 18 months of the Term and Tenant does not so exercise Tenant's renewal option, or if there is no renewal option in this Lease, Landlord may, at Landlord's option, terminate this Lease by delivering a written termination notice to Tenant, in which case the Rent will be abated for the unexpired portion of the Term, effective on the date Landlord received written notification of the damage.

**8.03 Substantial or Total Destruction.** If the Premises are substantially or totally destroyed by fire, tornado, or other casualty, or so damaged that rebuilding and repairs cannot reasonably be completed within 120 days after the date Landlord receives written notification from Tenant of the occurrence of the damage, either Landlord or Tenant may terminate this Lease by promptly delivering a written termination notice to the other party, in which event the monthly installments of Rent will be abated for the unexpired portion of the Term, effective on the date of the damage or destruction. If neither party promptly terminates this Lease, Landlord shall proceed with reasonable diligence to rebuild and repair the Premises (except that Tenant shall rebuild and repair Tenant's fixtures and improvements in the Premises). To the extent the Premises cannot be occupied (in whole or in part) after the casualty, the Rent payable under this Lease during the period the Premises cannot be fully occupied will be adjusted equitably.

## ARTICLE NINE

### CONDEMNATION

If, during the Term, all or a substantial part of the Premises are taken for any public or quasi-public use under any governmental law, ordinance or regulation or by right of eminent domain, or are conveyed to the condemning authority under threat of condemnation, this Lease will terminate and the monthly installments of Rent will be abated during the unexpired portion of the Term, effective on the date of the taking. If less than a substantial part of the Premises is taken for public or quasi-public use under any governmental law, ordinance or regulation, or by right of eminent domain, or is conveyed to the condemning authority under threat of condemnation, Landlord shall promptly, at Landlord's expense, restore and reconstruct the Premises (other than leasehold improvements made by Tenant or any assignee, subtenant or other occupant of the Premises) in order to make the Premises reasonably suitable for the Permitted Use. The Rent payable under this Lease during the unexpired portion of the Term will be adjusted equitably. If there is a taking of the Property that has a material, adverse effect on the operation of Tenant's business in the Premises, then the Rent will be adjusted equitably. Landlord and Tenant will each be entitled to receive and retain such separate awards and portions of lump sum awards as may be allocated to their respective interests in any condemnation proceeding. The termination of this Lease will not affect the rights of the parties to those awards.

## ARTICLE TEN

### ASSIGNMENT AND SUBLETTING

Tenant may not assign this Lease or sublet the Premises or any portion thereof, without the prior written consent of Landlord, which consent will not be unreasonably withheld or delayed. Any assignment or subletting will be expressly subject to all terms and provisions of this Lease, including the provisions of Section 6.01 pertaining to the use of the Premises. In the event of any assignment or subletting, Tenant will remain fully liable for the full performance of all of Tenant's obligations under this Lease. Tenant may not assign Tenant's rights under this Lease or sublet the Premises without first obtaining a written agreement from the assignee or sublessee whereby the assignee or sublessee agrees to assume the obligations of Tenant under this Lease and to be bound by the terms of this Lease. If a Default occurs while the Premises is assigned or sublet, Landlord may, at Landlord's option, in addition to any other remedies provided in this Lease or by law, collect directly from the assignee or subtenant all rents becoming due under the terms of the assignment or subletting and apply the rents against any sums due to Landlord under this Lease. No direct collection by Landlord from any assignee or subtenant will release Tenant from Tenant's obligations under this Lease.

## ARTICLE ELEVEN

### DEFAULT AND REMEDIES

11.01 **Default.** Each of the following events is a default under this Lease (a "**Default**"):

A. Failure of Tenant to pay any installment of the Rent or other sum payable to Landlord under this Lease on the date that it is due, and the continuance of that failure for a period of five days after Landlord delivers written notice of the failure to Tenant. This clause will not be construed to permit or allow a delay in paying Rent beyond the due date and will not affect Landlord's right to impose a Late Charge as permitted in Section 3.03;

B. Failure of Tenant to comply with any term, condition or covenant of this Lease, other than the payment of Rent or other sum of money, and the continuance of that failure for a period of 30 days after Landlord delivers written notice of the failure to Tenant;

C. Failure of Tenant or any guarantor of Tenant's obligations under this Lease to pay its debts as they become due or an admission in writing of inability to pay its debts, or the making of a general assignment for the benefit of creditors;

D. The commencement by Tenant or any guarantor of Tenant's obligations under this Lease of any case, proceeding or other action seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property;

E. The commencement of any case, proceeding or other action against Tenant or any guarantor of Tenant's obligations under this Lease seeking to have an order for relief entered against it as debtor, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property, and Tenant or any guarantor: (i) fails to obtain a dismissal of such case, proceeding, or other action within 60 days of its commencement; or (ii) converts the case from one chapter of the Federal Bankruptcy Code to another chapter; or (iii) is the subject of an order of relief that is not fully stayed within seven business days after the entry thereof; and

F. ~~Vacancy or abandonment by Tenant of any substantial portion of the Premises or cessation of the use of the Premises for the purpose leased, and the continuance of that vacancy,~~

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com TH-Dooling-Lease

~~abandonment or cessation for a period of 30 days after Landlord delivers a written notice to Tenant.~~

**11.02 Remedies.** Upon the occurrence of any Default listed in <u>Section 11.01</u>, Landlord may pursue any one or more of the following remedies without any prior notice or demand.

A. Landlord may terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord. If Tenant fails to surrender the Premises, Landlord may, without prejudice to any other remedy that Landlord may have for possession of the Premises or Rent in arrears, enter upon and take possession of the Premises and expel Tenant and any other person who may be occupying the Premises or any part thereof, without being liable for any claim for damages due to the termination of this Lease or termination of possession. Tenant shall pay to Landlord on demand the amount of all Rent and loss and damage Landlord may suffer by reason of the termination or inability to relet the Premises up to the date of termination, in addition to any other liabilities that survive the termination of this Lease.

B. Landlord may enter upon and take possession of the Premises, without terminating this Lease and without being liable for any claim for damages due to termination of possession, and expel Tenant and any other person who may be occupying the Premises or any part thereof. Landlord may relet the Premises and receive rent from the new occupant. Tenant agrees to pay to Landlord monthly, or on demand from time to time, any deficiency that may arise by reason of any such reletting. In determining the amount of the deficiency, professional service fees, reasonable attorneys' fees, court costs, remodeling expenses and other costs of reletting will be subtracted from the amount of rent received from the new occupant.

C. Landlord may enter upon the Premises, without terminating this Lease and without being liable for any claim for damages due to such entry, and do whatever Tenant is obligated to do under the terms of this Lease. Tenant agrees to pay Landlord on demand for expenses that Landlord incurs in performing Tenant's obligations under this Lease, together with interest thereon at the rate of 12% per annum from the date spent until paid.

D. Landlord may sue Tenant for damages for breach of this Lease after Tenant's Default and abandonment of the Premises, or after Landlord terminates Tenant's possession and Tenant vacates the Premises, in which case the measure of damages is the sum of: (i) the unpaid Rent up to the date of the abandonment or vacancy, plus (ii) the difference between the Rent for the remainder of the Term after abandonment or vacancy, and the fair market rental value of this Lease for the remainder of the Term after abandonment or vacancy, such difference to be discounted to present value at a rate equal to the rate of interest that is allowed by law in the State of Texas when the parties to a contract have not agreed on any particular rate of interest (or, in the absence of such law, at the rate of 6% per annum). Neither the enforcement or collection by Landlord of those amounts nor the payment by Tenant of those amounts will constitute a waiver by Landlord of any breach, existing or in the future, of any of the terms or provisions of this Lease by Tenant or a waiver of any rights or remedies that the Landlord may have with respect to any breach.

E. In addition to the foregoing remedies, Landlord may change or modify the locks on the Premises if Tenant fails to pay the Rent when due. Landlord will not be obligated to provide another key to Tenant or allow Tenant to regain entry to the Premises unless and until Tenant pays Landlord all Rent that is delinquent. Tenant agrees that Landlord will not be liable for any damages resulting to the Tenant from the lockout. When Landlord changes or modifies the locks, Landlord or Landlord's agent shall post a written notice in accordance with <u>Section 93.002</u> of the Texas Property Code, or its successor statute. Tenant may be subject to legal liability if Tenant or Tenant's representative tampers with any lock after the locks have been changed or modified.

F. No re-entry or taking possession of the Premises by Landlord will be construed as an election to terminate this Lease, unless a written notice of that intention is given to Tenant. Notwithstanding any re-entry, taking possession or reletting, Landlord may, at any time

thereafter, elect to terminate this Lease for a previous Default. Pursuit of any of the foregoing remedies will not preclude pursuit of any other remedies provided by law, nor will pursuit of any remedy provided in this Lease constitute a forfeiture or waiver of any Rent due to Landlord under this Lease or of any damages accruing to Landlord by reason of the violation of any of the provisions in this Lease. Failure of Landlord to declare any Default immediately upon its occurrence, or failure to enforce one or more of Landlord's remedies, or forbearance by Landlord to enforce one or more of Landlord's remedies upon a Default, will not be deemed to constitute a waiver of any of Landlord's remedies for any Default. Pursuit of any one of the remedies will not preclude pursuit by Landlord of any of the other remedies provided in this Lease. The loss or damage that Landlord may suffer by reason of a Default by Tenant under this Lease, or the deficiency from any reletting, will include the expense of taking possession and any repairs performed by Landlord after a Default by Tenant. If Landlord terminates this Lease at any time for any Default, in addition to other Landlord's remedies, Landlord may recover from Tenant all damages Landlord may incur by reason of the Default, including the cost of recovering the Premises and the Rent then remaining unpaid.

G. Nothing in this Lease will be construed as imposing any duty upon Landlord to relet the Premises. Landlord will have no duty to mitigate Landlord's damages except as required by applicable law. Any duty imposed by law on Landlord to mitigate damages after a Default by Tenant will be satisfied if Landlord undertakes to lease the Premises to another tenant (a "**Substitute Tenant**") in accordance with the following criteria:

(1) Landlord will have no obligation to solicit or entertain negotiations with any other prospective tenant for the Premises until Landlord obtains full possession of the Premises including, without limitation, the final and unappealable legal right to relet the Premises free of any claim of Tenant;

(2) Landlord will not be obligated to lease or show the Premises on a priority basis, or offer the Premises to a prospective tenant when other space in the Property suitable for the prospective tenant's use is (or soon will be) available;

(3) Landlord will not be obligated to lease the Premises to a Substitute Tenant for an amount less than the current fair market rent then prevailing for similar uses in comparable buildings in the same market area as the Property, nor will Landlord be obligated to enter into a new lease under other terms and conditions that are unacceptable to Landlord under Landlord's then current leasing policies for comparable space in the Property;

(4) Landlord will not be obligated to enter into a lease with a Substitute Tenant whose use would:

(i) violate any restriction, covenant, or requirement contained in the lease of another tenant of the Property;

(ii) adversely affect the reputation of the Property; or

(iii) be incompatible with other uses of the Property.

(5) Landlord will not be obligated to enter into a lease with a Substitute Tenant that does not have, in Landlord's reasonable opinion, sufficient financial resources to pay the Rent under the new lease and operate the Premises in a first class manner; and

(6) Landlord will not be required to spend any amount of money to alter, remodel, or otherwise make the Premises suitable for use by a proposed Substitute Tenant unless:

(i) Tenant pays any such sum to Landlord in advance of Landlord's execution of a lease with the Substitute Tenant (which payment will not be in lieu of any damages or other sums to which Landlord may be entitled as a result of Tenant's Default under this Lease); or

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

(ii) Landlord, in Landlord's reasonable discretion, determines that any such expenditure is financially justified in connection with entering into a lease with the Substitute Tenant.

**H.** No right or remedy of Landlord is intended to be exclusive of any other right or remedy, and each and every right and remedy will be cumulative and in addition to any other right or remedy now or hereafter existing under this Lease, at law, in equity or by statute. **Landlord will not be liable for any damages resulting to Tenant from any right or remedy exercised by Landlord, regardless of the cause, even if it is caused by the sole, joint or concurrent negligence of Landlord.**

**11.03 Notice of Default.** Tenant shall give written notice of any failure by Landlord to perform any of Landlord's obligations under this Lease to Landlord and to any ground lessor, mortgagee or beneficiary under any deed of trust encumbering the Premises whose name and address have been furnished to Tenant in writing. Landlord will not be in default under this Lease unless Landlord (or the ground lessor, mortgagee or beneficiary) fails to cure the nonperformance within 30 days after receipt of Tenant's notice. However, if the nonperformance reasonably requires more than 30 days to cure, Landlord will not be in default if the cure is commenced within the 30-day period and is thereafter diligently pursued to completion.

**11.04 Limitation of Landlord's Liability.** As used in this Lease, the term **"Landlord"** means only the current owner or owners of the fee title to the Premises, or the leasehold estate under a ground lease of the Premises, at the time in question. Each Landlord is obligated to perform the obligations of Landlord under this Lease only during the time such Landlord owns such title or estate. Any Landlord who transfers its title, estate or other interest is relieved of all liability with respect to the obligations of Landlord under this Lease accruing on or after the date of the transfer, and Tenant agrees to recognize the transferee as Landlord under this Lease. However, each Landlord shall deliver to its transferee the Security Deposit held by Landlord, to the extent the Security Deposit has not then been applied under the terms of this Lease.

## ARTICLE TWELVE

### LANDLORD'S CONTRACTUAL LIEN

In addition to the statutory Landlord's lien, Tenant hereby grants to Landlord a security interest to secure payment of all Rent and other sums of money becoming due under this Lease from Tenant, upon all inventory, goods, wares, equipment, fixtures, furniture and all other personal property of Tenant situated in or on the Premises, together with the proceeds from the sale thereof. Tenant may not remove such property without the consent of Landlord until all Rent in arrears and other sums then due to Landlord under this Lease have been paid. Upon the occurrence of a Default, Landlord may, in addition to any other remedies provided in this Lease or by law, enter upon the Premises and take possession of any and all goods, wares, equipment, fixtures, furniture and other personal property of Tenant situated in or on the Premises without liability for trespass or conversion, and sell the property at public or private sales, with or without having the property at the sale, after giving Tenant reasonable notice of the time and place of any such sale. Unless otherwise required by law, notice to Tenant of the sale will be deemed sufficient if given in the manner prescribed in this Lease at least 10 days before the time of the sale. Any public sale made under this Article will be deemed to have been conducted in a commercially reasonable manner if held on the Premises or where the property is located, after the time, place and method of sale and a general description of the types of property to be sold have been advertised in a daily newspaper published in the county where the Premises is located for five consecutive days before the date of the sale. Landlord or its assigns may purchase at a public sale and, unless prohibited by law, at a private sale. The proceeds from any disposition pursuant to this Article, less any and all expenses connected with the taking of possession, holding and selling of the property (including reasonable attorneys' fees and expenses), will be applied as a credit against the indebtedness secured by the security interest granted in this Article. Any surplus will be paid to Tenant or as otherwise required by law, and Tenant shall promptly pay any deficiencies. Landlord is authorized to file a financing statement to perfect the security interest of Landlord in the aforementioned property and proceeds thereof under the provisions of the Texas Business and Commerce Code in effect in the State of Texas. Provided Tenant is not in default under any of the

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com

~~terms of this Lease, upon written request by Tenant, Landlord shall deliver a written subordination of Landlord's statutory and contractual liens to any liens and security interests securing any institutional third party financing of Tenant. Landlord shall not unreasonably withheld or delay the delivery of Landlord's written subordination.~~

## ARTICLE THIRTEEN

## PROTECTION OF LENDERS

**13.01 Subordination and Attornment.** Landlord may subordinate this Lease to any future ground Lease, deed of trust or mortgage encumbering the Premises, and advances made on the security thereof and any renewals, modifications, consolidations, replacements or extensions thereof, whenever made or recorded. Landlord's right to subordinate is subject to Landlord providing Tenant with a written Subordination, Non-disturbance and Attornment Agreement from the ground lessor, beneficiary or mortgagee wherein Tenant's right to peaceable possession of the Premises during the Term will not be disturbed if Tenant pays the Rent and performs all of Tenant's obligations under this Lease and is not otherwise in default, in which case Tenant shall attorn to the transferee of or successor to Landlord's interest in the Premises and recognize the transferee or successor as Landlord under this Lease. Tenant's rights under this Lease are subordinate to any existing ground lease, deed of trust or mortgage encumbering the Premises. However, if any ground lessor, beneficiary or mortgagee elects to have this Lease be superior to its ground lease, deed of trust or mortgage and gives Tenant written notice thereof, then this Lease will be deemed superior to the ground lease, deed of trust or mortgage whether this Lease is dated prior or subsequent to the date of the ground lease, deed of trust or mortgage or the date of recording thereof.

∨―[reasonable]
**13.02 Signing of Documents.** Tenant shall sign and deliver ~~any~~ document that may be requested to evidence any attornment or subordination, or any agreement to attorn or subordinate, as long as the document is consistent with the provisions of <u>Section 13.01</u>. ~~If Tenant fails to do so within 10 days after a written request, Tenant hereby irrevocably appoints Landlord as Tenant's attorney-in-fact to execute and deliver the attornment or subordination document.~~

**13.03 Estoppel Certificates.**

    A. Upon Landlord's written request, Tenant shall execute and deliver to Landlord a written statement (an **"Estoppel Certificate"**) certifying:

        (1) whether Tenant is an assignee or subtenant;
        (2) the Expiration Date of this Lease;
        (3) the number of renewal options under this Lease, if any, and the total period of time covered by the renewal options;
        (4) that none of the terms or provisions of this Lease have been changed since the original execution of this Lease, except as shown on any attached amendments or modifications;
        (5) that no default exists under the terms of this Lease by either Landlord or Tenant;
        (6) that Tenant has no claim against Landlord under this Lease and has no defense or right of offset against collection of Rent or other charges accruing under this Lease;
        (7) the amount and payment date of the last payment of Rent, the period of time covered by that payment, and the amount of any rental payments made in advance;
        (8) the amount of any Security Deposit and other deposits, if any; and
        (9) the identity and address of any guarantor of this Lease.

        Tenant shall deliver the statement to Landlord within 10 days after Landlord's request. Landlord may forward any such statement to any prospective purchaser or lender of the Premises. The purchaser or lender may rely conclusively upon the statement as true and correct.

    B. If Tenant does not deliver the Estoppel Certificate to Landlord within the 10-day period, Landlord, and any prospective purchaser or lender, may conclusively presume and rely upon the following facts: (1) that the terms and provisions of this Lease have not been

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com

TH-Dooling-Lean

changed except as otherwise represented by Landlord; (2) that this Lease has not been terminated except as otherwise represented by Landlord; (3) that not more than one monthly installment of Base Rent and other charges have been paid in advance; (4) there are no claims against Landlord nor any defenses or rights of offset against collection of Rent; and (5) that Landlord is not in default under this Lease. In such event, Tenant will be estopped from denying the truth of the presumed facts.

C. Also, if Tenant does not deliver the Estoppel Certificate to Landlord within the 10-day period, Landlord may deliver a written notice to Tenant stating that Tenant must deliver an Estoppel Certificate under this Section within five days after Tenant receives the notice. If Tenant does not deliver an Estoppel Certificate to Landlord within five days after Tenant receives the notice, then Tenant's failure to deliver an Estoppel Certificate will constitute a Default under this Lease, notwithstanding any longer period of time under Section 11.01 that Tenant would otherwise be allowed to cure a failure before the failure would become a Default.

13.04 ~~Tenant's Financial Condition.~~ ~~Within 10 days after a written request from Landlord, but not more than two times in any calendar year, Tenant shall deliver to Landlord financial statements as are reasonably required by Landlord to verify the net worth of Tenant, or any assignee, subtenant, or guarantor of Tenant. In addition, Tenant shall deliver to any lender designated by Landlord any financial statements required by the lender to facilitate the financing or refinancing of the Premises. Tenant represents to Landlord that each financial statement is a true, complete, and accurate statement as of the date of the statement. All financial statements will be confidential and will be used only for the purposes set forth in this Lease.~~

## ARTICLE FOURTEEN

### ENVIRONMENTAL REPRESENTATIONS AND INDEMNITY

**14.01 Tenant's Compliance with Environmental Laws.** Tenant, at Tenant's expense, shall comply with all laws, rules, orders, ordinances, directions, regulations and requirements of Federal, State, county and municipal authorities pertaining to Tenant's use of the Property and with the recorded covenants, conditions and restrictions, regardless of when they become effective, including, without limitation, all applicable Federal, State and local laws, regulations or ordinances pertaining to air and water quality, Hazardous Materials (as defined in Section 14.05), waste disposal, air emissions and other environmental matters, all zoning and other land use matters, and with any direction of any public officer or officers, pursuant to law, which impose any duty upon Landlord or Tenant with respect to the use or occupancy of the Property.

**14.02 Tenant's Indemnification.** Tenant shall not cause or permit any Hazardous Materials to be brought upon, kept or used in or about the Property by Tenant, or Tenant's agents, employees, contractors or invitees without the prior written consent of Landlord. If the presence of Hazardous Materials on the Property caused or permitted by Tenant results in contamination of the Property or any other property, or if contamination of the Property or any other property by Hazardous Materials otherwise occurs for which Tenant is legally liable to Landlord for damage resulting therefrom, then Tenant shall indemnify, defend and hold Landlord harmless from any and all claims, judgments, damages, penalties, fines, costs, liabilities or losses (including, without limitation, diminution in value of the Property, damages for the loss or restriction on use of rentable or unusable space or of any amenity or appurtenance of the Property, damages arising from any adverse impact on marketing of building space or land area, sums paid in settlement of claims, reasonable attorneys' fees, court costs, consultant fees and expert fees) that arise during or after the Term as a result of the contamination. This indemnification of Landlord by Tenant includes, without limitation, costs incurred in connection with any investigation of site conditions or any clean-up, remedial work, removal or restoration work required by any Federal, State or local government agency because of Hazardous Materials present in the soil or ground water on or under the Property. Without limiting the foregoing, if the presence of any Hazardous Materials on the Property (or any other property) caused or permitted by Tenant results in any contamination of the Property, Tenant shall promptly take all actions at Tenant's sole expense as are necessary to return the Property to the condition existing prior to the introduction of any such Hazardous Materials, provided that Landlord's approval of such actions is first obtained.

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com

TH-Dooling-Lease

**14.03 Landlord's Representations.** Landlord represents, to the best of Landlord's actual knowledge, that: (i) any handling, transportation, storage, treatment or usage of Hazardous Materials that has occurred on the Property to date has been in compliance with all applicable Federal, State, and local laws, regulations and ordinances; and (ii) no leak, spill, release, discharge, emission or disposal of Hazardous Materials has occurred on the Property to date and that the soil or groundwater on or under the Property is free of Hazardous Materials as of the Commencement Date, unless expressly disclosed by Landlord to Tenant in writing.

**14.04 Landlord's Indemnification.** Landlord hereby indemnifies, defends and holds Tenant harmless from any claims, judgments, damages, penalties, fines, costs, liabilities, (including sums paid in settlements of claims) or loss, including, without limitation, reasonable attorneys' fees, court costs, consultant fees, and expert fees, which arise during or after the Term of this Lease from or in connection with the presence or suspected presence of Hazardous Materials in the soil or groundwater on or under the Property, unless the Hazardous Material is released by Tenant or is present as a result of the negligence or willful conduct of Tenant. Without limiting the generality of the foregoing, the indemnification provided by this Section will specifically cover costs incurred in connection with any investigation of site conditions or any clean-up, remedial work, removal or restoration work required by any Federal, State or local governmental authority.

**14.05 Definition.** For purposes of this Lease, the term **"Hazardous Materials"** means any one or more pollutant, toxic substance, hazardous waste, hazardous material, hazardous substance, solvent or oil as defined in or pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, as amended, the Clean Water Act, as amended, the Water Pollution Control Act, as amended, the Solid Waste Disposal Act, as amended, or any other Federal, State or local environmental law, regulation, ordinance, or rule, whether existing as of the date of this Lease or subsequently enacted.

**14.06 Survival.** The representations and indemnities contained in this Article Fourteen will survive the expiration or termination of this Lease.

## ARTICLE FIFTEEN

### PROFESSIONAL SERVICE FEES

**15.01 Amount and Manner of Payment.** Professional service Fees due to the Principal Broker and Cooperating Broker (together, the **"Brokers"**) will be calculated and paid as follows:

A. **Lump Sum.** Unless the box for Section 15.01B is checked in Section 1.14A, then Landlord agrees to pay to each of the Brokers a lump sum professional service Fee for negotiating this Lease, plus any applicable sales taxes, equal to: (i) the percentages stated in Section 1.14A of the total Base Rent to become due to Landlord during the Term, if the blanks for percentages are completed; or (ii) the amounts per square foot in the Premises stated in Section 1.14A, if the blanks for amounts per square foot are completed. The Fees will be paid to the Brokers (i) one-half on the date of final execution of this Lease, and (ii) the balance on the Commencement Date of this Lease.

B. **Monthly.** If the box for this Section 15.01B is checked in Section 1.14A, then Landlord agrees to pay to each of the Brokers a monthly professional service Fee for negotiating this Lease, plus any applicable sales taxes, equal to the percentages stated in Section 1.14A of each monthly Base Rent payment at the time the payment is due.

**15.02 Payments on Renewal, Expansion or New Lease.** Subject to the termination date stated in this Section below, if Tenant or Tenant's successors or assigns: (a) exercises any right or option to renew or extend the Term (whether contained in this Lease or in any amendment to this Lease) or enters into a new lease covering the Premises, a portion of the Premises, or the Premises and additional space; or (b) enters into any new lease, expansion or other rental agreement as to any premises located on or constituting all or part of any real property owned by Landlord adjacent to the Property, then Landlord shall pay to each of the Brokers an additional Fee covering the full period of

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com

TH-Dooling-Lease

the renewal, extension, new lease, expansion or other rental agreement. The additional Fees will be due on the date of exercise of a renewal option, or the date of execution in the case of a new lease, expansion or other agreement. The additional Fees will be computed and paid under Section 15.01A or Section 15.01B above (whichever has been made applicable under Section 1.14), as if a new lease had been made for such period of time. The Brokers' right to receive these additional Fees will terminate on the date that is 10 years after the expiration of the Term of this Lease, as amended or extended.

**15.03 Payments on Sale.** Subject to the termination date stated in this Section below, if Tenant or Tenant's successors or assigns, purchases the Premises pursuant to a purchase option contained in this Lease (or in any amendment to this Lease or any other agreement) or otherwise purchases the Premises, the Property or any portion of either the Premises or the Property, then Landlord shall pay to each of the Brokers a Fee equal to the percentages stated in Section 1.14B of the purchase price, payable in Good Funds at the closing. Upon the closing of a sale to Tenant, any monthly lease Fees will terminate upon payment of the Fee on the sale. The Brokers' right to receive the Fees set forth in this Section 15.03 will terminate on the date that is 10 years after the expiration of the Term of this Lease, as amended or extended.

**15.04 Other Brokers.** Both Landlord and Tenant represent to the other party that they have had no dealings with any person, firm or agent in the negotiation of this Lease other than the Broker(s) named in this Lease, and no other broker, agent, person, firm or entity other than the Broker(s) is entitled to any commission or fee in connection with this Lease.

**15.05 Landlord's Liability.** Landlord will be liable for payment of all Fees solely to the Brokers, and Landlord will not be obligated to pay any claims by any undisclosed broker. The Principal Broker may pay a portion of the Fee to any Cooperating Broker pursuant to a separate agreement between the Brokers.

**15.06 Joint Liability of Tenant.** If Tenant enters into any new lease, extension, renewal, expansion, or other agreement to rent, occupy, or purchase any property described in Section 15.02 or Section 15.03 within the time specified in those Sections, the negotiations must be communicated through the Principal Broker (which may be done through the Cooperating Broker), otherwise Tenant will be jointly and severally liable with Landlord for any payments due or to become due to the Principal Broker.

**15.07 Assumption on Sale.** In the event of a sale or other transfer of the Premises by Landlord, Landlord shall assign this Lease to the purchaser or other transferee, and obtain from the purchaser or other transferee an Assumption Agreement in recordable form whereby the purchaser or other transferee agrees to pay the Brokers all Fees payable under this Lease. Landlord shall deliver a fully executed original counterpart of the Assumption Agreement to each of the Brokers upon the closing of the sale or other transfer of the Premises. Landlord will be released from personal liability for subsequent payments of Fees payable under this Lease only upon the delivery of the Assumption Agreement to the Brokers.

**15.08 Termination.** Landlord and Tenant agree that the Brokers are third party beneficiaries of this Lease with respect to the Fees, and that no change may be made by Landlord or Tenant as to the time of payment, amount of payment or the conditions for payment of the Fees without the written consent of the Brokers. The termination of this Lease by the mutual agreement of Landlord and Tenant will not affect the right of the Brokers to continue to receive the Fees agreed to be paid under this Lease, just as if Tenant had continued to occupy the Premises and had paid the Rent during the entire Term. Amendment or termination of this Lease under Article Eight (Damage or Destruction) and Article Nine (Condemnation) will not amend or terminate the Brokers' right to collect the Fees.

**15.09 Intermediary Relationship.**

    A. If either of the Brokers has indicated in Section 1.12 or Section 1.13 or otherwise that they are acting as an intermediary, then Landlord and Tenant consent to the intermediary relationship, authorize such Broker or Brokers to act as an intermediary between Landlord and Tenant in connection with this Lease, and acknowledge that the source of any expected compensation to the Brokers will be Landlord, and the Brokers may also be paid a fee by Tenant. **A broker, and any broker or salesperson appointed to communicate**

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

TH-Dooling-Lease

with and carry out instructions of one party, who acts as an intermediary is required to act fairly and impartially, and may not:

(1) disclose to Tenant that Landlord will accept a rent less than the asking rent, unless otherwise instructed in a separate writing by Landlord;

(2) disclose to Landlord that Tenant will pay a rent greater than the rental submitted in a written offer to Landlord, unless otherwise instructed in a separate writing by Tenant;

(3) disclose any confidential information, or any information a party specifically instructs the real estate broker or salesperson in writing not to disclose, unless:

(a) the broker or salesperson is otherwise instructed in a separate writing by the respective party;
(b) the broker or salesperson is required to disclose the information by the Texas Real Estate License Act or a court order; or
(c) the information materially relates to the condition of the property;

(4) treat a party to the transaction dishonestly; or

(5) violate the Texas Real Estate License Act.

B. **Appointments.** Each Broker is authorized to appoint, by providing written notice to the parties, one or more license holders associated with the Broker to communicate with and carry out instructions of one party, and one or more other license holders associated with the Broker to communicate with and carry out instructions of the other party. An appointed license holder may provide opinions and advice during negotiations to the party to whom the license holder is appointed.

## ARTICLE SIXTEEN

### MISCELLANEOUS AND ADDITIONAL PROVISIONS

**16.01 Disclosure.** Landlord and Tenant understand that a real estate broker is not an expert in matters of law, tax, financing, surveying, hazardous materials, engineering, construction, safety, zoning, land planning, architecture, the TABA, or the ADA. The Brokers hereby advise Tenant to seek expert assistance on such matters. Brokers do not investigate a property's compliance with building codes, governmental ordinances, statutes and laws that relate to the use or condition of a property and its construction, or that relate to its acquisition. If the Brokers provide names of consultants or sources for advice or assistance, Tenant acknowledges that the Brokers do not warrant the services of the advisors or their products and cannot warrant the suitability of property to be acquired or leased. Furthermore, the Brokers do not warrant that the Landlord will disclose any or all property defects, although the Brokers will disclose to Tenant any actual knowledge possessed by Brokers regarding defects of the Premises and the Property. In this regard, Tenant agrees to make all necessary and appropriate inquiries and to use diligence in investigating the Premises and the Property before signing this Lease. Tenant acknowledges and agrees that neither the Principal Broker nor any Cooperating Broker has made any representation to Tenant with respect to the condition of the Premises, and that Tenant is relying exclusively upon Tenant's own investigations and the representations of Landlord, if any, with respect to the condition of the Premises. Landlord and Tenant agree to hold the Brokers harmless from any and all damages, claims, costs and expenses resulting from or related to Landlord's furnishing to the Brokers any inaccurate information with respect to the Premises, or Landlord's concealing any material information with respect to the Premises. Landlord and Tenant hereby agree to indemnify and defend the Brokers against any and all liabilities, claims, debts, damages, costs, or expenses, including but not limited to reasonable attorneys' fees and court costs, related to or arising out of or in any way connected to (a) representations concerning matters properly the subject of advice by experts; or (b) any dispute directly between Landlord and Tenant regarding this Lease. In addition, to the extent permitted by applicable law, the Brokers'

liability for errors, omissions, or negligence is limited to the return of the Fee, if any, paid to the Brokers pursuant to this Lease.

**16.02 Force Majeure.** If performance by Landlord of any term, condition or covenant in this Lease is delayed or prevented by any Act of God, strike, lockout, shortage of material or labor, restriction by any governmental authority, civil riot, flood, or any other cause not within the control of Landlord, the period for performance of the term, condition or covenant will be extended for a period equal to the period Landlord is so delayed or prevented.

**16.03 Interpretation.** The captions of the Articles or Sections of this Lease are to assist the parties in reading this Lease and are not part of the terms or provisions of this Lease. Whenever required by the context of this Lease, the singular will include the plural and the plural will include the singular, and the masculine, feminine and neuter genders will each include the other.

**16.04 Waivers.** Any waivers of any provisions of this Lease must be in writing and signed by the waiving party. Landlord's delay or failure to enforce any provisions of this Lease or Landlord's acceptance of late installments of Rent will not be a waiver and will not prevent Landlord from enforcing that provision or any other provision of this Lease in the future. No statement on a check from Tenant or in a letter accompanying a check will be binding on Landlord. Landlord may, with or without notice to Tenant, negotiate, cash, or endorse the check without being bound to the conditions of any such statement.

**16.05 Severability.** A determination by a court of competent jurisdiction that any provision of this Lease is invalid or unenforceable will not invalidate the remainder of that provision or any other provision of this Lease, which will remain in full force and effect.

**16.06 Joint and Several Liability.** All parties signing this Lease as Tenant will be jointly and severally liable for all obligations of Tenant. Tenant will be responsible for the conduct, acts and omissions of Tenant's agents, employees, customers, contractors, invitees, agents, successors or others using the Premises with Tenant's express or implied permission.

**16.07 Amendments or Modifications.** This Lease is the only agreement between the parties pertaining to the lease of the Premises and no other agreements are effective unless made a part of this Lease. All amendments to this Lease must be in writing and signed by all parties.

**16.08 Notices.** All notices and other communications required or permitted under this Lease must be in writing and will be deemed delivered, whether actually received or not, on the earlier of: (i) actual receipt if delivered in person or by messenger with evidence of delivery; or (ii) receipt of an electronic facsimile transmission ("Fax") with confirmation of delivery; or (iii) upon deposit in the United States Mail as required below. Notices may be transmitted by Fax to the Fax telephone numbers specified in Article One of this Lease, if any. Notices delivered by mail must be deposited in the U.S. Postal Service, certified mail, return receipt requested, postage prepaid, and properly addressed to the intended recipient as set forth in Article One. Notices sent by any other means will be deemed delivered when actually received, with proof of delivery. After possession of the Premises by Tenant, Tenant's address for notice purposes will be the address of the Premises unless Tenant notifies Landlord in writing of a different address to be used for that purpose. Any party may change its address for notice by delivering written notice of its new address to all other parties in the manner set forth above. Copies of all notices should also be delivered to the Brokers, but failure to notify the Brokers will not cause an otherwise properly delivered notice to be ineffective. Also, copies of all notices must also be delivered to the following persons [if the blanks have been completed]:

Copies of notices to Landlord are to be delivered to:

Address: _____

Telephone: _____ Fax: _____
Email: _____

Copies of notices to Tenant are to be delivered to:
Wingfoot Commercial Tire Systems, LLC, c/o CBRE
Address: 5100 Poplar Avenue, Suite 1000
Memphis, TN 38137
Telephone: _____ Fax: (901) 620-3211
Email: pas_goodyeardocs@cbre.com

☐ Landlord also consents to receive any notices by e-mail. *[Check the box, if applicable.]*

☐ Tenant also consents to receive any notices by e-mail. *[Check the box, if applicable.]*

**16.09 Attorneys' Fees.** If, on account of any breach or default by any party to this Lease in its obligations to any other party to this Lease (including, but not limited to, the Brokers), it becomes necessary for a party to employ an attorney to enforce or defend any of its rights or remedies under this Lease, the non-prevailing party agrees to pay the prevailing party its reasonable attorneys' fees and court costs, if any, whether or not suit is instituted in connection with the enforcement or defense.

**16.10 Venue.** All obligations under this Lease, including, but not limited to, the payment of Fees to the Brokers, will be performed and payable in the county in which the Property is located. The laws of the State of Texas will govern this Lease.

**16.11 Survival.** All obligations of any party to this Lease that are not fulfilled at the expiration or the termination of this Lease will survive such expiration or termination as continuing obligations of the party.

**16.12 Binding Effect.** This Lease will inure to the benefit of, and be binding upon, each of the parties to this Lease and their respective heirs, representatives, successors and assigns. However, Landlord will not have any obligation to Tenant's successors or assigns unless the rights or interests of the successors or assigns are acquired in accordance with the terms of this Lease.

**16.13 Right to Claim a Lien.** If a commission agreement or other agreement to pay Fees to the Brokers is not included in this Lease, then be advised that pursuant to Chapter 62 of the Texas Property Code, each Broker hereby discloses the Broker's right to claim a lien based on a separate written commission agreement or other agreement to pay Fees to the Broker, and this disclosure is incorporated in the commission agreement or other agreement to pay Fees.

**16.14 Patriot Act Representation.** Landlord and Tenant each represent to the other that: (1) its property interests are not blocked by Executive Order No. 13224, 66 Fed. Reg. 49079; (2) it is not a person listed on the Specially Designated Nationals and Blocked Persons list of the Office of Foreign Assets Control of the United States Department of the Treasury; and (3) it is not acting for or on behalf of any person on that list.

**16.15 Counterparts.** This Lease may be executed in a number of identical counterparts, and all counterparts will be construed together as one agreement.

**16.16 Offer.** The execution of this Lease by the first party to do so constitutes an offer to lease the Premises. Unless this Lease is signed by the other party and a fully executed copy is delivered to the first party by the earlier of this date _____ , _____ or the date that is 10 days after the date of execution by the first party, such offer to lease will be deemed automatically withdrawn. Any acceptance of an offer that has been withdrawn will only be effective if the party that withdrew the offer subsequently agrees to the acceptance either in writing or by course of conduct.

**16.17  Additional Provisions.** Landlord and Tenant agree to any provisions set forth on the attached Addenda (if any) and the following additional provisions (if any):

A. Tenant shall be granted early occupancy upon full lease execution, delivery of rent and security deposit checks and Landlord vacating the majority of the building.

B. Fixtures and equipment to remain on the Premises include: overhead gas heaters, electrical line and drops, compressed air lines and reels and fire extinguishers. All other items shall be at Landlord's discretion to move.

C. Landlord agrees to close and remove existing fuel island per proper TCEQ guidelines and agrees to indemnify Tenant on all environmental matters related to fuel island and underground storage tank.

D. Landlord agrees to remove modular office building from the site in a timely manner upon full lease execution.

E. Tenant, at Tenant's sole cost and expenses, is responsible for lawn care and landscaping during the term of the lease.

F. If a major component (compressor, fan motor, etc) must be replaced, Tenant will pay up to $1,000 of the replacement cost.  Landlord will pay the remainder of cost, provided Tenant maintains a regular scheduled maintenance and service contract per the terms of the Lease.  Additionally, any manufacturer's warranty included with the installation of new HVAC equipment will benefit Tenant.

**16.18 Consult an Attorney. This Lease is an enforceable, legally binding agreement. Read it carefully.** The Brokers involved in the negotiation of this Lease cannot give you legal advice. Landlord and Tenant acknowledge that they have been advised by the Brokers to have this Lease reviewed by competent legal counsel of their choice before signing this Lease. By executing this Lease, Landlord and Tenant each agree to the provisions contained in this Lease.

This Lease has been executed as of the Effective Date (as defined in Section 1.01).

**LANDLORD:**                                                 **LANDLORD:**

Superior Lubricants Transport

By *[Signature]*:                                            By *[Signature]*:
Name:  Royal D. Hurst                                        Name:
Title:  President                                            Title:
Date of Execution:                                           Date of Execution:


**TENANT:**                                                  **TENANT:**

Wingfoot Commercial Tire Systems, LLC

By *[Signature]*:                                            By *[Signature]*:
Name:  Steve Wilton                                          Name:
Title:  Vice President, Operations                           Title:
Date of Execution:                                           Date of Execution:


**PRINCIPAL BROKER:**                                        **COOPERATING BROKER:**

Transwestern Commercial Services Fort
Worth                                                        CBRE

By *[Signature]*:                                            By *[Signature]*:
Name: Todd Hawpe                                             Name: Timothy Vogds
Title: Vice President                                        Title:
Address: 777 Main #1100 FW, TX 76102                         Address:
Broker's License No.: 9000246                                Broker's License No.:
Tax ID No.: 27-4197764                                       Tax ID No.:

*PERMISSION TO USE: This form is provided for the use of members of the North Texas Commercial Association of REALTORS®, Inc. ("NTCAR"), members of the North Texas Commercial Association of Real Estate Professionals, Inc. and other licensed users of an NTCAR electronic forms system. Permission is given to make limited copies of the current version of this form for use in a particular Texas real estate transaction. Please contact the NTCAR office to confirm that you are using the current version of this form. Mass production, or reproduction for resale, is not allowed without express permission. Any changes to this form must be made in a manner that is obvious. If any words are deleted, they must be left in the form with a line drawn through them. If changes are made that are not obvious, the person who made the change could be subject to a claim of fraud or misrepresentation for passing off an altered form as if it were the genuine NTCAR form.*

**Transwestern**

## NORTH TEXAS COMMERCIAL ASSOCIATION OF REALTORS®
## ADDENDUM "A" TO LEASE
## RENEWAL OPTIONS

Address of the Premises: <u>3300-3316 Dooling, Fort Worth, TX  76111</u>

1. **Option to Extend the Term.** Landlord grants to Tenant <u>two (2)</u> option(s) (each an "**Option**") to extend the Term for an additional term of <u>60</u> months each (the "**Extension**"), on the same terms, conditions and covenants set forth in this Lease, except as provided below. Each Option may be exercised only by written notice delivered to the Landlord no earlier than <u>One Hundred Eighty</u> ( <u>180</u> ) days before, and no later than <u>One Hundred Twenty</u> ( <u>120</u> ) days before, the expiration of the Term or the preceding Extension of the Term, whichever is applicable. If Tenant fails to deliver to Landlord a written notice of the exercise of an Option within the prescribed time period, such Option and any succeeding Options will lapse, and there will be no further right to extend the Term. Each Option may only be exercised by Tenant on the express condition that, at the time of the exercise, Tenant is not in default under any of the provisions of this Lease. The Options are personal to Tenant and may not be exercised by an assignee or subtenant without Landlord's written consent.

2. **Calculation of Rent.** The Base Rent during the Extension(s) will be determined by one of the following methods *[check one]:*

[X] **A. Fair Market Rental.** The Base Rent during the Extension will be the Fair Market Rental determined as follows:

**a.** The "**Fair Market Rental**" of the Premises means the price that a ready and willing tenant would pay as of the commencement of the Extension as monthly rent to a ready and willing landlord of Premises comparable to the Premises if the property were exposed for lease on the open market for a reasonable period of time, and taking into account the term of the Extension, the amount of improvements made by Tenant at its expense, the creditworthiness of the Tenant, and all of the purposes for which the property may be used and not just the use proposed to be made of the Premises by Tenant. Upon proper written notice by Tenant to Landlord of Tenant's intention to elect to exercise the renewal Option, Landlord shall, within <u>10</u> days thereafter, notify Tenant in writing of Landlord's proposed Fair Market Rental amount, and Tenant shall thereupon notify Landlord of Tenant's acceptance or rejection of Landlord's proposed amount. Failure of Tenant to reject Landlord's Fair Market Rental amount within <u>5</u> days after receipt of Landlord's notice will be deemed Tenant's acceptance of Landlord's proposed Fair Market Rental amount.

**b.** If Landlord and Tenant have not been able to agree on the Fair Market Rental amount within 40 days following the exercise of the Option, the Fair Market Rental for the Extension will be determined by the following appraisal process. Landlord and Tenant shall endeavor in good faith to select a single Appraiser. The term "**Appraiser**" means a State Certified Real Estate Appraiser licensed by the State of Texas to value commercial property. If Landlord and Tenant are able to agree upon and select a single Appraiser, that Appraiser will determine the Fair Market Rental for the Extension.

If Landlord and Tenant are unable to agree upon a single Appraiser within <u>10</u> days after the end of the 40-day period, each will then appoint one Appraiser by written notice to the other, given within <u>10</u> days after the end of the 40-day period. Within five business days after the two Appraisers are appointed, the two Appraisers will appoint a third Appraiser. If either Landlord or Tenant fails to appoint its Appraiser within the prescribed time period, the single Appraiser appointed will determine the Fair Market Rental amount of the Premises. Each party will bear the cost of the appraiser appointed by it and the parties will share equally the cost of the third appraiser. The Fair Market Rental of the Premises will be the average of two of the three appraisals that are closest in amount, and the third appraisal will be disregarded.

c. In no event will the Base Rent be reduced for any Extension, regardless of the Fair Market Rental determined by any appraisal. If the Fair Market Rental is not determined before the commencement of the Extension, then Tenant shall continue to pay to Landlord the Base Rent applicable to the Premises immediately before the Extension until the Fair Market Rental amount is determined, and when it is determined, Tenant shall pay to Landlord the difference between the Base Rent actually paid by Tenant to Landlord and the new Base Rent.

☐ **B. Consumer Price Index Adjustment.** The monthly Base Rent during the Extension will be determined by multiplying the monthly installment of Base Rent during the last month of the Term by a fraction determined as follows:

a. The numerator will be the Latest Index that means either *[check one]:*

☐ (1) the Index published for the nearest calendar month preceding the first day of the Extension, or

☐ (2) the Index for the month of _____ preceding the first day of the Extension.

b. The denominator will be the Initial Index that means either *[check one]:*

☐ (1) the Index published for the nearest calendar month preceding the Commencement Date, or

☐ (2) the Index for the month of _____ preceding the Commencement Date.

*[If no blanks are filled in above, the choice (1) including the phrase "the nearest calendar month preceding" will apply. If the Index is not yet published for the nearest calendar month preceding the applicable date, then "the nearest calendar month" means the first month preceding the applicable date for which the Index is published].*

c. The Index means the Consumer Price Index (CPI) for All Urban Consumers (All Items) U.S. City Average (unless this box is checked ☐ in which case the CPI for the Dallas/Fort Worth Consolidated Metropolitan Statistical Area will be used) published by the U. S. Department of Labor, Bureau of Labor Statistics (Base Index of 1982-84 =100). If the Index is discontinued or revised, the new index or computation that replaces the Index will be used in order to obtain substantially the same result as would have been obtained if it had not been discontinued or revised. If such computation would reduce the Rent for the particular Extension, it will be disregarded, and the Rent during the immediately preceding period will apply instead.

☐ **C. Fixed Rental Adjustments.** The monthly installments of Base Rent during the Extension(s) will be increased beginning on the following dates to these amounts:

| Date: | _____ | Amount: $ | _____ |
|-------|-----------------|-----------|-----------------|
| Date: | _____ | Amount: $ | _____ |
| Date: | _____ | Amount: $ | _____ |
| Date: | _____ | Amount: $ | _____ |

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com          TH-Dooling-Lease

Transwestern
## NORTH TEXAS COMMERCIAL ASSOCIATION OF REALTORS®
## ADDENDUM "J" TO LEASE
## ADDITIONAL PROVISIONS

Address of the Premises: <u>3300-3316 Dooling, Fort Worth, TX 76111</u>

ADDENDUM "J" TO LEASE – Solo Page
©NTCAR 2014 – Form No. 2 (3/2014)

Transwestern, 777 Main Street, Suite 1100 Fort Worth, TX 76102
Phone: (817)877-4433       Fax:              Lester Day                                                      TH-Dooling-Lease
                    Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.ziplogix.com

ADDENDUM "J" ADDITIONAL PROVISIONS
TO COMMERCIAL LEASE BETWEEN
SUPERIOR LUBRICANTS TRANSPORT AND
WINGFOOT COMMERCIAL TIRE SYSETMS, LLC.

1.      The parties hereby agree and acknowledge that the Monthly Base Rent provided for in Section 1.06 of the Lease for the period commencing October 1, 2015 and expiring October 31, 2015 is $0.00.

2.      Notwithstanding anything contained in the Lease to the contrary, the parties hereby agree and acknowledge that Tenant shall have no obligation to pay any common area expenses or operating expenses.

3.      Section 1.09B.1 of the Lease entitled "Real Estate Taxes" is hereby amended by adding the following to the end of said Section:

"Notwithstanding anything herein to the contrary, Real Estate Taxes shall not include (a) any personal property taxes, capital levy, franchise, gross receipts, revenue, inheritance or estate taxes, income or profit, gift, payroll, transfer or stamp tax which may be levied against the business, estate or interests of Landlord, however such taxes may be designated, even though such taxes may become a lien against the Property, or (b) any special assessments or other taxes imposed or levied in connection with the initial construction of the Land and/or the improvements which constitute a part of the Property."

4.      Section 1.10 of the Lease entitled "Permitted Use" is hereby amended by deleting said provision in its entirety and substituting the following therefor:

"Tenant is expressly permitted to use and occupy the Premises as (a) office space (the "Office Use"), (b) warehouse space (the "Warehouse Use"), and (c) the sale of such products and furnishing of such services as in Wingfoot Commercial Tire Centers generally, including, but not limited to, the selling to consumers and to others of tires, tubes, oil and other lubricants, motor and tire accessories and kindred products, and the servicing, storing, and repairing of motor vehicles, tires, tubes, and kindred products, and all ancillary activities related thereto (the "Specific Wingfoot Use", and together with the Office Use and the Warehouse Use, the "Permitted Use")."

5.      Section 3.02 of the Lease entitled "Time of Payment" is hereby amended by adding "except as and to the extent provided for in this Lease" after "without off-set, deduction or prior demand".

6.      Section 5.03 of the Lease entitled "Liability Insurance" is hereby amended by deleting the penultimate sentence from said Section in its entirety and by adding the following to the end of said Section:

"Notwithstanding any other provision of this Lease, Tenant shall have the absolute right in Tenant's sole and absolute discretion to self-insure for all of Tenant's insurance obligations that are set forth herein."

7.      Section 5.04 of the Lease entitled "Indemnity" is hereby amended by deleting said Section in its entirety and substituting the following therefor:

"Subject to Section 5.05 of this Lease, except to the extent caused by the gross negligence or willful misconduct of Landlord, Landlord's agents, employees or contractors, Tenant will indemnify and hold Landlord harmless from and against all loss, cost, expense, and liability whatsoever (including Landlord's cost of defending against the foregoing, such cost to include reasonable attorneys' fees) resulting or occurring by reason of the gross negligence or willful misconduct of Tenant, Tenant's agents, employees or contractors. In no event shall Tenant be liable to Landlord for any punitive or consequential damages Landlord may suffer or incur, including, without limitation, damage for loss of business or loss of profits. Subject to Section 5.05 of this Lease, except to the extent caused by the gross negligence or willful misconduct of Tenant, Tenant's agents, employees or contractors, Landlord will indemnify and hold Tenant

ADDENDUM "J" ADDITIONAL PROVISIONS
TO COMMERCIAL LEASE BETWEEN
SUPERIOR LUBRICANTS TRANSPORT AND
WINGFOOT COMMERCIAL TIRE SYSETMS, LLC.

harmless from and against all loss, cost, expense, and liability whatsoever (including Tenant's cost of defending against the foregoing, such cost to include reasonable attorneys' fees) resulting or occurring by reason of the gross negligence or willful misconduct of Landlord, Landlord's agents, employees or contractors. In no event shall Landlord be liable to Tenant for any punitive or consequential damages Tenant may suffer or incur, including, without limitation, damage for loss of business or loss of profits. The terms and conditions of this Section shall expressly survive the expiration or earlier termination of this Lease."

8.      Section 6.02 of the Lease entitled "Compliance with Laws" is hereby amended by adding the following to the end of said Section:

"Notwithstanding anything contained in this Lease to the contrary, Tenant shall have no obligation to: (i) undertake any action or have any liability with respect to hazardous substances discovered within the Premises, unless any such hazardous substances were brought to the Premises by Tenant, Tenant's agents, employees or contractors; (ii) perform any maintenance, repairs, alterations or improvements to the Premises in order to comply with any laws, including, without limitation, the Americans with Disabilities Act, unless necessitated by the Specific Wingfoot Use; (iii) perform any restoration to the Premises following any event of casualty or condemnation; or (iv) perform any restoration to the Premises upon the expiration or earlier termination of this Lease, with the exception of removing Tenant's personal property from the Premises."

9.      Section 7.01 of the Lease entitled "Property Condition" is hereby amended by changing both references in said Section to "30 days" to "90 days"

10.     Section 7.03A of the Lease entitled "Landlord's Obligations" is hereby by adding the following to the end of said Section:

"Notwithstanding anything contained in this Lease to the contrary, if Landlord fails to perform any obligation of Landlord pursuant to this Lease within ten (10) days after written notice thereof from Tenant or such longer period as is reasonably necessary under the circumstances, provided that Landlord commences the cure thereof within such ten (10) day period and thereafter diligently prosecutes the same until completion, then Tenant shall have the right ("Self-Help Right"), but not the obligation, to perform such obligations on behalf of Landlord; provided, however, as a condition to exercising Tenant's Self-Help Right expressly provided to Tenant by this paragraph: (i) if Tenant's action in accordance with this paragraph affects the electrical, mechanical, plumbing, HVAC or life safety systems serving the Premises, then Tenant shall engage Landlord's approved contractors for such work, provided that Landlord delivers to Tenant written notice of the approved contractors, the approved contractors are capable of accommodating Tenant's schedule for the performance of the work and such approved contractors execute construction contracts in form and substance reasonably acceptable to Tenant; (ii) Tenant shall take only such action as is reasonably necessary to correct the defective condition; (iii) all work done in accordance with this paragraph by any contractor that is not a Landlord approved contractor must be performed at a reasonable and competitive cost and expenses; (iv) Tenant shall use commercially reasonable efforts to minimize interference with the rights of other tenants to use their respective premises; and (v) any work done or action taken by Tenant under this paragraph shall be completed in accordance with all laws. Additionally, notwithstanding anything contained herein to the contrary, if there is an emergency situation, Tenant shall have the right, but not the obligation, to exercise its Self-Help Right; provided, however, promptly after exercising such Self-Help Right Tenant shall notify Landlord of the same and the same shall not be considered a default by Landlord under the terms of this Lease. In the event Tenant exercises its Self-Help Right as hereinabove provided, Landlord shall pay to Tenant the reasonable cost of the same, plus an administrative fee equal to fifteen percent (15%); provided, however, such administrative fee

ADDENDUM "J" ADDITIONAL PROVISIONS
TO COMMERCIAL LEASE BETWEEN
SUPERIOR LUBRICANTS TRANSPORT AND
WINGFOOT COMMERCIAL TIRE SYSETMS, LLC.

shall not be payable for the exercise by Tenant of its Self-Help Right during an emergency situation, within ten (10) days of Tenant's delivery to Landlord of reasonable supporting documentation evidencing the actual costs incurred by Tenant. Notwithstanding anything contained herein to the contrary, if Landlord fails to pay Tenant in accordance with the terms of the preceding sentence within such ten (10) day period, then Tenant shall have the right to offset such costs payable by Landlord, plus interest thereon at the annual interest rate of 15%, against rent otherwise payable by Tenant pursuant to this Lease until Tenant is fully reimbursed."

11.     Section 7.05 of the Lease entitled "Condition upon Termination" is hereby amended by deleting "the same condition as received" from said Section and substituting "good condition and repair" therefor.

12.     Article Ten of the Lease entitled "Assignment and Subletting" is hereby amended by adding the following to the end of said Article:

"Notwithstanding anything set forth above, Tenant may assign this Lease or sublet the Premises or any portion thereof ("Permitted Assignments") without the prior consent of Landlord to any Successor (hereinafter defined) or Affiliate (hereinafter defined), or to effect a transfer of ownership, control or assets of Tenant to a Successor or Affiliate (each, a "Permitted Transferee"). "Successor" is defined as any corporation or entity resulting from a merger or consolidation with Tenant or any corporation or entity succeeding to substantially all of the business and assets of Tenant. "Affiliate" is defined as any corporation or entity that through one or more intermediaries, controls or is controlled by, or is under common control with, Tenant ("control" meaning the possession of the power to direct or cause the direction of the management and policies of an entity, whether through the ownership of voting securities, by contract or otherwise). Further, any change of ownership resulting in a change of majority control from those persons or entities not having control shall not be deemed an assignment or transfer requiring Landlord's consent. Notwithstanding anything set forth above, any public offering or transfer in which all or a portion of Tenant's stock shall be sold or traded on a nationally recognized stock exchange or on the "over-the-counter" market or the sale of Tenant's stock on a nationally recognized stock exchange or over-the-counter-market shall not be deemed an assignment for the purposes of this Lease and nothing in this Lease shall be applicable to, nor prohibit, such transaction."

13.     Section 11.01 of the Lease entitled "Default" is hereby amended by adding the following to the end of paragraph B in said Section:

"provided that if such default is not capable of being cured within such 30 day period and Tenant commences curing within such 30 day period and diligently pursues curing of the same thereafter to completion, the same shall not be a default so long as Tenant is diligently pursuing the curing of such default;"

14.     Section 11.03 of the Lease entitled "Notice of Default" is hereby amended by adding the following to the end of said Section:

"Notwithstanding anything contained herein to the contrary, upon the occurrence of any such default, Tenant, may pursue any rights or remedies that Tenant is entitled to under this Lease, as well as any rights or remedies available at law or in equity, including, without limitation, specific performance and injunctive relief, and Landlord shall be obligated to pay for all reasonable costs and expenses in connection therewith. If Landlord fails to pay any such amount within 10 days after demand therefor, Tenant shall be entitled to offset such amount, plus interest thereon at the annual interest rate of 15%, against Tenant's rent obligations under this Lease until Tenant is fully repaid."

## ADDENDUM "J" ADDITIONAL PROVISIONS
## TO COMMERCIAL LEASE BETWEEN
## SUPERIOR LUBRICANTS TRANSPORT AND
## WINGFOOT COMMERCIAL TIRE SYSETMS, LLC.

15.     Section 13.03 of the Lease entitled "Estoppel Certificates" is hereby amended by deleting paragraphs B and C in their entirety.

16.     Section 16.02 of the Lease entitled "Force Majeure" is hereby amended by deleting said Section in its entirety and substituting the following therefor:

"Notwithstanding anything contained in this Lease to the contrary, Landlord and Tenant, as applicable, shall not be required to perform any covenant or obligation in this Lease, or be liable in damages to the other party, so long as the performance or non-performance of the covenant or obligation is delayed, caused by or prevented by an act of God or force majeure. For purposes of this Lease, an "act of God" or "force majeure" is defined as strikes, material or labor shortages, or restrictions on material or labor by any governmental authority, riots, floods, explosions, earthquakes, fire, storms, weather (including wet grounds or inclement weather which prevents construction), acts of the public enemy, wars, insurrections and any other cause not reasonably within the control of Landlord or Tenant, as applicable, and which by the exercise of due diligence Landlord or Tenant, as applicable, is unable, wholly or in part, to prevent or overcome."

17.     Notwithstanding anything contained in the Lease to the contrary, all references in the Lease to a default by Tenant shall be revised to be a default by Tenant beyond the lapse of any applicable notice and cure periods.

18.     Notwithstanding anything contained in the Lease to the contrary, in all instances where Landlord's consent is required, such consent shall not be unreasonably withheld, conditioned or delayed.

19.     Landlord warrants and represents to Tenant that Landlord is the sole owner of the fee title to the Property. So long as Tenant is not in default under the Lease, beyond the lapse of any applicable notice and cure periods, Landlord will warrant and defend Tenant in the enjoyment and peaceful possession of the Premises during the term of the Lease.

20.     Addendum A to the Lease entitled "Renewal Options" is hereby amended by deleting the last sentence in Section 1 in its entirety.

21.     Notwithstanding anything contained in this Lease to the contrary, if any utility services are interrupted, curtailed or discontinued for a period of two (2) consecutive days *Due to Landlord's* Negligence then Tenant's obligation to pay rent shall abate in proportion to the square footage of the Premises that is closed for business as a result of said interruption, curtailment or discontinuance until such time as such interruption, curtailment or discontinuance ceases or Tenant reopens for business in the portion of the Premises closed for business.

ADDENDUM "J" ADDITIONAL PROVISIONS
TO COMMERCIAL LEASE BETWEEN
SUPERIOR LUBRICANTS TRANSPORT AND
WINGFOOT COMMERCIAL TIRE SYSETMS, LLC.

1.      The parties hereby agree and acknowledge that the Monthly Base Rent provided for in Section 1.06 of the Lease for the period commencing October 1, 2015 and expiring October 31, 2015 is $0.00.

2.      Notwithstanding anything contained in the Lease to the contrary, the parties hereby agree and acknowledge that Tenant shall have no obligation to pay any common area expenses or operating expenses.

3.      Section 1.09B.1 of the Lease entitled "Real Estate Taxes" is hereby amended by adding the following to the end of said Section:

        "Notwithstanding anything herein to the contrary, Real Estate Taxes shall not include (a) any personal property taxes, capital levy, franchise, gross receipts, revenue, inheritance or estate taxes, income or profit, gift, payroll, transfer or stamp tax which may be levied against the business, estate or interests of Landlord, however such taxes may be designated, even though such taxes may become a lien against the Property, or (b) any special assessments or other taxes imposed or levied in connection with the initial construction of the Land and/or the improvements which constitute a part of the Property."

4.      Section 1.10 of the Lease entitled "Permitted Use" is hereby amended by deleting said provision in its entirety and substituting the following therefor:

        "Tenant is expressly permitted to use and occupy the Premises as (a) office space (the "Office Use"), (b) warehouse space (the "Warehouse Use"), and (c) the sale of such products and furnishing of such services as in Wingfoot Commercial Tire Centers generally, including, but not limited to, the selling to consumers and to others of tires, tubes, oil and other lubricants, motor and tire accessories and kindred products, and the servicing, storing, and repairing of motor vehicles, tires, tubes, and kindred products, and all ancillary activities related thereto (the "Specific Wingfoot Use", and together with the Office Use and the Warehouse Use, the "Permitted Use")."

5.      Section 3.02 of the Lease entitled "Time of Payment" is hereby amended by adding "except as and to the extent provided for in this Lease" after "without off-set, deduction or prior demand".

6.      Section 5.03 of the Lease entitled "Liability Insurance" is hereby amended by deleting the penultimate sentence from said Section in its entirety and by adding the following to the end of said Section:

        "Notwithstanding any other provision of this Lease, Tenant shall have the absolute right in Tenant's sole and absolute discretion to self-insure for all of Tenant's insurance obligations that are set forth herein."

7.      Section 5.04 of the Lease entitled "Indemnity" is hereby amended by deleting said Section in its entirety and substituting the following therefor:

        "Subject to Section 5.05 of this Lease, except to the extent caused by the gross negligence or willful misconduct of Landlord, Landlord's agents, employees or contractors, Tenant will indemnify and hold Landlord harmless from and against all loss, cost, expense, and liability whatsoever (including Landlord's cost of defending against the foregoing, such cost to include reasonable attorneys' fees) resulting or occurring by reason of the gross negligence or willful misconduct of Tenant, Tenant's agents, employees or contractors. In no event shall Tenant be liable to Landlord for any punitive or consequential damages Landlord may suffer or incur, including, without limitation, damage for loss of business or loss of profits. Subject to Section 5.05 of this Lease, except to the extent caused by the gross negligence or willful misconduct of Tenant, Tenant's agents, employees or contractors, Landlord will indemnify and hold Tenant

ADDENDUM "J" ADDITIONAL PROVISIONS
TO COMMERCIAL LEASE BETWEEN
SUPERIOR LUBRICANTS TRANSPORT AND
WINGFOOT COMMERCIAL TIRE SYESTMS, LLC.

harmless from and against all loss, cost, expense, and liability whatsoever (including Tenant's cost of defending against the foregoing, such cost to include reasonable attorneys' fees) resulting or occurring by reason of the gross negligence or willful misconduct of Landlord, Landlord's agents, employees or contractors. In no event shall Landlord be liable to Tenant for any punitive or consequential damages Tenant may suffer or incur, including, without limitation, damage for loss of business or loss of profits. The terms and conditions of this Section shall expressly survive the expiration or earlier termination of this Lease."

8.      Section 6.02 of the Lease entitled "Compliance with Laws" is hereby amended by adding the following to the end of said Section:

"Notwithstanding anything contained in this Lease to the contrary, Tenant shall have no obligation to: (i) undertake any action or have any liability with respect to hazardous substances discovered within the Premises, unless any such hazardous substances were brought to the Premises by Tenant, Tenant's agents, employees or contractors; (ii) perform any maintenance, repairs, alterations or improvements to the Premises in order to comply with any laws, including, without limitation, the Americans with Disabilities Act, unless necessitated by the Specific Wingfoot Use; (iii) perform any restoration to the Premises following any event of casualty or condemnation; or (iv) perform any restoration to the Premises upon the expiration or earlier termination of this Lease, with the exception of removing Tenant's personal property from the Premises."

9.      Section 7.01 of the Lease entitled "Property Condition" is hereby amended by changing both references in said Section to "30 days" to "90 days".

10.     Section 7.03A of the Lease entitled "Landlord's Obligations" is hereby by adding the following to the end of said Section:

"Notwithstanding anything contained in this Lease to the contrary, if Landlord fails to perform any obligation of Landlord pursuant to this Lease within ten (10) days after written notice thereof from Tenant or such longer period as is reasonably necessary under the circumstances, provided that Landlord commences the cure thereof within such ten (10) day period and thereafter diligently prosecutes the same until completion, then Tenant shall have the right ("Self-Help Right"), but not the obligation, to perform such obligations on behalf of Landlord; provided, however, as a condition to exercising Tenant's Self-Help Right expressly provided to Tenant by this paragraph: (i) if Tenant's action in accordance with this paragraph affects the electrical, mechanical, plumbing, HVAC or life safety systems serving the Premises, then Tenant shall engage Landlord's approved contractors for such work, provided that Landlord delivers to Tenant written notice of the approved contractors, the approved contractors are capable of accommodating Tenant's schedule for the performance of the work and such approved contractors execute construction contracts in form and substance reasonably acceptable to Tenant; (ii) Tenant shall take only such action as is reasonably necessary to correct the defective condition; (iii) all work done in accordance with this paragraph by any contractor that is not a Landlord approved contractor must be performed at a reasonable and competitive cost and expenses; (iv) Tenant shall use commercially reasonable efforts to minimize interference with the rights of other tenants to use their respective premises; and (v) any work done or action taken by Tenant under this paragraph shall be completed in accordance with all laws. Additionally, notwithstanding anything contained herein to the contrary, if there is an emergency situation, Tenant shall have the right, but not the obligation, to exercise its Self-Help Right; provided, however, promptly after exercising such Self-Help Right Tenant shall notify Landlord of the same and the same shall not be considered a default by Landlord under the terms of this Lease. In the event Tenant exercises its Self-Help Right as hereinabove provided, Landlord shall pay to Tenant the reasonable cost of the same, plus an administrative fee equal to fifteen percent (15%); provided, however, such administrative fee

ADDENDUM "J" ADDITIONAL PROVISIONS
TO COMMERCIAL LEASE BETWEEN
SUPERIOR LUBRICANTS TRANSPORT AND
WINGFOOT COMMERCIAL TIRE SYSETMS, LLC.

shall not be payable for the exercise by Tenant of its Self-Help Right during an emergency situation, within ten (10) days of Tenant's delivery to Landlord of reasonable supporting documentation evidencing the actual costs incurred by Tenant. Notwithstanding anything contained herein to the contrary, if Landlord fails to pay Tenant in accordance with the terms of the preceding sentence within such ten (10) day period, then Tenant shall have the right to offset such costs payable by Landlord, plus interest thereon at the annual interest rate of 15%, against rent otherwise payable by Tenant pursuant to this Lease until Tenant is fully reimbursed."

11.     Section 7.05 of the Lease entitled "Condition upon Termination" is hereby amended by deleting "the same condition as received" from said Section and substituting "good condition and repair" therefor.

12.     Article Ten of the Lease entitled "Assignment and Subletting" is hereby amended by adding the following to the end of said Article:

"Notwithstanding anything set forth above, Tenant may assign this Lease or sublet the Premises or any portion thereof ("Permitted Assignments") without the prior consent of Landlord to any Successor (hereinafter defined) or Affiliate (hereinafter defined), or to effect a transfer of ownership, control or assets of Tenant to a Successor or Affiliate (each, a "Permitted Transferee"). "Successor" is defined as any corporation or entity resulting from a merger or consolidation with Tenant or any corporation or entity succeeding to substantially all of the business and assets of Tenant.   "Affiliate" is defined as any corporation or entity that through one or more intermediaries, controls or is controlled by, or is under common control with, Tenant ("control" meaning the possession of the power to direct or cause the direction of the management and policies of an entity, whether through the ownership of voting securities, by contract or otherwise). Further, any change of ownership resulting in a change of majority control from those persons or entities not having control shall not be deemed an assignment or transfer requiring Landlord's consent. Notwithstanding anything set forth above, any public offering or transfer in which all or a portion of Tenant's stock shall be sold or traded on a nationally recognized stock exchange or on the "over-the-counter" market or the sale of Tenant's stock on a nationally recognized stock exchange or over-the-counter-market shall not be deemed an assignment for the purposes of this Lease and nothing in this Lease shall be applicable to, nor prohibit, such transaction."

13.     Section 11.01 of the Lease entitled "Default" is hereby amended by adding the following to the end of paragraph B in said Section:

"provided that if such default is not capable of being cured within such 30 day period and Tenant commences curing within such 30 day period and diligently pursues curing of the same thereafter to completion, the same shall not be a default so long as Tenant is diligently pursuing the curing of such default;"

14.     Section 11.03 of the Lease entitled "Notice of Default" is hereby amended by adding the following to the end of said Section:

"Notwithstanding anything contained herein to the contrary, upon the occurrence of any such default, Tenant, may pursue any rights or remedies that Tenant is entitled to under this Lease, as well as any rights or remedies available at law or in equity, including, without limitation, specific performance and injunctive relief, and Landlord shall be obligated to pay for all reasonable costs and expenses in connection therewith. If Landlord fails to pay any such amount within 10 days after demand therefor, Tenant shall be entitled to offset such amount, plus interest thereon at the annual interest rate of 15%, against Tenant's rent obligations under this Lease until Tenant is fully repaid."

ADDENDUM "J" ADDITIONAL PROVISIONS
TO COMMERCIAL LEASE BETWEEN
SUPERIOR LUBRICANTS TRANSPORT AND
WINGFOOT COMMERCIAL TIRE SYSETMS, LLC.

15.     Section 13.03 of the Lease entitled "Estoppel Certificates" is hereby amended by deleting paragraphs B and C in their entirety.

16.     Section 16.02 of the Lease entitled "Force Majeure" is hereby amended by deleting said Section in its entirety and substituting the following therefor:

"Notwithstanding anything contained in this Lease to the contrary, Landlord and Tenant, as applicable, shall not be required to perform any covenant or obligation in this Lease, or be liable in damages to the other party, so long as the performance or non-performance of the covenant or obligation is delayed, caused by or prevented by an act of God or force majeure. For purposes of this Lease, an "act of God" or "force majeure" is defined as strikes, material or labor shortages, or restrictions on material or labor by any governmental authority, riots, floods, explosions, earthquakes, fire, storms, weather (including wet grounds or inclement weather which prevents construction), acts of the public enemy, wars, insurrections and any other cause not reasonably within the control of Landlord or Tenant, as applicable, and which by the exercise of due diligence Landlord or Tenant, as applicable, is unable, wholly or in part, to prevent or overcome."

17.     Notwithstanding anything contained in the Lease to the contrary, all references in the Lease to a default by Tenant shall be revised to be a default by Tenant beyond the lapse of any applicable notice and cure periods.

18.     Notwithstanding anything contained in the Lease to the contrary, in all instances where Landlord's consent is required, such consent shall not be unreasonably withheld, conditioned or delayed.

19.     Landlord warrants and represents to Tenant that Landlord is the sole owner of the fee title to the Property. So long as Tenant is not in default under the Lease, beyond the lapse of any applicable notice and cure periods, Landlord will warrant and defend Tenant in the enjoyment and peaceful possession of the Premises during the term of the Lease.

20.     Addendum A to the Lease entitled "Renewal Options" is hereby amended by deleting the last sentence in Section 1 in its entirety.

21.     Notwithstanding anything contained in this Lease to the contrary, if any utility services are interrupted, curtailed or discontinued for a period of two (2) consecutive days *Due to Landlord's* *Negligence* then Tenant's obligation to pay rent shall abate in proportion to the square footage of the Premises that is closed for business as a result of said interruption, curtailment or discontinuance until such time as such interruption, curtailment or discontinuance ceases or Tenant reopens for business in the portion of the Premises closed for business.

Exhibit "A"

- 3300 Dooling Street, Fort Worth, TX 76111

  Block 5, Lot 7B – Diamond Heights Industrial ADN

  Appraisal Site #80056997

- 3304 Dooling Street, Fort Worth, TX 76111

  Block 5, Lot 7A - Diamond Heights Industrial ADN

  Appraisal Site #80057012

- 3316 Dooling Street, Fort Worth, TX 76111

  Block 5, Lot 3R - Diamond Heights Industrial AND

  Appraisal Site # 80056997

EXHIBIT "B"
SITE PLAN





# Exhibit "E"

J. Robert Forshey
State Bar No. 07264200
Matthew G. Maben
State Bar No. 24037008
Juan J. Mendoza
State Bar No. 24099721
FORSHEY & PROSTOK, L.L.P.
777 Main Street, Suite 1290
Fort Worth, Texas 76102
(817) 877-8855 ● (817) 877-4151 FAX
Email: bforshey@forsheyprostok.com
Email: mmaben@forsheyprostok.com
Email: jmendoza@forsheyprostok.com

ATTORNEYS FOR INTEGRA FUNDING SOLUTIONS, LLC

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 16-42146-rfn7 |
| | § | |
| SUPERIOR LUBRICANTS TRANSPORT INC. | § | Chapter 7 |
| | § | |
| | § | |
| Debtor. | § | |

### NOTICE OF PERFECTION OF LIENS PURSUANT TO 11 U.S.C. § 546(b)

COMES NOW Integra Funding Solutions, LLC ("Integra"), a secured creditor and party in interest in the above-referenced case, and hereby files this Notice of Perfection of Liens Pursuant to 11 U.S.C. § 546(b) (the "Notice"), and in support thereof, respectfully shows as follows:

1.     On June 2, 2016 (the "Petition Date"), Superior Lubricants Transport Inc. (the "Debtor") filed a voluntary petition for relief under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") commencing this bankruptcy case.  Marilyn Garner is the duly appointed Chapter 7 Trustee for the Debtor's estate.

2.     The Debtor is indebted to Integra based on a prepetition loan made by Integra to the Debtor.[1]  Such loan is evidenced by that certain Promissory Note executed by the Debtor in

---

[1] In addition to this prepetition loan, the Debtor is also indebted to Integra under a certain Receivables Purchase Agreement (the "Factoring Agreement") dated April 2, 2015.  Pursuant to the Factoring Agreement, Integra is the

favor of Integra dated May 15, 2015 in the original principal amount of $220,000 (the "Note").

Pursuant to a Security Agreement dated May 15, 2015, the Debtor granted Integra security

interests in and liens on various personal property of the Debtor to secure repayment of the

Note.  Integra's liens on such personal property are perfected.

      3.      In addition to the liens on personal property set forth above, to secure repayment

of the Note and all other indebtedness of the Debtor to Integra, the Debtor granted Integra a

security interest in and lien on that certain real property (the "Real Estate") located at 3312

Dooling Street, Fort Worth, Texas 76111 and described as:

> Lots 2-R and 3-R, Block 5, Diamond Heights Industrial Addition, an
> Addition to the City of Fort Worth, Tarrant County, Texas, according
> to the Plat recorded in Volume 388-42, page 40, Plat Records,
> Tarrant County, Texas, Lot 5-R, Block 5, Diamond Heights
> Industrial Addition, an Addition to the City of Fort Worth, Tarrant
> County, Texas, according to the plat recorded in Volume 388-116,
> page 40, Plat Records, Tarrant County, Texas and a portion of Lot
> 7, Block 5, Diamond Heights Industrial Addition, an Addition to the
> City of Fort Worth, Tarrant County, Texas, according to the plat
> recorded in Volume 388-Y, page 1, Plat Records, Tarrant County,
> Texas.

Integra's lien against the Real Estate is perfected, as evidenced by that certain Deed of Trust

Security Agreement – Financing Statement (the "Deed of Trust") recorded on June 15, 2015 in

the Deed Records of Tarrant County, Texas as Instrument No. D215126223.

      4.      The Note is further secured by an Assignment of Leases and Rents (the

"Assignment") included in the Deed of Trust.  Such Assignment grants Integra the right to collect

and receive all rents, income, receipts, revenues, issues, profits and proceeds that become due

and payable to the Debtor under the terms of any lease covering the Real Estate.  Currently, the

Real Estate is subject to a Commercial Lease Agreement between the Debtor, as landlord, and

Wingfoot Commercial Tire Systems, LLC, as tenant.

---

owner of all accounts receivables factored to it.  Further, the Debtor granted Integra security interests in and liens on
various personal property of the Debtor.  The Debtor defaulted on its obligations under the Factoring Agreement
prepetition and the debt owed to Integra pursuant to the terms of the Factoring Agreement is approximately
$122,000.

### The Debtor is in Default

5.        Prior to the Petition Date, the Debtor became delinquent in its obligations to Integra under the Note.  By letter dated March 4, 2016, the Debtor was given notice of its defaults under the Note at that time and demand was made for payment of $21,777.94 in past due payments.  The Debtor failed to cure its defaults and was then given notice by letter dated April 4, 2016 that Integra had accelerated the Note.  The debt owed to Integra pursuant to the Note is approximately $179,000.

### Integra's Liens Remain Perfected Post-Petition

6.        Pursuant to applicable Texas law, Integra's liens attach to and encumber the Real Estate, including all leases and all rents, income, receipts, revenues, issues, profits and proceeds thereof, of the Real Estate.  Under section 552(b) of the Bankruptcy Code, Integra's prepetition perfected security interest in the rents is automatically extended to include any rents collected postpetition.

7.        Pursuant to section 546(b)(2) of the Bankruptcy Code, and the exception to the automatic stay afforded under section 362(b)(3) of the Bankruptcy Code, and in order to maintain and perfect Integra's lien and interest in the Real Estate, as well as the property and proceeds encumbered by the Assignment, Integra hereby gives notice to all parties in interest of Integra's specific intention to preserve for enforcement all of its claims, rights and interests in the property described above, including all proceeds from such property, as against all owners of the same.

8.        Notwithstanding the broad scope of the automatic stay afforded by section 362 of the Bankruptcy Code, subsection (b)(3) thereof excepts from the stay any act to maintain or continue perfection of an interest in property to the extent a trustee's rights and powers are subject to section 546(b).  In turn, section 546(b) provides that the trustee's rights and powers are subject to applicable state law that "provides for the maintenance or continuation of perfection of an interest in property."  Where state law requires the commencement of an action

to maintain or continue perfection of an interest or lien and the action was not commenced prepetition, "perfection of such interest shall be maintained or continued, by giving notice within the time fixed by such law for ... such commencement." 11 U.S.C. § 546(b)(2).

9.      This Notice is filed to preserve the status quo by timely perfecting, continuing, maintaining and/or preserving Integra's existing liens and privileges.

10.      Integra reserves the right to supplement and/or amend this Notice.  Integra further reserves all rights under applicable law.

DATED:  August 16, 2016.               Respectfully Submitted,

                        By:  /s/ J. Robert Forshey
                        J. Robert Forshey
                        State Bar No. 07264200
                        Matthew G. Maben
                        State Bar No. 24037008
                        Juan J. Mendoza
                        State Bar No. 24099721
                        FORSHEY & PROSTOK, L.L.P.
                        777 Main Street, Suite 1290
                        Fort Worth, TX 76102
                        (817) 877-8855 (817) 877-4151 fax
                        bforshey@forsheyprostok.com
                        mmaben@forsheyprostok.com
                        jmendoza@forsheyprostok.com

                        ATTORNEYS FOR INTEGRA FUNDING SOLUTIONS, LLC


## CERTIFICATE OF SERVICE

     I hereby certify that a true and correct copy of the above and foregoing document was served upon the parties on the attached service list via United States Mail, first class postage prepaid, or via ECF Electronic Notice, where available, on the 16th day of August, 2016.

                        /s/ Juan J. Mendoza

L:\BFORSHEY\Integra (CrR - Superior) #5824\Pleadings\Notice of Perfection of Liens on Rents .docx

*Service List*
*Superior Lubricants*
*16-42146-rfn7*
*Integra#5824*

~~Superior Lubricants Transport Inc.~~
~~3311 Crabtree~~
~~Fort Worth, TX 76111~~

Superior Lubricants Transport Inc.
c/o Alice Bower
Law Office of Alice Bower
6421 Camp Bowie Blvd., Suite 300
Fort Worth, TX 76116

United States Trustee
Attn: Erin Schmidt
1100 Commerce Street, Room 976
Dallas, TX 75242

Marilyn Garner
Law Offices of Marilyn D. Garner
2007 E. Lamar Blvd., Suite 200
Arlington, TX 76006

Lyndel Anne Mason/Vargas
Cavazos Hendricks Poirot & Smitham PC
900 Jackson, Suite 570
Dallas, TX 75202-4425

Airedale Haulage, LLC
c/o Mark C. Mackie
2340 Justin Road, Suite 100
Highland Village, TX 75077

American Energy Transport LLC
2415 W Northwest Highway, No. 105
Dallas, TX 75220

Federated Mutual
5501 W. IH 35
Fort Worth, TX 76111

Federated Mutual Insurance Company
Cozen O'Connor
c/o William H. Craven
1717 Main Street, Suite 3400
Dallas, TX 75201-7335

Howard Borg, AUSA
801 Cherry Street, Unit 4
Fort Worth, TX 76102

Integra Funding Solutions
6300 Ridglea, Suite 1101
Fort Worth, TX 76116

Internal Revenue Service
1100 Commerce St., MC 5026 DAL
Dallas, TX 75242-1100

Internal Revenue Service
PO Box 7346
Philadelphia, PA 19101-7346

Jerri Gooden
8811 Royal Harbor
Fort Worth, TX 76179

Paccar Financial
2951 Braswell
Fort Worth, TX 76111

U.S. Attorney General
Main Justice Building, Room 5111
10th & Constitution Ave., NW
Washington, DC 20530-0001

US Department of Justice
717 N. Harwood, Suite 400
Dallas, TX 75201-6598

United States Attorney
1100 Commerce, Room 300
Dallas, TX 75242-0397

Tarrant County
c/o Sherrel K. Knighton, Esq.
Linebarger Goggan Blair & Sampson LLP
2777 N. Stemmons Freeway, Ste. 1000
Dallas, TX 75207

Texas Comptroller of Public Accounts
Attn: John Mark Stern, Asst Attorney General
Bankruptcy & Collections Division
PO Box 12548
Austin, TX 78711-2548

Paccar Financial Corp.
c/o Mark W. Stout; Matthew D. Giadrosich
Padfield & Stout, LLP
421 W. Third Street, Suite 910
Fort Worth, TX 76102

Mel Ottinger
c/o Peter F. Bagley, Esq.
Blumberg & Bagley, LLP
2304 W. Interstate 20, Suite 190
Arlington, TX 76017

# Exhibit "F"

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
**ENTERED**
THE DATE OF ENTRY IS ON
THE COURTS DOCKET

Russell F. Nelms
U.S. Bankruptcy Judge

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| | § | |
| SUPERIOR LUBRICANTS TRANSPORT | § | Case No. 16-42146-rfn-7 |
| INC. d/b/a SUPERIOR TRANSPORT, | § | |
| | § | Preliminary Hrg: Aug. 17, 2016 |
| DEBTOR. | § | Time: 1:30 p.m. |
| | § | |

## AGREED ORDER GRANTING TRUSTEE'S
## MOTION FOR AUTHORITY TO RECEIVE AND
## <u>HOLD LEASE PAYMENTS SUBJECT TO DISPUTED CLAIMS</u>

On this day came on for consideration the **Trustee's Motion for Authority to Receive**

**and Hold Lease Payments on Behalf of Integra Funding Solutions, LLC** (the "Motion")

[Docket No. 35], filed by Marilyn D. Garner, Chapter 7 Trustee (the "Trustee") in the above-

captioned case.  The Court takes notice of the agreement of the parties signed below as a partial

resolution of the pending motions for relief from the automatic stay [Doc. No. 12] and for

adequate protection [Doc. No. 13], both brought by Integra Funding Solutions, LLC ("Integra"),

with regard to various forms of collateral pledged by the Debtor[1] to Integra prepetition.

Having considered the Motion, the Court finds that the relief sought is in the best interests of the Estate and will preserve the Lease Payments arising from the Debtor's lease of the Dooling Property, without prejudice to the lien claims of Integra, while the Trustee investigates the transfers to JGooden, LLC of the building and real estate. Thus the Court is of the opinion that good cause exists to grant said Motion. It is therefore

ORDERED, that the *Trustee's Motion for Leave to Hold Lease Payments on Behalf of Integra Funding Solutions, LLC* is in all aspects GRANTED; it is further

ORDERED, that Goodyear is ordered to make all payments on the Lease (as further described in the Motion) to the Trustee; it is further

ORDERED, that the Trustee shall receive such payments on the Lease and hold the proceeds in a separate account, subject to the lien claim of Integra, to the same extent, validity and priority of the same on the date the bankruptcy was filed, until such time as an order is entered by this Court for the release such funds; it is further

ORDERED, that entry of this Agreed Order is without prejudice to Integra's right to seek to recover rent and other payments under the Lease based on the lien asserted by Integra against the same.

### END OF ORDER ###

---

[1] Capitalized terms not defined herein shall have the meaning attributed to such terms in the Motion.

AGREED:

| | |
|---|---|
| /s/ Lyndel Anne Vargas | /s/ Matthew G. Maben |
| Lyndel Anne Vargas | Matthew G. Maben |
| State Bar No. 24058913 | State Bar No. 24037008 |
| CAVAZOS, HENDRICKS, | J. Robert Forshey |
| POIROT & SMITHAM, P.C. | State Bar No. 07264200 |
| Suite 570, Founders Square | Forshey & Prostok, L.L.P. |
| 900 Jackson Street | 777 Main Street, Suite 1290 |
| Dallas, TX 75202 | Fort Worth, TX 76102 |
| Telephone: (214) 573-7300 | (817) 877-8855 • (817) 877-4151 FAX |
| Fax: (214) 573-7399 | Email: bforshey@forsheyprostok.com |
| Email: LVargas@chfirm.com | Email: mmaben@forsheyprostok.com |
| | |
| PROPOSED ATTORNEYS FOR MARILYN | ATTORNEYS FOR INTEGRA FUNDING |
| GARNER, CHAPTER 7 TRUSTEE | SOLUTIONS, LLC |

# SERVICE LIST

**Service List**
*Superior Lubricants*
**16-42146-rfn7**
**Integra#5824**

~~Superior Lubricants Transport Inc.~~
~~3311 Crabtree~~
~~Fort Worth, TX 76111~~

Superior Lubricants Transport Inc.
c/o Alice Bower
Law Office of Alice Bower
6421 Camp Bowie Blvd., Suite 300
Fort Worth, TX 76116

United States Trustee
Attn: Erin Schmidt
1100 Commerce Street, Room 976
Dallas, TX 75242

Marilyn Garner
Law Offices of Marilyn D. Garner
2007 E. Lamar Blvd., Suite 200
Arlington, TX 76006

Lyndel Anne Mason/Vargas
Cavazos Hendricks Poirot & Smitham PC
900 Jackson, Suite 570
Dallas, TX 75202-4425

Airedale Haulage, LLC
c/o Mark C. Mackie
2340 Justin Road, Suite 100
Highland Village, TX 75077

American Energy Transport LLC
2415 W Northwest Highway, No. 105
Dallas, TX 75220

Federated Mutual
5501 W. IH 35
Fort Worth, TX 76111

Federated Mutual Insurance Company
Cozen O'Connor
c/o William H. Craven
1717 Main Street, Suite 3400
Dallas, TX 75201-7335

Howard Borg, AUSA
801 Cherry Street, Unit 4
Fort Worth, TX 76102

Integra Funding Solutions
6300 Ridglea, Suite 1101
Fort Worth, TX 76116

Internal Revenue Service
1100 Commerce St., MC 5026 DAL
Dallas, TX 75242-1100

Internal Revenue Service
PO Box 7346
Philadelphia, PA 19101-7346

Jerri Gooden
8811 Royal Harbor
Fort Worth, TX 76179

Paccar Financial
2951 Braswell
Fort Worth, TX 76111

U.S. Attorney General
Main Justice Building, Room 5111
10th & Constitution Ave., NW
Washington, DC 20530-0001

US Department of Justice
717 N. Harwood, Suite 400
Dallas, TX 75201-6598

United States Attorney
1100 Commerce, Room 300
Dallas, TX 75242-0397

Tarrant County
c/o Sherrel K. Knighton, Esq.
Linebarger Goggan Blair & Sampson LLP
2777 N. Stemmons Freeway, Ste. 1000
Dallas, TX 75207

Texas Comptroller of Public Accounts
Attn: John Mark Stern, Asst Attorney General
Bankruptcy & Collections Division
PO Box 12548
Austin, TX 78711-2548

Paccar Financial Corp.
c/o Mark W. Stout; Matthew D. Giadrosich
Padfield & Stout, LLP
421 W. Third Street, Suite 910
Fort Worth, TX 76102

Mel Ottinger
c/o Peter F. Bagley, Esq.
Blumberg & Bagley, LLP
2304 W. Interstate 20, Suite 190
Arlington, TX 76017